**No. 06-54C**
**(Judge Lettow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**PRAECOMM, INC., d/b/a AMERICAN RADIO,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Acting Director**

**BRIAN M. SIMKIN**
**Assistant Director**

**OF COUNSEL:**

**PATRICK BUTLER**
**Litigation Attorney**
**U.S. Army Litigation Division**
**901 N. Stuart Street**
**Arlington, VA 22203**

**GREGG M. SCHWIND**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**U.S. Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington D.C. 20530**
**Tel: (202) 353-2345**
**Fax: (202) 514-8624**
**Attorneys for Defendant**

**March 1, 2007**

**TABLE OF CONTENTS**


DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ……………………...…………..1

DEFENDANT'S BRIEF ……………………………………………………………...1

STATEMENT OF THE ISSUES ………………………………………………………1

STATEMENT OF THE CASE ……………………………………………….......................2

I. Nature Of The Case …………………...……………………..….....................2

II. Statement Of Facts ….……………………….…………………………..….2

ARGUMENT ………….………………………………………..…………………...13

I. Summary Judgment Standards……………………………………………..13

II. Plaintiff's Interpretation Of The Contracts Is Clearly Inconsistent With The Plain Terms Of The Contracts …………………………………..…14

A. The Requirement To Install The Radio Equipment Was PraeComm's Alone ……………………………………...……14

B. PraeComm's Breach Argument Asks The Court To Transform The Fixed Price Contracts Into Requirements-Type Contracts ………....18

C. PraeComm Cannot Recover Lost Profits……………………………...20

III. Plaintiff's Asserted "Constructive Change" Resulted In No Additional Performance On The Part Of Plaintiff ..……………………………………....22

A. The "Constructive Change" Doctrine ……………………………..….23

B. The "Constructive Change" Alleged By Plaintiff Resulted In No Additional Work Under The Contracts, And Therefore Caused No Harm To Plaintiff …………………………………………………24

C. Plaintiff's Theory of "Constructive Change" More Accurately Alleges A Constructive Termination For Convenience ……………..….26

IV. Plaintiff Has Not Alleged A Compensable Breach Of The Government's Implied Covenant Of Good Faith And Fair Dealing ……………………………..…..28

A. The Implied Covenant of Good Faith And Fair Dealing ………………..29

B. Assuming The Accuracy Of Facts As Pled In Plaintiff's Complaint, The Army Did Not Breach Its Implied Covenant ……………………….31

CONCLUSION ……………………………………..…………………………………...…34

# TABLE OF AUTHORITIES

## CASES

Ace Constructors, Inc. v. United States,
70 Fed. Cl. 253 (2006) ……..…………………………………………………....24

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ……..…………………………………………………....14

American Airlines, Inc. v. United States,
204 F.3d 1103 (Fed. Cir. 2000) ……..…………………………………………...14

Best Foam Fabricators, Inc. v. United States,
38 Fed. Cl. 627 (1997) ……..………………………………. ……………………27

Bradley v. Chiron Corp.,
136 F.3d 1317 (Fed. Cir. 1998) ……..…………………………………………....30

C.B.C. Enterprises, Inc. v. United States,
24 Cl. Ct. 1 (1991) ……..……………………………………………..………..30

California Federal Bank v. United States,
245 F.3d 1342 (Fed. Cir. 2001) ……..……………………………………………14

California Federal Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) ……..…………………………………………… 20

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ……..……………………………………………………..…14

Clearwater Constructors, Inc. v. United States,
71 Fed. Cl. 25 (2006) ……..………………………………………………………26

Comprehensive Care Corp. v. RehabCare Corp.,
98 F.3d 1063 (8th Cir. 1996) ……..…………………………………………… 29

Conner Brothers Construction Co., Inc. v. United States,
65 Fed. Cl. 657 (2005) ……..…………………………………………………...23

Dalton v. Cessna Aircraft Co.,
98 F.3d 1298 (Fed. Cir. 1996) ……..…………………………………………….19

Engineered Demolition, Inc. v. United States,
70 Fed. Cl. 580 (2006) …….……………………………………………….. …. 25

Essen Mall Properties v. United States,
21 Cl. Ct. 430 (1990) …….………………………………. …………………… 21

Essex Electro Eng'rs, Inc. v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) …….…………………………………………...31

First Heights Bank, FSB v. United States,
422 F.3d 1311 (Fed. Cir. 2005) …….………………………………. ………… 20

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) …….…………………………………………14

G.C. Casebolt Co. v. United States,
190 Ct.Cl. 783, 421 F.2d 710 (1970) …….…………………………………… 27

Granite Construction Co. v. United States,
962 F.2d 998 (Fed. Cir. 1992) …….…………………………………………...23

Hansen Bancorp v. United States,
367 F.3d 1297 (Fed. Cir. 2004) …….…………………………………………….22

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384 (1965) …….……………………………………………………...15

Hyman Constr. Co. v. United States,
832 F.2d 574 (Fed. Cir. 1987) …….………………………………………………….. 15

Indiana-Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) …….………………………………. ………….. 20

International Data Products v. United States,
70 Fed. Cl. 387 (2006) …….………………………………………………..24, 25, 26

John Reiner & Co. v. United States,
163 Ct. Cl. 381, 325 F.2d 438 (1963) …….………………………………….. 27

La Gloria Oil and Gas Co. v. United States,
72 Fed. Cl. 544 (2006) …….…………………………………………………..31

La Van v. United States,
382 F.3d 1340 (Fed. Cir. 2004) …….…………………………………………... 20

Maxima Corp. v. United States,
847 F.2d 1549 (1988) ……..………………………………….. ………………….. 27

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) ……..……………………………………………….15

Moden v. United States,
404 F.3d 1335 (Fed. Cir. 2005) ……..……………………………………………..14

Myerle v. United States,
33 Ct. Cl. 1 (1897) ……..…………………………………………………… 20

National Australia Bank v. United States,
452 F.3d 1321 (Fed. Cir. 2006) ……..……………………………………………...31

P.R. Burke Corp. v. United States,
277 F.3d 1360 (Fed. Cir. 2002) ……..……………………………………………..29

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006) ……..…………………………………. …………………. 20

Rumsfeld v. Applied Companies, Inc.,
325 F.3d 1328 (Fed. Cir. 2003) ……..…………………………………………….19, 22

San Carlos Irrigation & Drainage Dist.,
111 F.3d 1557 (Fed. Cir. 1997) ……..…………………………………………… 20

Sauer, Inc. v. Danzig,
224 F.3d 1340 (Fed. Cir. 2000) ……..……………………………………………...24

State of Alaska v. United States,
35 Fed. Cl. 685 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997)…………………………...30

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005) ……..……………………………………………………..24, 26

Travelers Casualty and Surety Co. v. United States,
74 Fed. Cl. 75 (2006) ……..……………………………………………………..23

Varilease Technology Group, Inc. v. United States,
289 F.3d 795 (Fed. Cir. 2002) ……..……………………………………………….14

White Buffalo Construction, Inc. v. United States,
52 Fed. Cl. 1, 4-5 (2002) ……..…………………………………. ……………….. 28

## REGULATIONS

48 C.F.R. § 12.301 ……..………………………………………………………………. 26, 27

48 C.F.R. § 52.212-4 ……...…………………………………………………………… 26, 27, 28

# INDEX TO APPENDIX

United States Office of Management and Budget, Report to Congress Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108-11), June 2, 2003)………………………………. 1

United States Office of Management and Budget, Report to Congress Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003, July 14, 2003 …………………………………………............ 16

Pages 34-36 Intentionally Omitted

Office of Management and Budget, Quarterly Update to Congress (Executive Summary), July 2004 ……………………….................................................... 37

United States Department of Defense, Report to Congress: Measuring Stability and Security in Iraq, July 2005 ……………………….................................................... .56

Special Inspector General for Iraq Reconstruction, Review of the Advanced First Responder Network, July 28, 2006 ……………………….........................79

Contract DABV01-03-C-0032 ("Contract 0032") ……………………….......................... 119

Lucent Technologies World Services, B-295462, Mar. 2, 2005, 2005 CPD ¶ 55 ……………………….......................................128

Contract W914NS-05-F-9001 ("Contract 9001")……………….........................................140

Contract W914NS-05-F-9027 ("Contract 9027") with modifications ……............................148

The First Responder Network (FRN) Project Site Preparation Brief ……………………….. 162

Delivery/Payment Documents For Contracts 9001 and 9027 …………………………..........176

Memorandum For File, dated October 12, 2005 ……………………….............................192

Various electronic mail between Army and PraeComm personnel …………………………..193

Letter from DiLuigi to Zubel, dated August 14, 2005 ……………………….......................252

Letter from Jackson to DiLuigi, dated October 14, 2005 ……………………….................255

Letter from DiLuigi to Zubel, dated November 8, 2005 ……………………….................256

Declaration of Colonel John Graham

Declaration of Lieutenant Colonel Erik Fretheim

Declaration of Robert Sile

Declaration of Lieutenant Commander Idella Folgate

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRAECOMM, INC., d/b/a AMERICAN RADIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-54C (Judge Lettow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, the United States respectfully requests the Court grant summary judgment in the United States' favor as to all of plaintiff's claims related to two contracts to provide radio equipment in Iraq. The parties do not dispute that plaintiff delivered the radio equipment and that the United States paid the full contract price. As described below, the United States' decision not to order plaintiff to install the radio equipment did not breach the contracts or otherwise entitle plaintiff to relief. In support of this motion, we rely upon the pleadings, the following brief, the attached appendix, the attached declarations, and Defendant's Proposed Findings of Uncontroverted Fact.

**DEFENDANT'S BRIEF**

**STATEMENT OF THE ISSUES**

1. Whether the Government's decision to place plaintiff's radio equipment into storage rather than requiring plaintiff to install the equipment in specified Iraqi cities constituted a breach of the contracts.

2. Whether there is any legal theory under which PraeComm can recover damages, where the United States paid the full contract price for the commercial items ordered and the alleged change resulted in no additional performance on the part of PraeComm.

3. Whether the United States breached an implied covenant of good faith and fair dealing by electing to hold the radio equipment in storage instead of ordering its immediate installation.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiff, PraeComm, seeks damages related to the performance of two contracts with the United States for the provision and installation of radio equipment in Iraq. PraeComm asserts that the decision by military officials to take delivery of the equipment but not have the equipment installed in the cities contemplated in the contracts was (1) a breach of the terms of the contracts; (2) a constructive change to the contracts without compensation; and (3) a breach of the United States' implied covenant of good faith and fair dealing. Compl. ¶¶ 62-110. The United States paid the full price of both contracts and has stored the radio equipment in a warehouse in Baghdad for possible later use. In its complaint, PraeComm seeks damages of almost $18 million. Compl. at 27-29.

### II. Statement Of Facts

United States and coalition armed forces took control of Baghdad, Iraq, in March 2003. Approximately one month later, the Coalition Provisional Authority ("CPA") was established "to restore conditions of security and stability" in the country, and "facilitat[e] economic development, sustainable reconstruction, and development." A 3. One priority for the CPA was

the creation, training, and equipping of local police forces in cities and towns across Iraq. The July 2003 Office of Management and Budget Report to Congress stated the task in these terms:

> Public Safety/Law and Order. The CPA activity has focused on vetting, hiring, training and deploying Iraqi police forces and other security forces to assist in establishing a secure and permissive environment. The CPA has recalled to duty over 30,000 police officers, is refurbishing police academies in Baghdad and Basra, is equipping 26 police stations in Baghdad, and in May began joint Iraqi-Coalition patrols. After extensive looting, *CPA has had to provide virtually all equipment, uniforms and office supplies to stand up the police capability*. In Baghdad, 33 police stations and 3 police divisions are now operating 24 hours a day resulting in a dramatic increase in daily patrols. The CPA and Coalition forces created an armed port security force for Um Qasr port, and are beginning to create security forces for various ministries. Rebuilding Iraqi police forces has been a challenge because the existing force was poorly trained, ineffective, and widely distrusted. *But the creation and training of responsible public safety forces are indispensable to long-term progress in Iraq.*

(emphasis added) A 20-21.

The United States Government, through its Project and Contracting Office ("PCO") in Baghdad, awarded contract No. DABV01-03-C-0032 ("Contract 0032") to PraeComm (also known as American Radio, Inc.) on December 17, 2003. A 119-127. Contract 0032 was for the provision and installation of single-channel handheld radios in 83 cities in Iraq, as part of the "First Responders Network" ("FRN") which the CPA[1] intended to furnish to the newly-created Iraqi Police Service ("IPS"). Id. Contract 0032, a Cost Plus Fixed Fee contract, was completed by the fall of 2004 and PraeComm was paid the full price of the contract as modified. A. 192. Contract 0032 is not in dispute in this case.

In April 2004, the CPA initiated the design and procurement of a far larger and more complex communications system known as the "Advanced First Responders Network" ("AFRN") to serve as a comprehensive long term solution for the Iraqi Police, Fire, EMS and

[1] The CPA ceased operations on June 28, 2004, when authority was transferred to the Iraqi Interim Government.

related units. A 81. The goal of the AFRN was to "deploy a communications network to enable interoperable communications for Iraqi Ministry of Interior security and safety forces throughout Iraq to improve public safety." A 87. The Iraqi Police Service fell under the Iraqi Ministry of Interior, whose forces also included Highway Patrol, Border Police, the Civil Intervention Force, and the Emergency Response Unit. A 72. As of July 2004, the IPS was functional nationwide, with approximately 120,000 officers on the payroll; however, many police personnel had not been adequately trained, and the "immediate focus" was still "to reconstitute and reorganize the IPS and accelerate efforts to equip and train the force." A 44.[2]

In the fall of 2004, Colonel John Graham and Lieutenant Colonel Eric Fretheim, two United States Army Officers involved in the training and assistance to the IPS, contacted PraeComm regarding the possibility of upgrading the existing single channel radios delivered under Contract 0032 to a trunked system in the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Graham Decl. at 1-2; Fretheim Decl. at 1-2. Colonel Graham was the J-6 (Communications Officer) for the Multi National Security Transition Command - Iraq ("MNSTC-I") and Lieutenant Colonel Fretheim was the officer in charge of communications systems for the Civilian Police Assistance Training Team ("CPATT"). Id.

---

[2] The Director of OMB wrote Congressional leaders in his July 2, 2004 cover letter to the July 2004 Report to Congress that:

> Security still remains the most difficult challenge facing the coalition in its efforts to assist the new Iraqi government. Increases in insurgent activities have slowed reconstruction, particularly in the electricity and oil sectors. To address this situation, the Department of Defense has focused its efforts on improving the capabilities of the Iraqi security services, including the Iraqi Police Service, the Iraqi Armed Forces, and the Iraqi National Guard (formerly the Iraqi Civil Defense Corps). Today, the Iraqi security services are growing in number and are receiving the proper training and equipment they will need as Iraqis assume greater responsibility for their own security.

A 37.

PraeComm was sought out for this contract because the company had already supplied radio equipment in these four cities pursuant to Contract 0032, and because the larger, more comprehensive AFRN system that was going to replace FRN was experiencing mounting delays in implementation. Graham Decl. at 3, 5. At this time, given that the Request for Proposals ("RFP") for the AFRN system was not issued until October 26, 2004, a fully functioning AFRN system was still many months or more away. A 129. The AFRN RFP was protested by the designer of the specifications, Lucent Technologies, who had been excluded from the procurement in November 2004 on the basis of an Organizational Conflict of Interest. A 128-139. This protest further delayed the implementation of the AFRN system. Graham Decl. at 3.

The need to transition from a single channel to a trunked radio network arose as an operational requirement because communication among security forces was critical and because many handheld radios were lost, stolen or captured in Iraq. Graham Decl. at 3-4. The loss of radios increased the threat that enemy personnel would be able to track the movements of U.S. and Iraqi forces. Id. When a radio was lost, captured or stolen under the existing single channel system supplied by PraeComm, all of the remaining radios needed to be reprogrammed by hand to eliminate the threat that the enemy was tracking U.S. and Iraqi forces with the missing radio. Id.; Fretheim Decl. at 2. A trunked system, by comparison, allows for a missing radio to be individually disconnected from the network, allowing the other radios to continue operation without adjustment. Graham Decl. at 4. Further, the single channel system did not allow room for significant bandwidth expansion on the system, which prevented the addition of new users. Id. A trunked radio system increased the available bandwidth allowing more handheld radio users to operate within the system. Id.

The PCO awarded contract No. W914NS-050-9001 ("Contract 9001") to PraeComm on October 14, 2004 upon determining that its offer represented the best value to the Government. A 140-147. Contract 9001 was a commercial items contract for the replacement and upgrading of certain existing PraeComm radios (delivered under Contract 0032), namely the conversion from a single channel to a trunked network system in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Id. The contract was executed on the standard commercial items contract form (SF 1449) and incorporated a Statement of Work ("SOW"). A 144-145. The SOW for Contract 9001 included the following with respect to the Iraqi cities where the radio equipment would be used:

> 1.0 GENERAL. The Coalition Provisional Authority now MNSTC-I has a requirement to upgrade UHF radio systems in four cities to provide trunked communications.
>
> 2.0 BACKGROUND. The current radio systems in Ad Diwaniyah, An Najaf, Al Hillah and Karbala are FM single channel systems. These systems provide basic communications capabilities for the Iraqi Police Forces, however, the systems are encrypted with a Type I encryption system which requires hand keying the radios to change encryption. Because it is impractical to do so on a frequent basis, lost and captured radios can be used to monitor police communications. In addition, the capacity of these systems is limited. Converting these cities to trunked networks will allow compromised radios to be cut out of the system from a central station. In addition, the capacity of the current system will be increased.

A 144.

The SOW also described the specifications for the radio equipment, period of service, Government responsibilities, and contractor responsibilities. A 144-145. The contract required PraeComm to "provide distribution and installation of the radios at designated sites," "ensure the devices are properly fielded," and to "provide training on the systems." Id. The only

Government responsibilities stated in the Statement of Work were to "provid[e] a distribution plan and coordinate[e] a distribution schedule," and to "provide frequency plans." Id.

Contract 9001 also incorporated PraeComm's proposal. A 140, 146. PraeComm's proposal acknowledged that the tasking "would be focused on the following four cities: 1. Ad Diwaniyah, 2. An Najaf, 3. Al Hillah, [and] 4. Karbala." A 146. The proposal then identified the specific radio equipment to be installed. Id. The total contract price of $363,878 consisted of the 1,502 radios ($283,878), labor to install the radios ($50,000), and miscellaneous expenses such as travel ($30,000). A 140.

Neither the Statement of Work nor Contract 9001 made any representations as to the long term use of the radio equipment in the four cities specified for delivery, or the likelihood of PraeComm or any other supplier receiving a contract to supply additional radio equipment in the named cities (or any other cities) in the future. A 140-146.

Contract 9001 was awarded and administered by the PCO[3]; however, the payment office for the contract was within the Army Corps of Engineers. A 140. PraeComm was the sole offeror for Contract 9001. Fretheim Decl. at 3.

Shortly after the award of Contract 9001, the PCO decided that it wanted to upgrade existing radio systems in several additional Iraqi cities by acquiring trunked radios similar to those provided under Contract 9001. Graham Decl. at 5; A 162-175. The Statement of Work for this requirement, which eventually led to Contract No. W914NS-05-F-9027 ("Contract 9027"), specified that the vendor would provide 8-channel trunked radio systems in five cities and 6-channel trunked radio systems in nine other cities. A 154-155. The cities identified for delivery of the trunked radio systems were Samarra, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kapri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi. Id.

[3] The PCO was renamed the Joint Contracting Center - Iraq and Afghanistan ("JCC").

The Contract 9027 SOW provided the following background for the procurement:

> B. Background
>
> Over the past year, the coalition has installed ARI [American Radio, Inc. (plaintiff)] analog radio systems in a number of cities in Iraq to support the Iraqi Police Service. These radio systems were originally designed to provide initial support for a force of 85,000 officers. The radios were to be replaced in June 2004 with the Advanced First Responders Network. That network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. Additionally, the system will need to become a long term solution given that the AFRN will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network.
>
> In addition to adding capacity, the trunked system increases the security of the network by allowing the compromised stations to be shut off the network.

A 154.

The Contract 9027 SOW then listed the requirements that the successful contractor had to meet. A 154-155. Generally, the vendor was required to supply the specified radio equipment, including chargers, batteries, cables, and software; the vendor was also required to install the equipment and train users on its operation. Id.

Like Contract 9001, Contract 9027 was also a commercial items contract executed on a standard commercial items form SF 1449. A 149. PraeComm was the sole offeror for Contract 9027. Fretheim Decl. at 3. The Statement of Work for Contract 9027 required PraeComm not only to provide the radio equipment, but also to install the equipment for use by the IPS:

> C. Requirements
>
> * * *
>
> 13. The vendor will provide engineering, project management, and support as needed to install and establish the trunked radio systems.

> 14. The vendor will provide periodic (weekly) status reports to the CPATT C-6 for the duration of the project.
>
> 15. All systems must be installed and functional within 60 days of the award of the project.

A 155.

PraeComm submitted an undated proposal in late November or early December 2004 to supply and install the radio equipment for $7,245,880. A 152. Consistent with the terms of the SOW, PraeComm's proposal called for five 8-channel base systems, seven 6-channel base systems, 11,440 radios, associated accessories, and labor for installation and training. Id. The PCO accepted PraeComm's offer and awarded Contract 9027 to PraeComm on December 6, 2004, for the offered price of $7,295,880. A 149-150. According to plaintiff's proposal for Contract 9027 and the contract itself (CLIN 0012), the price for shipping and installation of the equipment was $500,000. A 150, 152.

In January 2005, the AFRN cities continued to change and the PCO determined that it wanted to acquire the same trunked radio equipment for use in the Iraqi cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah and As Sawawah. Graham Decl. at 5; A 156. Bilateral Modification P00001 to Contract 9027, dated January 28, 2005, added the names of the six cities in place of several cities previously named in the original contract. A 159. The modification further explained that "all other terms and conditions of [the] contract remained the same." Id. Accordingly, the modification did not change either the number of radios, the radio systems (8-channel versus 6-channel), the installation requirement, or the contract pricing in any way. Id.

PraeComm alleges in its complaint that it never installed its FRN equipment in any of the cities in Contracts 9001 and 9027 because the Army decided to include many of the same cities in its AFRN system. See Compl. ¶¶ 66, 73, 79, 82, 90. Numerous e-mails record messages

between the Army and plaintiff's principal, Dom DiLuigi, in which the issue of which cities would ultimately be included in AFRN was discussed. A 193-233. The lists of cities slated for AFRN versus cities slated for FRN frequently changed. Id. Mr. DiLuigi wrote in a March 5, 2005 e-mail, "I've seen so many 'lists' on this AFRN/FRN project I can't count them." A 193. Mr. DiLuigi later acknowledged in an August 15, 2005 e-mail to the contracting officer: "The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it." A 243.

In March 2005, Major Robert Sile, who had replaced Lieutenant Colonel Fretheim as the new CPATT C-6 (lead communications officer), analyzed the progress on the AFRN system and saw that AFRN was now expected to cover some of the cities where the Government was planning on setting up the PraeComm FRN system. Sile Decl. at 2-3. Based on the projected roll-out, Major Sile decided to redirect PraeComm's radio systems to other cities that would not come under the AFRN umbrella until later. Id. Major Sile recognized that it would have been unworkable and redundant to have technologically disparate radio systems (AFRN and FRN) in the same city at the same time. Id. He wrote Mr. DiLuigi on March 5, 2005:

> Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [PraeComm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.

A 193.

Of the 17 cities expected to use PraeComm's FRN equipment at the time the contracts were executed, 12 were now (as of March 2005) expected to be included in the AFRN system network. A 193-195. In response, Mr. DiLuigi informed Major Sile that PraeComm had

"provided extremely aggressive pricing to the PCO to be able to enter this market in the cities and manner we had been contracted to." A 196-197. This March 5, 2005 e-mail appears to be the first time plaintiff made such a representation to any contracting official.

Thereafter, efforts were made to plan the fielding and installation of PraeComm's radios in five of the 17 cities contemplated in Contracts 9001 and 9027, as well as follow-on fielding in a number of other Iraqi cities. A 216, 218, 223. PraeComm made several costly counter-proposals to get its equipment into certain Iraqi cities; however, none of these plans was accepted by the Army. A 201-204, 210-220. The list of AFRN and FRN cities continued to change between April and August 2005. A 223-225, 228-233. Army personnel believed that the contract could be changed at no cost to substitute the new cities for installation of the equipment; the overall number of cities and quantity of radio equipment would not change. A 230. However, a modification was never agreed upon by the parties.

Mr. DiLuigi sent an e-mail to the Army on July 17, 2005, that expanded upon his "aggressive pricing" assertion in his March 5, 2005 e-mail. A 239-241. He now claimed that that he had provided pricing for Contracts 9001 and 9027 "based on quantity of order and likelihood of future sales/business," and that he had given the Army a 25 percent discount "designed to get us into the larger cities." Id.

Plaintiff shipped the radio equipment ordered under Contracts 9001 and 9027 in several shipments between February and August 2005. A 176-190. The radios were delivered to Iraq and stored in a warehouse in Baghdad where they remain today. Sile Decl at 5; Folgate Decl. at 3. The contracts were never modified to delete the required tasks to install the radio equipment in the designated cities and train local personnel on its use. Nonetheless, the Army paid plaintiff

$363,878, the full contract price in Contract 9001, and $7,295,880, the full price in Contract 9027. A 192.

With no resolution of which cities would use the FRN radio equipment, PraeComm sent the Contracting Officer a letter dated August 14, 2005, demanding an equitable adjustment of $13,657,500 for what it called a "constructive cardinal change" to Contracts 9001 and 9027. A 252-254. Plaintiff asserted in its letter that such a change would result unless the Army permitted the installation of PraeComm's equipment in the cities recited in the contracts and unless the Army declared "the American Radio solution the system of choice for the Program of Record in the contractually designated cities." Id. In its August 14 letter, PraeComm claimed that it had given the Army a 30 percent discount on the equipment ordered under Contracts 9001 and 9027. A 253.

The contracting officer told PraeComm the following by e-mail dated September 23, 2005:

> It is my understanding the equipment provided by American Radio, which is currently stored in a warehouse, will be used in the future. It would be wrong not to use equipment which has been bought and paid for. At this time nobody can tell exactly which cities the equipment will be used in nor can they tell what specific technical requirements will be changed.

A 250.

By letter dated October 14, 2005, another contracting officer formally responded to PraeComm's August 14, 2005 letter. A 255. She informed PraeComm that she was unable to consider the request for equitable adjustment because the Government had made the final payments due under Contracts 9001 and 9027, and the contracts had been closed. Id.

PraeComm then sent a certified claim for $17,974,281.29 to the contracting officer dated November 8, 2005. A 256-264. PraeComm asserted that the basis of its claim was the decision

of the Army not to install its radio equipment in "major" Iraqi cities. Id. The contracting officer did not respond to the claim. PraeComm then filed suit in this Court on January 23, 2006.

PraeComm never installed its FRN radio equipment or trained police forces on its use. Folgate Decl. at 2-3. The equipment is currently still being held by the United States in storage in a warehouse in Baghdad. Id. The distribution plan for PraeComm's radios has not been finalized; however, the radios are expected to be used by Iraqi police forces in an area currently supported by the United States Marines. Id. The United States and the Iraqi government have now acquired and fielded other communications systems such as the AFRN for Iraqi police and other first responders. See Attachment to Folgate Decl.

## ARGUMENT

Plaintiff contends in the six counts recited in its complaint that (1) the United States breached the terms of the contracts by not installing the radio equipment in the cities named in the contracts (Compl. ¶¶ 62- 75 (Counts I and II)); (2) the United States "constructively changed" the contracts by storing the radio equipment in a warehouse instead of installing the equipment in the cities stated in the contracts (Compl. ¶¶ 76-91 (Counts III and IV)); and (3) the United States breached its covenant of good faith and fair dealing thereafter by permitting the installation of the AFRN system in several cities contemplated in PraeComm's contracts (Compl. ¶¶ 92-110 (Counts V and VI)). As we demonstrate below, there are no disputed material facts with respect to the contracts or the parties' performance, and judgment is warranted in the United States' favor as a matter of law.

### I. Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing RCFC 56(c)); FRCP 56(c)); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). A material fact is one "that might affect the outcome of the suit under the governing law"; an issue is "genuine" "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that no genuine issues of material fact preclude summary judgment. Celotex Corp., 477 U.S. at 323. All justifiable inferences should be drawn in favor of the nonmovant. Anderson, 477 U.S. at 255. Nevertheless, the party opposing summary judgment must show an evidentiary conflict on the record. American Airlines, Inc. v. United States, 204 F.3d 1103, 1112 (Fed. Cir. 2000). A factually unsupported argument is insufficient to defeat a motion for summary judgment. Id.

Plaintiff's complaint raises a question as to contract interpretation, namely which party was required to install plaintiff's radio equipment in the named cities. Contract interpretation is a question of law. Cal. Fed. Bank v. United States, 245 F.3d 1342, 1346 (Fed. Cir. 2001); Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Therefore, resolving a dispute via summary judgment is appropriate in contract interpretation cases. Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).

## II. Plaintiff's Interpretation Of The Contracts Is Clearly Inconsistent With The Plain Terms Of The Contracts

### A. The Requirement To Install The Radio Equipment Was PraeComm's Alone

Plaintiff asserts in its complaint that the United States breached PraeComm's contracts. See Compl. ¶¶ 62- 75. Plaintiff alleges that the breach occurred when the United States

"refuse[d] to perform Contract 9001 by not installing PraeComm's FRN equipment in the specified major Iraq cities." Compl. ¶ 63 (Count 1). Plaintiff makes the identical allegation with respect to Contract 9027, that the United States breached the contract "by not installing PraeComm's FRN equipment." Compl. ¶ 70 (Count II). Yet there is no term in either contract – and plaintiff has cited none – requiring the United States to install any of plaintiff's radio equipment. Indeed, plaintiff's interpretation of the contracts has it exactly backwards: the express terms of both Contract 9001 and Contract 9027 required and separately compensated plaintiff to field, install, and train users on its equipment.

"It is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 388 (1965). Where the language of the contract is clear and unambiguous, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties." Hyman Constr. Co. v. United States, 832 F.2d 574, 579 (Fed. Cir. 1987) (quoting Elden v. United States, 223 Ct. Cl. 239, 252 (1980)); accord McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). In this case, the language of Contracts 9001 and 9027 is clear and unambiguous with respect to PraeComm's responsibility to install its radio equipment. There is nothing in either of the contracts imposing a duty to install on the United States.

For example, Contract 9001 required PraeComm to provide 1,502 radios, field/install them in four named cities, and train end-users. The SOW for Contract 9001 assigned the following responsibilities to PraeComm in unambiguous terms:

> 5.0 CONTRACTOR RESPONSIBILITIES
>
> 5.1 Will provide unit programming software . . . .
> 5.2 Will provide distribution and installation of the radios at designated sites.
> 5.3 Will provide an efficient and effective project management and tracking mechanism to ensure the devices are properly fielded.
> 5.4 Will provide training on the systems
>
> * * *
>
> 8.0 PROJECT MANAGEMENT: The vendor will provide project management to coordinate the installation.

A 144-145.

Not surprisingly, the Government agreed in CLIN 0003 of Contract 9001 to pay plaintiff an additional $50,000 for the labor necessary to perform the fielding, installation, and training tasks – work that plaintiff agrees was never performed after delivery of the equipment to Baghdad. A 140.

Accordingly, the sole responsibility for installation resided with PraeComm. In its complaint, plaintiff has not explained how this requirement was or could be shifted to the United States. In the absence of a requirement on the United States to install the radio equipment, plaintiff's claim of breach of Contract 9001 (Count 1) fails.

Similarly, Contract 9027 required PraeComm to provide 11,440 radios, base systems, and accessories, as well as to install the equipment in 14 cities (later modified to 13 cities). A 150, 154. The Statement of Work incorporated into Contract 9027 again placed the responsibility to install the radio equipment squarely on the contractor:

C. Requirements

* * *

13. The vendor will provide engineering, project management, and support as needed to install and establish the trunked radio systems.

14. The vendor will provide periodic (weekly) status reports to the CPATT C-6 for the duration of the project.

15. All systems must be installed and functional within 60 days of the award of the project.

A. 155. As with Contract 9001, the United States agreed in a separate CLIN in Contract 9027 to pay PraeComm for its work to install the radio equipment. A 150. Under CLIN 0012, originally called "Shipping and Installation" but later changed to "Labor and Miscellaneous Expenses" in a June 2005 modification, the Government agreed to pay PraeComm $500,000 for installation. A 150, 160-161. Regardless of the modification of the label for CLIN 0012, the requirement that PraeComm install the equipment was never omitted or altered in any way.

Since neither Contract 9001 nor 9027 imposed a duty upon the Government to install PraeComm's equipment, plaintiff's contention in its complaint that the United States breached such a duty, as a matter of law, is not cognizable. *PraeComm* was the only party obligated to install the radio equipment in the cities originally contemplated in the contracts. As explained below, to the extent the decision not to have *PraeComm* install the equipment was a change to the contracts, the change could only have been deductive; that is, the "change" resulted in the non-performance of work required under the contract and a reduction in PraeComm's costs of performance. In any event, the predicate requirement for the breach alleged in plaintiff's complaint does not exist within the terms of either contract. The Government's obligation in these commercial items contracts was to pay for the goods and services performed by the plaintiff. The Government fulfilled its obligation by paying the full contract price for both

contracts. Since there was no breach, there is no need to analyze plaintiff's alleged damages. For this reason, the Court should enter judgment in favor of the United States with respect to Counts I and II of the complaint.

### B. PraeComm's Breach Argument Asks The Court To Transform The Fixed Price Contracts Into Requirements-Type Contracts

In alleging breach and resulting damages, plaintiff also attempts to place contract obligations on the United States above and beyond the installation requirement discussed above. This is because the bulk of plaintiff's claim for damages – over $14 million – is linked to a claim for lost profits on contracts never even executed with PraeComm, contracts that assume PraeComm was somehow named the sole source future radio equipment provider in the cities named in Contracts 9001 and 9027. In other words, plaintiff's theory of recovery depends upon an unwritten requirement that the United States, and ostensibly the Iraqi Ministry of Defense and its police forces, use PraeComm's radio equipment exclusively and indefinitely in the cities named in the contracts. As explained below, the contracts made no such representations.

Plaintiff's assumption of future sole source exclusivity is the basis for PraeComm's claim for $4,818,959.60 under Contract 9001 (see Compl. 68) and $9,637,920.40 under Contract 9027 (see Compl. ¶ 75) for profits PraeComm alleges it would have earned had it served as the exclusive communications system provider in the cities named in the contracts. PraeComm's sole source theory of lost profits is stated clearly in its November 8, 2005 claim to the contracting officer:

> The Government's arbitrary and unreasonable decision to remove 12 of the major cities in American Radio's Contracts has resulted in a loss to American Radio of conservatively over $14 Million. *But for the Government's actions, American Radio would have been the sole source supplier for the equipment in follow on contracts with the PCO*."

(emphasis added) A 263.

Yet plaintiff fails to point to any obligation in Contract 9001 or 9027 to make PraeComm the "sole source provider" of radio equipment anywhere in Iraq. The decision by the Army had nothing to do – as PraeComm argues throughout its complaint – with placing PraeComm's equipment in "major" versus "minor" cities: the equipment has not yet been installed in *any* cities. Moreover, it is inconceivable how the United States could bind the Iraqi police and emergency authorities to purchase all future radio equipment from PraeComm. The United States – and Iraq for that matter – are free to change or update technologies and systems at any time. While PraeComm may have wished for lucrative sole source future arrangements with the Iraqi authorities in major cities, these terms were not in the contracts. The absence of these terms renders plaintiff's theory of recovery as speculative as it is illogical.

Finally, plaintiff's assertions of breach would have the Court essentially transform two fixed quantity, fixed-price contracts into a far broader requirements contract. See Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328, 1334 (Fed. Cir. 2004) ( a requirements contract 'calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price'") (citing Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992)). There is no evidence within the contracts or in plaintiff's complaint suggesting that the United States sought a requirements-type arrangement with PraeComm. Absent express terms in Contracts 9001 and 9027 creating a requirements-type arrangement, the Court has no basis to alter the fundamental fixed quantity, fixed price nature of the contracts.[4]

---

[4] See Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1304-05 (Fed. Cir. 1996):

> It is undisputed that the contract was a firm fixed-price services contract. Such a contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type

### C. PraeComm Cannot Recover Lost Profits

As a general matter, a contractor can only recover breach damages where "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Indiana-Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002).[5] While courts have recognized that damages need not be "ascertainable with absolute exactness or mathematical precision," recovery for speculative damages is not permitted. San Carlos Irrigation & Drainage Dist., 111 F.3d 1557, 1563 (Fed. Cir. 1997) (citation omitted). "Remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common law damages." Id. Likewise, for a contractor to recover lost profits, they must "flow from the contract that is the subject of the lawsuit and not from 'independent and collateral undertakings.'" Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 471 (2006) (quoting Energy Capital, 302 F.3d at 1328).

---

> places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties. . . . Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract.

[5] A number of Federal Circuit cases have held a contractor to a higher causation standard for damages than the "substantial factor" test in Indiana-Michigan and Energy Capital. See, e.g., First Heights Bank, FSB v. United States, 422 F.3d 1311 (Fed. Cir. 2005) ("but for" standard for causation; La Van v. United States, 382 F.3d 1340 (Fed. Cir. 2004) ("but for" standard for causation; Cal. Fed. Bank v. United States, 395 F.3d 1263 (Fed. Cir. 2005) ("definitively established" test for causation); Myerle v. United States, 33 Ct. Cl. 1 (1897) ("inevitably and naturally" standard for causation).

In this case, PraeComm's claim for lost profits is, as a matter of law, unrecoverable because the profits are too speculative, remote, and unforeseeable. Essen Mall Props. v. United States, 21 Cl. Ct. 430, 447 (1990) ("[D]amages claims for loss of anticipated profits are generally 'too remote, consequential and speculative' from any breach that may have occurred to be recoverable as a matter of law."). In other words, PraeComm cannot show that the damages it claims were caused by the breach (Counts I and II) or the "constructive change" (Counts III and IV) it alleges. This is because its theory of recovery depends upon an unwritten obligation on the part of the United States, and ostensibly Iraqi police forces, to purchase and use PraeComm's radio equipment exclusively and indefinitely in the cities contemplated in the contracts. Of course, the contracts contained no such representations, and there is no evidence that damages from the loss of the sole source arrangement now urged by plaintiff were foreseeable to United States at the time of contract inception.

Further, PraeComm's claim that the United States hindered its performance of sole source contracts in the future is speculative and remote on its face. Indeed, plaintiff's damage claim relies upon unwritten contracts in unknown cities among unknown parties for an unknown quantity of equipment over an unknown period of time into the future. The only impact of the "constructive change" that can be enunciated with any reasonable certainty is that plaintiff's cost of performance necessarily would have been higher had the United States insisted that PraeComm install the equipment and train end users in the cities contemplated in the contracts. Under these circumstances, plaintiff is precluded from recovering damages for the alleged "constructive change."

In addition, and as a general rule, when there has been a breach of contract, the non-breaching party is entitled to an award of damages that will place it "in as good a position as [it]

would have been in had the breaching party fully performed." Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328, 1336 (Fed. Cir. 2003), citing Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996). Under this rule, the non-breaching party is not permitted "to achieve, through the award of damages, 'a position superior to the one it would reasonably have occupied had the breach not occurred.'" Hansen Bancorp v. United States, 367 F.3d 1297, 1318 (Fed. Cir. 2004) (citations omitted). This rule "sets the ceiling for damages [], because the non-breaching party is 'not entitled to be put in a better position by the recovery than if the [breaching party] had fully performed the contract." Applied Companies, 325 F.3d at 1336 (citing Miller v. Robertson, 266 U.S. 243, 260 (1924)). Plaintiff's claims of breach (and "constructive change") thwarts this rule by demanding almost $18 million over and above the contract price for Contracts 9001 and 9027. See Compl. at 27-28. Clearly, such a result would place PraeComm in a far better position than if the contract had been fully performed, that is, if the United States had ordered PraeComm to install the radio equipment.

## III. Plaintiff's Asserted "Constructive Change" Resulted In No Additional Performance On The Part Of Plaintiff

PraeComm next avers in its complaint that it is entitled to damages as a result of what it calls a "constructive change" of Contracts 9001 and 9027 by the Government. See Compl. ¶¶ 76-91 (Counts III and IV). Plaintiff's allegations of "constructive change" are vague as to exactly what contract requirement on the part of the United States was "changed," if at all, to plaintiff's detriment by the Government's decision to pay the full contract price and store the radios in a warehouse in Baghdad. Reading plaintiff's complaint in Counts III and IV as a whole, however, plaintiff identifies two actions by the United States that form the basis for its claim for damages under its "constructive change" theory: (1) the decision not to order

PraeComm to install its equipment in the cities named in the contracts; and (2) the decision to procure the AFRN system for use in some of the same cities named in Contracts 9001 and 9027.

This first action by the United States is the only action that reasonably can be construed as a "constructive change" to the contracts in question, and we do so for purposes of this motion for summary judgment. However, as described below, even assuming the United States "constructively changed" the contracts by not ordering PraeComm to install the radio equipment in the named cities, this "change" could only have *reduced* PraeComm's required performance under the contracts. As a matter of law, plaintiff cannot recover damages for such a deductive change to the contracts.

The second action alleged by plaintiff is not an actual or constructive change to the contracts at all because nothing in the contracts barred the United States, or the Iraqi Police Service, from selecting and fielding another communications system for police and emergency units in the Iraqi cities named in Contracts 9001 and 9027. As explained above, while plaintiff may have aspired to have its radio system become the exclusive system of choice for Iraqi first responders in various cities, this proffered interpretation is not supported by the terms of either Contract 9001 or 9027.

**A. The "Constructive Change" Doctrine**

A "constructive change" under the CDA, if established, entitles the contractor to an equitable adjustment in the contract price for the costs incurred to comply with the change. See, e.g., Granite Constr. Co. v. United States, 962 F.2d 998, 1008 (Fed. Cir. 1992); Travelers Cas. and Sur. Co v. United States, 74 Fed. Cl. 75 (2006). By definition, constructive changes arise "where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract documents." Conner Bros. Const. Co., Inc. v. United

States, 65 Fed. Cl. 657, 679 (2005) (citing Lathan Co. v. United States, 20 Cl. Ct. 122, 128 (1990)). In other words, a constructive change is a change that adds work to the contract requiring the contractor to incur additional costs to comply with the change. International Data Prods. v. United States, 70 Fed. Cl. 387, 402 (2006) ("A constructive change occurs where a contractor performs work *beyond the contract requirements*, without a formal order under the changes clause, either by an informal order of the Government or due to the fault of the Government) (emphasis added) (citing Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994)); Tecom, Inc. v. United States, 66 Fed. Cl. 736, 774-75 (2005) ("For a contract to be constructively changed, the plaintiff must demonstrate that the Government expressly or impliedly ordered the contractor to perform work that was outside the contract requirements.") (citations omitted).

Similarly, this Court has held that "the proper measure of an equitable adjustment is the *extra costs* incurred by the contractor, if those *additional costs* are reasonable." (emphasis added) Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 274-75 (2006); see also Sauer, Inc. v. Danzig, 224 F.3d 1340, 1348 (Fed.Cir.2000) (constructive change entitles a contractor to compensation for "increased costs flowing directly and necessarily from that change"). Hence, an increased cost of compliance is a necessary element of recovery under a "constructive change" theory.

### B. The "Constructive Change" Alleged By Plaintiff Resulted In No Additional Work Under The Contracts, And Therefore Caused No Harm To Plaintiff

Plaintiff states in Counts III and IV of its complaint that the Government's "constructive change" to Contracts 9001 and 9027 – not ordering PraeComm to install the radio equipment and then later procuring the AFRN system for certain cities – had an adverse "economic impact" on PraeComm. Compl. ¶¶ 76-91. PraeComm describes the "economic impact" as (1) PraeComm's

inability to recoup the discount it claims it gave the United States in expectation of more lucrative follow-on contracts for radio equipment in the named cities; and (2) PraeComm's loss of millions of dollars in profits on equipment it would have later sold Iraqi police in the named cities. Compl. ¶¶ 83, 91. For at least two reasons, plaintiff has not alleged a valid theory of recovery.

First, the constructive change doctrine is of questionable applicability where, as in this case, there is no changes clause in either Contract 9001 or 9027 permitting an equitable adjustment for a unilateral change. See Int'l Data Prods. v. United States, 70 Fed. Cl. 387, 402-03 (2006) (constructive change and equitable adjustment held impossible as a matter of law because of absence of changes clause in effect at time of alleged change: "the concepts of constructive change, equitable adjustment and cardinal change have no applicability to this case."); see also Engineered Demolition, Inc. v. United States, 70 Fed. Cl. 580, 588 n.10 (2006) ("As commentators have stated, the constructive-change doctrine is a judicially-created adjunct to a changes clause in the contract."). By operation of FAR section 12.301(b)(3), both commercial items contracts incorporated only the very limited changes clause of section 52.212.4. See 48 C.F.R. § 12.301(b)(3) and 52.212-4(c) (Contract Terms and Conditions – Commercial Items). The commercial items changes clause of FAR section 52.212-4 states that changes to the contract may only be made by written agreement of the parties. In this case, there was no such agreement to the change PraeComm asserts; in the absence of an agreed-upon change and a clause permitting an equitable adjustment, plaintiff's request for compensation for a change – whether actual or constructive – is misplaced.

Second, the "constructive change" doctrine fails in the absence of any evidence that the Army ordered PraeComm to perform any work "beyond" or "outside the contract requirements."

Tecom, 66 Fed. Cl. at 774. Indeed, there is no dispute on this point. PraeComm's argument is that the Army required it to perform *less* work, and thereby caused it to lose future business in follow on contracts. This theory of constructive change – in the absence of any "work beyond the contract requirements" or "extra costs" – has never been held to entitle a contractor to an equitable adjustment. Thus, while we agree that a contractor may be entitled to an equitable adjustment in the contract price for actual or constructive changes, under the facts of this case PraeComm has not alleged a compensable change. Moreover, we are aware of no case in this Court or in the Court of Appeals for the Federal Circuit in which a contractor has been awarded lost profits as an equitable adjustment for an alleged "constructive change." See, e.g., Clearwater Constructors, Inc. v. United States, 71 Fed. Cl. 25 (2006); Int'l Data Prods. Corp. v. United States, 70 Fed. Cl. 387, 402-03 (2006).

### C. Plaintiff's Theory of "Constructive Change" More Accurately Alleges A Constructive Termination For Convenience

Plaintiff's assertion that the United States constructively "changed" the contracts fails for one final and arguably more fundamental reason. Under circumstances where the Government ordered and accepted delivery of PraeComm's radio equipment but elected to hold the equipment in a warehouse, plaintiff's real complaint is that the contracts were constructively terminated for the convenience of the Government prior to installation. This is because the United States never unilaterally changed the contracts, constructively or otherwise, except to *not* insist that PraeComm perform the work remaining on the contracts, namely to install the radio equipment and train end users. In this light, PraeComm's argument is more accurately framed as a constructive termination for convenience: due to changed circumstances, the Government effectively terminated the installation and training work items/ CLINs.

A termination for convenience clause was incorporated into both Contracts 9001 and 9027. By operation of FAR section 12.301(b)(3), both commercial items contracts incorporated the termination clauses in FAR section 52.212.4. See 48 C.F.R. § 12.301(b)(3) and 52.212-4(l) (termination for convenience) and (m) (termination for cause). Under FAR section 52.212-4(l), the United States reserved its right to terminate the contracts "for its sole convenience." This termination clause limits the contractor's recovery to: (1) "a percentage of the contract price reflecting the percentage of work performed prior to the notice of termination"; and (2) "reasonable charges" that "have resulted from the termination." 48 C.F.R. § 52.212-4(l).

A line of cases in this Court has consistently found that a plaintiff's damages are limited when the United States acts so as to constructively terminate the plaintiff's contract for the convenience of the Government. See, e.g., Best Foam Fabricators, Inc. v. United States, 38 Fed. Cl. 627, 638 (1997) ("if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach and limit liability."); John Reiner & Co. v. United States, 163 Ct. Cl. 381, 325 F.2d 438, 443-44 (1963); G.C. Casebolt Co. v. United States, 190 Ct.Cl. 783, 421 F.2d 710, 712 (1970); Maxima Corp. v. United States, 847 F.2d 1549, 1553 (1988). We do not agree that the conduct of the United States amounted to either a "constructive change" or a termination for convenience of the Government; however, because the termination for convenience clause of FAR section 52.212-4 was incorporated into PraeComm's contracts by operation of law, the Army's decision not to require Praecomm to install the radios amounted, at most, to a constructive termination for convenience, and not a "constructive change."

This distinction between a "constructive change" and a constructive termination for convenience is important because the termination for convenience clause in the contracts sharply limits PraeComm's damages to a percentage of the contract price and its termination costs. 48 C.F.R. § 52-212-4(l). Lost profits are not permitted. Id. In this case, PraeComm has already been paid the full contract price; moreover, Praecomm has never asserted that it incurred additional costs because the United States elected not to order the installation of the radios. Therefore, PraeComm cannot establish entitlement to any damages for the wrong it alleges. See White Buffalo Constr., Inc. v. United States, 52 Fed. Cl. 1, 4-5 (2002) (contractor's recovery following a termination of a fixed-price contract for the convenience of the Government is capped at an amount equal to the contract price, less payments already received).

## IV. Plaintiff Has Not Alleged A Compensable Breach Of The Government's Implied Covenant Of Good Faith And Fair Dealing

Plaintiff's final two counts allege that PraeComm was "financially harmed" because the United States "breached its duty of good faith and fair dealing by deciding not to install PraeComm's equipment" in the cities named in Contracts 9001 and 9027. See Compl. ¶¶ 92-100 (Count V) and 101-110 (Count VI). Plaintiff does not seek anticipated profits under this final theory of recovery; instead, plaintiff asserts it is entitled only to the alleged "discount" it gave the United States in both Contracts 9001 and 9027. Id. at ¶¶ 100, 110.

The paragraphs under Counts V and VI of plaintiff's complaint do not allege any facts suggesting that the United States acted in bad faith. Instead, the complaint makes the conclusory allegation that the United States' decision not to install PraeComm's equipment in the named cities, in and of itself, was taken in bad faith. However, plaintiff does allege facts earlier in its complaint that illuminate its theory of liability under Counts V and VI. Plaintiff asserts that:

> 54. Based upon information and belief, PraeComm has subsequently learned that the PCO's reason for removing 12 of the major Iraq cities specifically identified in Contracts 9001 and 9027, as modified, as cities for the installation of PraeComm's FRN equipment, was because of the resolution of an underlining [sic] dispute between U.S. Deputy Undersecretary for International Technology Security Jack Shaw and CPA Senior Adviser for Communications Dan Sudnick regarding the installation of Lucent's AFRN equipment in Iraq.
>
> 55. Based upon information and belief, PraeComm has subsequently learned that the underlining [sic] dispute between U.S. Deputy Undersecretary Shaw and CPA Senior Adviser Sudnick regarding the installation of Lucent's AFRN equipment in Iraq was resolved by the departure of U.S. Deputy Undersecretary Shaw and the replacing of CPA Senior Adviser Sudnick with Dr. Arno Kosko.
>
> 56. Based upon information and belief, PraeComm has subsequently learned that the PCO's reason for removing 12 of the major Iraq cities specifically identified in Contracts 9001 and 9027, as modified, as cities for the installation of PraeComm's FRN equipment, was because the PCO, through Dr. Kosko, preferred the installation of Lucent's AFRN equipment in those major Iraq cities instead of PraeComm's FRN equipment.

Compl. ¶¶ 54-56. As explained below, the "facts" pled with respect to the Deputy Undersecretary and the CPA Adviser fail, as a matter of law, to allege a violation of the Government's covenant of good faith and fair dealing.

### A. The Implied Covenant of Good Faith And Fair Dealing

It is generally recognized that every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. See, e.g., P.R. Burke Corp. v. United States, 277 F.3d 1346, 1360 (Fed. Cir. 2002) (citing Restatement (Second) of Contracts § 205 (1979)). The scope of this implied duty, however, is not as universal as its recognition. See Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996) ("The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties"). In order to ensure that the parties to a contract may accurately determine the risks they are assuming when they enter into a contract and, thus, make

stable plans for the future based upon the terms of the contract, courts have adopted the principle that contracts should not be interpreted so as to impose obligations upon the parties that they did not agree to assume.

Regarding the implied covenant of good faith and fair dealing, this Court and other circuits have applied this principle by holding that there must be a link, or attachment, between the covenant and an express substantive obligation to which the parties have mutually assented. See Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1998) ("implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create new obligations not contemplated in the contract"); State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997) (Table) ("The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties."); C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991) (generalized assertions, such as "failure to act in good faith, must have a contract performance referent to have any relevance").[6]

This necessarily means that, as the Federal Circuit has stated, the implied covenant of good faith and fair dealing cannot be used by one party to expand the other party's contractual duties beyond those in the contract. Bradley v. Chiron Corp., 136 F.3d at 1326. Thus, the focus of the inquiry is whether a party has taken any action so as "to deprive plaintiff of one of its negotiated contract benefits" or otherwise deprive plaintiff the benefit of its bargain under the

[6] See also Comprehensive Care, 98 F.3d at 1066 ("the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms"); Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist., 226 F.3d 1170, 1178 (10th Cir. 2000) ("we will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves") (quoting Brown v. Moore, 973 P.2d 950, 954 (Utah 1998)); Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992) (implied covenant of good faith "guides the construction of explicit terms in an agreement").

contract in dispute. Nat'l Australia Bank v. United States, 452 F.3d 1321, 1324-25 (Fed. Cir. 2006); La Gloria Oil & Gas Co. v. United States, 72 Fed. Cl. 544, 572 (2006).

**B. Assuming The Accuracy Of Facts As Pled In Plaintiff's Complaint, The Army Did Not Breach Its Implied Covenant**

The undisputed facts make clear that the United States did not interfere with or hinder PraeComm's performance of Contracts 9001 and 9027 or deprive PraeComm of any benefit it negotiated under the two contracts. This is a critical fact because, as detailed above, the focus of the implied covenant analysis is the performance of the contract allegedly breached, not other contracts. Essex Electro Eng'rs v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'"). To be sure, the Army did *reduce* PraeComm's performance by not insisting that the equipment be installed in the named cities; however, such a decrease in work cannot be construed as a breach of an implied duty, particularly where the decrease was for a reasonable purpose and reduced plaintiff's cost of performance. More to the point, the only benefits negotiated in PraeComm's contracts were that the United States would accept delivery of the radio equipment and pay the full contract price. PraeComm was not denied either of these benefits. Instead, PraeComm complains that the United States has hindered its performance of *other* contracts: sole source contracts for its equipment in unknown cities among unknown parties for an unknown quantity of equipment over an unknown period of time into the future. This is not a valid basis for entitlement under an implied covenant theory.

Further, the Government did not "destroy" PraeComm's "reasonable expectations" as to the benefits of Contracts 9001 and 9027. There are no disputed material facts on this point. Plaintiff has presented no evidence that the Army misrepresented the scope of the FRN system or

the AFRN system or otherwise acted unreasonably. The contractor knew that both FRN and AFRN were in a state of flux, and that the lists of cities slated for AFRN versus cities slated for FRN frequently updated and changed. As Mr. DiLuigi wrote in a March 5, 2005 e-mail, "I've seen so many 'lists' on this AFRN/FRN project I can't count them." A 193. Mr. DiLuigi later acknowledged in an August 15, 2005 e-mail to the contracting officer: "The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it. A 243.

Moreover, plaintiff understood and agreed that overlap of the FRN and AFRN systems in the same cities was unworkable. After being told that the Army wanted to avoid overlapping the systems, Mr. DiLuigi wrote Major Sile in March 12: "We agree and understand your not wanting to install and utilize two systems in the same city for the same for the same application (in this case FRN/AFRN) . . . frankly we would have had a problem with that notion if you would have recommended it . . . ." A 202. Accordingly, any expectation by PraeComm of a sole source arrangement in certain Iraqi cities for an indefinite period of time in the future was unreasonable and PraeComm's alone. As Major Sile told Mr. DiLuigi in March 2005:

> I now understand you had other designs for the system and leveraging it for business opportunities but that was never a consideration for us nor was it a consideration for selecting you as a vendor. You were selected in part because it was felt you could deliver a FRN system in a timely manner and provide needed comm[unication]s to the ISF and first responders.

A 203. Mr. Di Luigi did not dispute Major Sile in his response later that same day. A 202. Indeed, in all of Mr. DiLuigi's e-mail communications with Army personnel produced by the parties in this case, Mr. DiLuigi never claimed that he informed anyone that PraeComm's equipment was offered at a discount in anticipation of obtaining sole source arrangements with the United States and the Iraqi Police Service.

We add that plaintiff has disclosed no evidence that the Government directed PraeComm regarding the pricing that it submitted in its proposals in response to the Statements of Work. PraeComm's pricing decision was controlled by PraeComm alone and presumably reflected PraeComm's best business judgment, taking into consideration what was known at the time. In its filings with this court as well as in its November 7, 2005 claim to the Contracting Officer, plaintiff stated that one of the main factors influencing the allegedly discounted prices in its proposals was an expectation that it would receive lucrative contracts in the future. A 260-261. This may have been its sincere hope; however, this hope had to be tempered with plaintiff's knowledge of the inherent uncertainty of wartime procurement, the availability of other radio systems (such of the AFRN) that could meet the Government's needs, and the limitations within the four corners of Contracts 9001 and 9027, which were for a fixed quantity of radio equipment at a fixed price with no promises of future orders. Under these circumstances, the United States did not act unreasonably.

With respect to the specific "facts" purportedly supporting plaintiff's claim of breach of the implied covenant, the Court should hold that, as a matter of law, plaintiff has failed to allege a breach. See Compl. ¶¶ 54-56. For purposes of summary judgment, we assume the accuracy of plaintiff's allegations that the decision to install the AFRN system in certain cities instead of PraeComm's FRN system was driven by a preference among certain senior Government officials within the Department of Defense, the Department of State, and the Iraqi Ministry of Interior for the AFRN system. Id. Given that the United States accepted delivery of the equipment and paid the full contract price, plaintiff's allegations in no way suggest that the United States interfered with the benefits negotiated in the contracts. Thus, the preferences of senior Government officials are irrelevant: Plaintiff received all of the benefits promised under the contracts.

We add that the goal of the multi-million dollar AFRN system procurement for certain Iraq cities was a system that would provide secure nationwide communications capability among police, border patrol, firefighters, medical personnel, and civil defense agencies during wartime and beyond. A 87. PraeComm's radio system, while adequate for first responders within a given city to talk with one another, could not meet the specifications of the far more complex and comprehensive AFRN system; PraeComm did not attempt to bid on any of the AFRN work later awarded to other companies. Thus, plaintiff has failed to allege any impropriety in the Government's decisionmaking, much less an impropriety that would somehow entitle PraeComm to damages for the Government's decision to select and field the AFRN system.

As demonstrated above, there are no material facts in dispute with respect to PraeComm's claim of breach of the implied covenant of good faith and fair dealing. PraeComm's reference to the decision-making among senior Government officials fails to even allege a breach. Finally, plaintiff has not alleged any facts suggesting that the Government's acted inappropriately or unreasonably with respect to PraeComm's performance of the contracts. Accordingly, summary judgment is warranted with respect to Counts V and VI of the complaint.

## CONCLUSION

For the reasons detailed above, we respectfully request that the Court enter judgment in favor of the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

OF COUNSEL:

PATRICK BUTLER
Litigation Attorney
U.S. Army Litigation Division
901 N. Stuart Street
Arlington, VA 22203

s/ Gregg M. Schwind
GREGG M. SCHWIND
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tel: (202) 353-2345
Fax: (202) 514-8624

Attorneys for Defendant

March 1, 2007