# First Responder Radios

## Accountability and Transfer of First Responder Radios

To their credit, the Office of the Chief of Staff, CPATT, issued written policy and procedures for receipt and issuance of AFRN radios. The guidance contained specific procedures and documents for transferring the assets from CPATT to the AFRN contractor for programming, from the contractor back to CPATT, and then from CPATT to representatives of the Iraqi Ministry of Interior.

However, CPATT personnel did not properly account for, control, and transfer all first responder radios. Specifically, the number of radios transferred to the Iraqi Ministry of the Interior and on-hand with CPATT[18] exceeded the total number documented as purchased. On the last recorded date of a signed receipt from a representative of the Ministry of Interior (January 22, 2005), the total of all radios transferred by CPATT representatives to the Iraqi government was 28,417 radios. On March 27, 2006, the AFRN contractor transferred 4,444 residual first responder radios of various models to CPATT representatives. Our reconciliation of available documents for the total radios purchased to the total quantities transferred to the ministry or on-hand disclosed CPATT did not maintain proper accountability over the radios. As noted in Table 5, the total number of handheld radios transferred or on-hand (28,481) exceeded the quantity purchased (25,149) by over 3,300 radios.

**Table 5: Reconciliation of First Responder Radios**

| Model Type | Purchased | Received | CPATT Transfers To Ministry of Interior | Residual Radios Received from Contractor | Total On-Hand or Transferred | Difference (Purchased less On-Hand/ Transferred) |
|---|---|---|---|---|---|---|
| Handheld | 25,149 | 25,149 | 24,831 | 3,650 | 28,481 | +3,332 |
| Mobile | 4,140 | 4,140 | 3,282 | 161 | 3,443 | -697 |
| Gateway | 609 | 609 | 0 | 609 | 609 | 0 |
| Desktop | 399 | 399 | 304 | 24 | 328 | -71 |
| **Total** | **30,297** | **30,297** | **28,417** | **4,444** | **32,861** | **N/A** |

Source: CPATT and Contractor Transfer and Inventory Records, as of March 27, 2006.

This condition brings into question the accuracy of the quantities[19] listed on all transfer and inventory documents. Although there is no way to make a specific determination, it is possible that discrepancies occurred when radios were returned from the Ministry of

[18] The contractor responsible for programming the radios transferred all remaining radios to CPATT officials on March 27, 2006. Our reconciliation included a review of available documents for all transfers to the Ministry of Interior prior to that date and all on-hand radios received on that date.

[19] In addition to the 30,297 radios purchased under the contract there were many thousands of associated accessories purchased as well; for example carrying cases, antennas, spare batteries and re-chargers. Our reconciliation was limited to the radios which had the highest dollar value per item and were most subject to pilferage.

Interior to CPATT and then on to the various contractors[20] for either warranty work, upgrades, or retrofitting; and subsequently back the Ministry of Interior. Under these circumstances, it is possible that radios previously transferred to the Ministry of Interior were once again documented as transfers and receipted again by ministry officials. The CPATT procedures did not include guidance on the accountability, control, and transfer of radios returned from the Ministry of Interior to be worked on. However, we must note that there was insufficient documentation, either in the form of signed receipts transferring radios to the Iraqi government or remaining balances received[21] from the contractor, to account for 697 mobile and 71 desktop radios. For those two models (valued at over $700,000), either the Ministry of Interior transfer receipts or the actual radios are missing. Further, we could not determine why CPATT did not issue any of the 609 Gateway model radios (valued at over $900,000) to the Ministry of Interior for use in the AFRN system. Regarding the 3,332 handheld radios that exceeded the actual quantity purchased and received, we can only speculate that this occurred as a result of radios issued to the Ministry of Interior and subsequently returned and later reissued again.

## Management Actions

Upon detection of the radio accountability issues we notified responsible CPATT officials. The officials began action to identify any missing documents evidencing transfer of radios to the Ministry of Interior. CPATT personnel requested copies of transfer and receiving documents from the ministry and, to that end, did receive and provide to us the copies they received. However, this additional documentation did not provide any new information on radio transfers or resolve the accountability issues described in this report.

[20] There were two contractors: (1) the vendor responsible for warranty work and (2) the AFRN contractor who performed programming and retrofitting required to add each radio to the AFRN system.
[21] DD Form 1149, Requisition and Invoice/Shipping Document, March 27, 2006, transferring residual assets from the AFRN contractor to CPATT.

# Sustainment of the AFRN

U.S. funding for sustainment of the AFRN, to include typical operations and maintenance activities, is inadequate to maintain the system over time. Although U.S. government officials developed plans to sustain the AFRN system and U.S. officials provided the responsible Iraqi Ministry with sufficient information on operations and maintenance support requirements , the $180.1 million IRRF budget for AFRN , combined with the ultimate cost to field the system , was insufficient to provide sustainment pending the Iraqi government's assumption of those responsibilities. Specifically, only one of the AFRN task orders contained statement of work elements for operations an maintenance of the system. The AFRN "Integration" contract, funded from the Iraq Security Support Fund as discussed earlier, was a follow-on contract that contained operations and maintenance provisions for the AFRN through the end of January 2006. Consequently, U.S. officials sought sustainment support to fund an operations and maintenance contract from the Iraqi Ministry of Interior. However, the time required for writing, soliciting, and awarding the resulting contract eventually necessitated extending the AFRN Integration contract, and eventually the use of a separate "bridging" contract to cover the period between the "Integration" contract and the eventual Iraq contract, awarded with DFI funds. Although there was insufficient funding, the task orders issued from the design/build contract as well as the Integration contract contained provisions to develop the Iraqi government's ability to maintain the AFRN system.

**Task Orders 5 and 6 – Operations and Maintenance Provisions**. In contrast to AFRN Task Order 5, which included operations and maintenance of the AFRN Baghdad Region, the work scope for Task Order 6 specifically did not include any such provision, even though the size[22] of the Task Order 6 infrastructure deployment was nearly twice that (approximately 173%) of the AFRN infrastructure deployed under Task Order 5. Although Task Order 6 included the provisioning of required tools for end-user personnel to perform maintenance it did not include the actual performance of operations and maintenance activities such as making repairs or refueling generators. In effect, U.S. agencies were installing additional infrastructure during Task Order 6 with no provisions to provide associated operations and maintenance for the AFRN system. However, the task orders did include training the system users (the Iraqi government) for both operations and maintenance personnel, to include equipment manuals.

**Iraqi Ministry of Interior Sustainment Support**. U.S. officials recognized the shortfall in sustainment funding. On August 1, 2005, the Commanding General, JCC-I/A sent a memorandum to the Iraqi government's Minister of the Interior requesting assurance that the Iraqi government would provide adequate funds for operations and maintenance of the AFRN system during 2006. The memorandum provided an estimated sustainment cost of $15.3 million[23] for the period of February through December of 2006. The Minister's response was that the Ministry's budget for calendar year 2006 could not support operations and maintenance funding following completion of the AFRN Integration contract on January 31, 2006. As a result, on August 6, 2005, MNSTC-I and JCC-I/A decided to request financial support from the Ministry of Interior by obtaining approval to use $15.3 million of uncommitted DFI money to supplement the ministry's

[22] This is a SIGIR computed estimate based on the number of "facilities" in each task order. This included switching offices, command/control/system monitoring facilities, and base transmission tower sites; a total of 30 facilities for Task Order 5 and 52 facilities for Task Order 6.
[23] Our extrapolation of the figure results in an annualized estimate of $16.7 million.

calendar year 2006 budget for AFRN sustainment. On December 24, 2005, the Iraqi Minster of Finance signed a memorandum providing $20 million of uncommitted DFI funds "solely for the purpose of operation and maintaining the Advanced First Responder Network." The memo also extended to December 31, 2006, the authority for JCC-I/A to monitor, make payments, and otherwise administer DFI funded contracts. The approval to use DFI money would allow sustainment through December 31, 2006, for example the cost of refueling generators, various lease expenses, and maintenance of the system components.

**Extension of the AFRN "Integration" Contract**. The Integration contract was also extended to address the shortfall in sustainment funding and included additional tasks to build the Iraqi government's abilities to take over system operations. For example, the contract included an on-the-job training program to transfer technical operations and maintenance knowledge that would enable Iraqi engineers and technicians to conduct operations and maintenance activities. In addition, all documentation created for the operations and maintenance program was provided in English and Arabic, and in both hard and soft (electronic) copies. On January 15, 2006, pending solicitation and award of the DFI funded contract for the Iraqi government, JCC-I/A extended the performance period on the Integration contract line item for generator refueling and operations maintenance at an additional cost of $2.9 million. The cost to extend the contract caused the total contract costs to exceed the $20 million obtained from the Iraq Security Support Fund. The additional $2.9 million needed was funded from the $16.7 million allotment received from the DFI and was intended to ensure continued sustainment support.

**DFI Bridging Contract**. Due to the time required to solicit and award the DFI funded AFRN sustainment contract it was necessary to find a temporary vehicle to continue operations and maintenance support when the AFRN "Integration" contract expired on May 2, 2006. As a result, JCC-I/A awarded a short duration "bridging" contract[24] to span the period until award of the DFI contract. The bridging contract period ended on June 10, 2006, and used an additional $2.3 million of the $16.7 million allocation from the Development Fund for Iraq. This allowed the U.S. and Iraqi governments to continue AFRN sustainment support.

**DFI Sustainment Contract.** JCC-I/A awarded DFI sustainment contract[25] began on June 11, 2006. The contract will provide operations and maintenance support through December 31, 2006, at which time the Iraqi government's budget will begin for calendar year 2007. The contract also includes training of Iraqi personnel. The net amount of the original DFI allotment of $16.7 million, after deducting the sustainment support received from that allotment on the "Integration" and bridging contracts funded the DFI Sustainment Contract at $11.5 million.

[24] Contract number DFIFAC-06-C-0001, May 3, 2006.
[25] Contract number DFIFAC-06-C-0003, June 11, 2006.

# Contract Definitization and Propriety of Equipment Purchases and Contractor Services

Contracting officials properly managed the undefinitized contract actions issued under both the IRRF funded design-build contract and the subsequent ISSF-funded "Integration" contract. These were the only contracts related to the AFRN project that we reviewed which were subject to definitization. Specifically, and in accordance with Defense Federal Acquisition Regulation criteria, each task order for the design-build contract or contract line item for the "Integration" contract established a not to exceed value at the time of notification to proceed; each undefinitized contract action was definitized within the 180 day time limit; and none of these exceeded the 50% obligation limit prior to definitization. As a result, U.S. officials took appropriate actions to definitize both contracts containing undefinitized contracting actions.

For the definitized contracts, our review did not identify any equipment or contractor services that indicated expenses not reasonably expected for the design and installation of a communications system. Specifically, our review of the definitized cost proposal schedules of the most significant costs for equipment (predominantly communications-electronics equipment items) and services (security, design and installation) did not reveal planned equipment or services that would not be consistent with the design, procurement, and installation of a communications system. For example, the most significant single item equipment cost estimate contained in the pricing schedules was for the three switches for the mobile switching offices (estimated at approximately $3 million per item). Contractor services included system engineering, installation, and the life support and security platform of Task Order 3; with the latter estimated at $16 million over the life of the design-build contract.

# Conclusion and Recommendations

## Conclusion

The initial assumptions to build the AFRN system upon the existing Iraqi electrical and fiber optic infrastructure exacerbated the extent to which U.S. implementing agencies could efficiently and effectively manage the AFRN project. The combined effects of the concept of operations; scope assumptions regarding existing infrastructure; project budget; and the political and security environment in which the system would be built and operated resulted in a project fraught with risk. As a result, the Advanced First Responder Network project has not provided the Iraqi citizens or the Iraqi government with a fully functioning and effective first responder communication, command, and control capability.

The conditions limiting the effectiveness are fundamental and significant on both the governorate and national levels of the AFRN system. To a large measure, the AFRN limitations are the result of assumptions that the existing fiber optic and electrical infrastructure could readily support the AFRN project. Assuming the infrastructure conditions can be effectively resolved, sufficient trained personnel are not available to man the first responder dispatch centers. Although the AFRN project has increased communication capability amongst first responders, at the governorate level, Iraqi citizens cannot use their telephones to access the AFRN system to request police, fire department, or emergency medical from seven of the nine governorate dispatch centers.

- None of the dispatch centers can use the AFRN systems computer-assisted dispatch features while dispatchers at seven of the centers cannot monitor radio communications of the first responders. Assuming the preceding problems did not exist, sufficient trained personnel to fully staff all of the dispatch centers are likely not available.

- At the national level, there is no AFRN connectivity between the three zones of the system. Consequently, the escalation of incidents to and visibility of first responder resources by the national coordination center is not possible for eight of the nine governorates. Located in and isolated to Baghdad as well are the systems monitoring functions of the AFRN communication center. As a result, monitoring the performance and health of the AFRN system is limited to the Baghdad zone.

Accountability was not maintained for the 30,000 radios, valued at over $24 million, purchased for the Iraqi police, fire, and emergency medical organizations. Our reconciliation of the thousands of radios purchased to the total number of radios transferred to the Iraqi government or from the contractor to the Civilian Police Assistance and Training Team pending transfer to the Iraqi government disclosed accountability had been lost. The reconciliation indicated 9% more radios transferred to the Ministry of Interior than the number purchased. On one hand, our reconciliation indicated two different radio models with a combined shortage (i.e. number purchased greater than number transferred or on hand) totaling 768 radios; while the records for a third model reflected 3,332 more radios than were ever purchased. The reconciliation variances bring the accuracy of all inventory and transfer records into question.

Sufficient U.S. funds were not available to sustain the AFRN system until the Iraqi Ministry of Interior could budget for and obtain the necessary funds to sustain the AFRN

system. When U.S. officials determined sufficient funding was not available they took effective actions to seek and obtain the needed funding from other sources.

**Material Management Control Weaknesses.** Our review disclosed a material management control weakness regarding U.S. Government property accountability for the 30,000 radios purchased during the AFRN project.

## Recommendations

We recommend the following management corrective action regarding fiber optic network connectivity and capacity required to achieve inter-zone operation of the Advanced First Responder Network.

1. We recommend that the Commanding General, Multi-National Security Transition Command-Iraq ensure that the contractor conducting the AFRN assessment is required to coordinate with the Iraqi Ministry of Interior and Iraqi Ministry of Communications Iraq Telephone and Postal Company in diagnosing and resolving the specific technical reason or reasons why connectivity between the three AFRN zones does not exist.

We also recommend the following management corrective actions regarding the accountability of radios purchased for the Advanced First Responder Network.

2. We recommend that the Commanding General, Multi-National Security Transition Command-Iraq, direct the appropriate command organization to:
    a. Request the Iraqi Ministry of Interior provide current inventory information, by model type, for the first responder radios in their possession.
    b. Direct CPATT personnel conduct a physical inventory, by model type, of any radios not yet transferred to the Ministry of Interior.
    c. Reconcile the Iraqi Ministry of Interior and CPATT inventories to the record of all radios purchased and document the results.
    d. Initiate actions in accordance with applicable U.S. government property management policies, to properly account for and control all radios.

## Management Comments and Audit Response

We received written comments on a draft of this report from MNSTC-I and the Iraq Reconstruction Management Office. We received technical comments from JCC-I/A and the U.S. Army Corps of Engineers Gulf Region Division.

MNSTC-I did not concur with the first recommendation (for jurisdictional reasons), but did concur with the second. We agree the IRMO Communications Sector was responsible for the AFRN project, as evidenced by the original CPA tasking order; however, our recommendation was appropriately addressed to MNSTC-I for the following two reasons. First, the AFRN system transferred to control of the Iraq Ministry of Interior on June 26, 2006 and secondly; MNSTC-I assumed responsibility for coalition force liaison to the Ministry of Interior in October, 2005. Although management did not specifically concur with the first recommendation, we believe the substance of their comments fully satisfy the recommendation's intent. Specifically, their comments state

the contractor has in fact assessed the connectivity situation, is working with the Iraq Telephone and Postal Company to address the connectivity issues, and that a formal meeting is planned between the Ministry of Interior and Ministry of Communication to discuss system requirements and the way ahead. In addition to concurring with recommendation two, MNSTC-I stated corrective actions are either in progress or planned. MNSTC-I also provided technical comments for this report. We reviewed those comments and incorporated changes into the final report where appropriate.

The Iraq Reconstruction Management Office suggested we add a recommendation to "get all nine AFRN Governorate Dispatch Centers operating and in service with fully trained staff to realize the full potential of the system". While we recognize the importance of the Governorate Dispatch Centers to the AFRN system, and discuss this on pages 12-13, we did not include this recommendation in our report because the DFI Sustainment contract depicted in Table 1, page 1 and discussed on page 18 notes the subject contract includes training.

The Joint Contracting Command-Iraq/Afghanistan and the U.S. Army Corps of Engineers Gulf Region Division also provided technical comments for this report. We reviewed those comments and incorporated changes into the final report where appropriate.

All comments received were fully responsive.

# Appendix A. Scope and Methodology

This audit was initiated on February 23, 2006 (Project No. 6008) to determine whether responsible personnel efficiently and effectively managed the Advanced First Responder Network (AFRN) project which was created to provide Iraqi police, fire, and emergency medical units with a core national public safety communication, command, and control system. More specifically, this report addresses the extent to which:

- AFRN provides effective emergency communications for the citizens of Iraqi, the police, fire, emergency medical departments, and related command and control organizations
- radios purchased for distribution to the Iraqi police, fire, and emergency medical organizations were properly accounted for, controlled, supported, and transferred to the Iraqi Ministry of Interior
- U.S. government plans and funding were in place to sustain the Advanced First Responder Network pending the Iraqi government's assumption of those responsibilities; and whether U.S. officials provided the responsible Iraqi Ministry with sufficient information on operations and maintenance support requirements
- AFRN task orders were properly definitized; and related equipment purchases and contractor services were within the scope of the contract

In the performance of the audit, we interviewed key management officials in Joint Contracting Command-Iraq/Afghanistan, U.S. Army Corps of Engineers Gulf Region Division and Project and Contracting Office , Iraq Reconstruction Management Office , and Multi-National Security Transition Command-Iraq .

To determine whether the AFRN system provided effective emergency communications to the Iraqi citizens, first responders, and associated command and control elements we identified first responder network requirements contained in the CPA Program Management Office, Communications and Transportation Sector Task Order TC-001 , the final AFRN Concept of Operations , and the user requirements contained in the applicable contract task orders . In addition, we reviewed applicable contract and project administration records for AFRN task orders 2, 4, 5, and 6 ; and the follow-on contract for indications of scope or user requirement changes , associated cost estimates, and cost to complete information .

To determine if the AFRN system was effective we reviewed the most recent AFRN status report, charts depicting system performance, and discussed the operational status of the system with U.S. government officials knowledgeable with the project and current status. In addition, we visited the Ministry of Interior where we observed AFRN Communications Center, the central zone mobile switching office, and discussed the AFRN system with officials of the ministry.

To determine if the radios purchased for the AFRN system were properly accounted for, controlled, supported, and transferred to the Ministry of the Interior we reviewed the pertinent contract and related purchase orders; U.S. government receiving documents; documents used to transfer and evidence receipt of radios transferred to Iraqi government representatives; and receiving documents used to transfer residual AFRN radios and accessories to CPATT. We computed and reconciled the totals of radios orders, received, transferred to the Iraqi government representatives, and the residual assets transferred to

CPATT. We also reviewed the CPATT policy and procedures to maintain control and accountability of the AFRN radios to the point of transfer to the Government of Iraq.

To determine if government officials effectively and efficiently managed the AFRN contract to include the definitization of the task orders we reviewed each of the six task orders issued under the design-build contract and compared the date of task order issue to the date each respective task order was definitized. To determine if AFRN task orders were properly definitized, we reviewed and compared the applicable independent government estimates, notices to proceed, not to exceed funding documents, and related definitization documents to criteria contained in SUBPART 217.74 of the Defense Federal Acquisition Regulation Supplement, May 12, 2006.

To determine whether plans and funding were in place to sustain the first responder radios and AFRN, we identified and reviewed pertinent contracts for sustainment efforts (operations and maintenance) in the statements of work. We identified and reviewed U.S. documents used to develop sustainment cost estimates in order to determine whether U.S. officials had developed and provided to representatives of the Iraqi government sufficient information detailing the estimated funding needed to operate and sustain the AFRN system.

To determine whether equipment purchases and contractor services were within the scope of the contract, we reviewed the definitized contractor and subcontractor estimated cost exhibits for both equipment and services and compared high dollar equipment items and services to the applicable task order or contract line item work scopes.

We conducted this audit from February 2006 to July 2006, in accordance with generally accepted government auditing standards.

**Use of Computer-Processed Data.** During the course of this audit we used computer-processed contract payment data for radios purchased under contract number W914NS-05-D-9008 obtained from Corps of Engineers Financial Management System. Although we did not assess the general or application controls of the system, we determined the accuracy of the data through comparison to applicable invoices and purchase order pricing documents. Our tests disclosed the data were sufficiently reliable to support audit conclusions and recommendations.

**Prior Coverage.** We did not identify any prior audit or inspection reports addressing the effectiveness of AFRN, definitization of AFRN task orders, control and transfer of first responder radios, or U.S. government plans and funding to sustain AFRN.

# Appendix B. Acronyms

| | |
|---|---|
| AFRN | Advanced First Responder Network |
| CPA | Coalition Provisional Authority |
| CPATT | Civilian Police Assistance Training Team |
| DFI | Development Fund for Iraq |
| GDC | Governorate Dispatch Office |
| GRD-PCO | U.S. Army Corps of Engineers Gulf Region Division - Project and Contracting Office |
| JCC-I/A | Joint Contracting Command-Iraq/Afghanistan |
| IRMO | Iraq Reconstruction Management Office |
| IRRF-1 | Iraq Relief and Reconstruction Fund, Fiscal Year 2003 Appropriation |
| IRRF-2 | Iraq Relief and Reconstruction Fund, Fiscal Year 2004 Appropriation |
| ISSF | Iraq Security Support Fund |
| ITPC | Iraq Telephone and Postal Company |
| MNSTC-I | Multi-National Security Transition Command-Iraq |

# Appendix C. Report Distribution

## Department of State

Secretary of State
  Senior Advisor to the Secretary and Coordinator for Iraq
U.S. Ambassador to Iraq
  Director, Iraq Reconstruction Management Office
  Mission Director-Iraq, U.S. Agency for International Development
Inspector General, Department of State

## Department of Defense

Secretary of Defense
Deputy Secretary of Defense
  Director, Defense Reconstruction Support Office
Under Secretary of Defense (Comptroller)/Chief Financial Officer
  Deputy Chief Financial Officer
  Deputy Comptroller (Program/Budget)
Inspector General, Department of Defense
Director, Defense Contract Audit Agency
Director, Defense Finance and Accounting Service
Director, Defense Contract Management Agency

## Department of the Army

Assistant Secretary of the Army for Acquisition, Logistics, and Technology
  Principal Deputy to the Assistant Secretary of the Army for Acquisition, Logistics, and Technology
  Deputy Assistant Secretary of the Army (Policy and Procurement)
  Director, Project and Contracting Office
  Commanding General, Joint Contracting Command-Iraq/Afghanistan
Assistant Secretary of the Army for Financial Management and Comptroller
Chief of Engineers and Commander, U.S. Army Corps of Engineers
  Commanding General, Gulf Region Division
Auditor General of the Army

## U.S. Central Command

Commanding General, Multi-National Force-Iraq
  Commanding General, Multi-National Security Transition Command-Iraq
  Commander, Joint Area Support Group-Central

## Other Federal Government Organizations

Director, Office of Management and Budget
Comptroller General of the United States
Inspector General, Department of the Treasury
Inspector General, Department of Commerce
Inspector General, Department of Health and Human Services
Inspector General, U.S. Agency for International Development
President, Overseas Private Investment Corporation
President, U.S. Institute for Peace

## Congressional Committees and Subcommittees, Chairman and Ranking Minority Member

**U.S. Senate**

Senate Committee on Appropriations
- Subcommittee on Defense
- Subcommittee on State, Foreign Operations and Related Programs

Senate Committee on Armed Services

Senate Committee on Foreign Relations
- Subcommittee on International Operations and Terrorism
- Subcommittee on Near Eastern and South Asian Affairs

Senate Committee on Homeland Security and Governmental Affairs
- Subcommittee on Federal Financial Management, Government Information and International Security
- Subcommittee on Oversight of Government Management, the Federal Workforce, and the District of Columbia

**U.S. House of Representatives**

House Committee on Appropriations
- Subcommittee on Defense
- Subcommittee on Foreign Operations, Export Financing and Related Programs
- Subcommittee on Science, State, Justice and Commerce and Related Agencies

House Committee on Armed Services

House Committee on Government Reform
- Subcommittee on Management, Finance and Accountability
- Subcommittee on National Security, Emerging Threats and International Relations

House Committee on International Relations
- Subcommittee on Middle East and Central Asia

# Appendix D. Audit Team Members

This report was prepared and the review was conducted under the direction of Joseph T. McDermott, Assistant Inspector General for Audit, Office of the Special Inspector General for Iraq Reconstruction. The staff members who contributed to the report include:

Samuel Gonite

Walt Keays

Larry T. Monson

Jason Venner

# Management Comments
# Multi-National Security Transition Command-Iraq

MULTI-NATIONAL SECURITY TRANSITION COMMAND-IRAQ
BAGHDAD, IRAQ
APO AE 09316

CONCUR

27 July 2006

MNSTC-I ACoS, DIRECTOR OF COMMUNICATIONS/J6

MEMORANDUM FOR SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION

SUBJECT: Draft Audit Report on Review of the Advanced First Responder Network (SIGIR-06-020)

1. This Multi-National Security Transition Command-Iraq (MNSTC-I) response to the subject audit will be addressed in 4 areas. The first area will contain responses to recommendations and findings (paragraphs 2 and 3), the second area will contain additional management comments not identified in the report (paragraph 4), the third area will contain inaccuracies noted within the report (paragraph 5) and the fourth will contain a general Command recommendation as a result of the deficiencies noted in this program (paragraph 6):

2. MNSTC-I does not concur with recommendation #1 which was to: "*ensure that the contractor conducting the AFRN assessment is required to coordinate with the Iraqi Ministry of Interior and Iraqi Ministry of Communications Iraq Telephone and Postal Company in diagnosing and resolving the specific technical reason or reasons why connectivity between the three AFRN zones does not exist.*" The US implementing agencies for all AFRN contracts, prior to the O&M contract let in June 2006, did not include MNSTC-I as a responsible agency. While the O&M contractor has agreed to do an assessment of the status of AFRN, the full completion of this recommendation does not fall within the scope of the existing O&M contract. Additionally, the resolution of such a solution would almost certainly involve millions of dollars that are not part of this contract or programmed for on any budget. When IRMO transferred ownership of the program to the MOI, MNSTC-I agreed to do Operation and Maintenance of the system from June 2006 to December 2006 with the money available in the program. IRMO had final responsibility for the contracts that built this program and produced these deficiencies and should be responsible to ensure any deficiencies recommended for US correction are resolved.

   a. The first part of this action has been completed, in that the contractor has assessed the connectivity situation, and produces a weekly report for the MoI and MNSTC-I on connectivity status. The contractor is also working with ITPC to address connectivity issues. A formal meeting is planned between MoI and MoC to discuss system requirements and the way ahead.

   b. The Command would add, however, that since AFRN was an Iraqi Reconstruction Management Office (IRMO) project, that the IRMO Office of Communications (OOC), who are responsible for interfacing with the Ministry of Communications, and who were responsible for working to coordinate and provision of ITPC connectivity during the build phase, be engaged in the effort to "diagnose and resolve" connectivity issues that existed and still exist under their contract.

3. Recommendation #2: Although IRMO was responsible for this contract and therefore the accountability of the radios under it, the J6/CPATT Support Division did assist them with the distribution of those radios and has the current O&M contract that started 10 Jun 06. Therefore, the Command concurs with this recommended action to correct the deficiencies as follows:

a. Item 2a: *"Request the Iraqi Ministry of Interior provide current inventory information, by model type, for the first responder radios in their possession."* <u>**Concur:**</u> This action is in progress.

b. Item 2b: *"Direct CPATT personnel conduct a physical inventory, by model type, of any radios not yet transferred to the Ministry of Interior."* <u>**Concur:**</u> This item is also in progress. All radios received were transferred to the MoI. However, since that time, many have been returned to the J6/CPATT Support Division's possession for repair and retrofit. As noted in the report, sufficient processes did not exist at the time to maintain 100% positive accountability of returned radios. The CPATT Support Division is currently performing physical inventories of those radios in their possession and those which are out for repair. Procedures to accommodate radios and other equipment being transferred back to the CPATT Support Division, and then again to the MoI, as well as to and from the contractors are being developed.

c. Item 2c: *"Reconcile the Iraqi Ministry of Interior and CPATT inventories to the record of all radios purchased and document the results."* <u>**Concur:**</u> This action will commence immediately upon completing the actions cited under Recommendations 1 and 2.

d. Item 2d: *"Initiate actions in accordance with applicable U.S. government property management policies, to properly account for and control all radios."* <u>**Concur:**</u> As stated under Recommendation 2, appropriate procedures are being developed. It should be noted, that procedures are also being developed within the MoI to manage and account for the radios and other equipment they now own.

4. Additional MNSTC-I comments relative to the report's findings, for which no recommendations were cited:

a. In reference to the opening paragraph in the conclusions: *"U.S. implementing agencies did not efficiently and effectively manage the AFRN project."* **Command recommendations:** that the implementing agencies develop, enforce and/or overhaul policies and procedure to ensure effective and efficient management. In the case of AFRN, these deficiencies are most notable in the lack of qualified technical oversight, ineffective or non-existent design review and approval procedures, and inadequate or no formally appointed program management. Although the report contends that insufficient funding was allocated for the project, the Command maintains that funding was more than adequate to build the system, without the numerous residual technical defects and *with* an adequate number of sufficiently trained personnel *if* there had been adequate and qualified technical and managerial oversight.

b. A lack of adequate design review is the singularly most significant factor in the failure of AFRN to achieve the stated objective. Evidence of this can be seen in numerous quotes from the audit report:

*(1) "...assumptions by U.S. government officials that the existing fiber optic and electrical infrastructure could readily support the communications requirements."*

*(2) "...no connectivity between the three zones of the AFRN system...and insufficient backup generators"*

*(3) "There are an insufficient number of backup generators to ensure uninterrupted electrical power to the AFRN facilities. In spite of the documented problems with maintaining constant, and stable, electrical supply in Iraq; the AFRN design and subsequent construction task orders 5 and 6 assumed the availability of commercial power."*

c. A lack of qualified technical oversight was also a significant factor in the failure of AFRN to achieve the stated objective as partially noted in the report quotes in italics below:

*(1) "It appears the AFRN network was not designed for the communication protocol used by the ITPC public phone system."* (Page 12)

(2) The section pertaining to ***Mobile Switching Offices*** (Page 5) states in part: *"The mobile switching office ... provides the link to the public telephone system, to include communication protocols compatible with that used in the public telephone system."* However, during the build phase, the switches were configured with a different communications protocol that is used in Iraq. As a result, specialized converters were installed in the system to compensate, incurring additional cost, time and complexity. These converters have been a continuous source of problems in the system, in that they throw off system timing. The original problem could have been solved – and still can be – through use of specialized communication cards installed in the GDCs; which would correct the protocol disparity without creating timing issues.

*(3) "None of the nine GDCs can identify the locations of the various first responders."* (Page 11)

(4) Under **Governate Dispatch Centers** (Page 5), the report states "the dispatcher...then views a terminal that uses computer assisted dispatch software to display the location of available first responder resources." The original computer aided dispatch software (ProCAD) was entirely in English. When an attempt was made to upgrade to an Arabic-enabled, the effort utilized approximately $1.4M, was unsuccessful, and the contractor was unable to revert to the previous version. As a result, the GPS capability of the system was inoperable for several months. Once the appropriate technical resources were engaged, the problem was rectified in a matter of days.

d. Inadequate program management was a significant contributing factor in the failure of AFRN to achieve the stated objective, specifically as noted in the report quotes in italics below and our comments thereto:

*(1) "...insufficient numbers of trained personnel to fully staff and operate all nine of the first responder dispatch centers."* AND *"Although there was insufficient*

*funding allocated, the task orders issued from the design/build contract as well as the Integration contract contained provisions to develop the Iraqi government's ability to maintain the AFRN system."* It further warrants mention that the DFI fund secured form Operation and Maintenance until the end of CY06 may not, in the end analysis, provide sufficient funding for some of the training required - and decidedly insufficient to fund correction of any of the outstanding technical deficiencies (generators, incorrect communication protocols, etc.) - as much of the funding was absorbed to defray overruns from the previous contracts.

(2) *"In contrast to AFRN Task Order 5, which included operations and maintenance...Task Order 6 did not include any such provision, even though the size of the Task Order 6 infrastructure deployment was nearly twice that of the AFRN infrastructure deployed under Task Order 5."*

(3) It should also be noted that, although the report correctly notes, at several junctures, that *"the...budget for AFRN, combined with the ultimate cost to field the system, was insufficient to provide sustainment pending the Iraqi government's assumption of those responsibilities;"* it does ***not*** note that, in the end analysis, the funding also proved insufficient to adequately complete the system and bring it to an acceptable level of operation.

(4) As can be seen from the report, many of the efforts that were supposed to be executed under the AFRN contract(s) were only partially completed or not completed at all. The principal reason for this lies with the nature of the contract. AFRN was establish as a Level of Effort endeavor...which, in essence, means that once the funding is gone or the contract period is over, the contractor has fulfilled their obligation, regardless of the status of the system. Ergo, provisions such as those listed under "**AFRN Integration Contract**" (Page 8) – many of which were not fully executed – remain incomplete; there is no requirement for the contractor to finish the job; or for a specified level of functionality or quality. *"The AFRN "Integration" contract included a requirement to install an additional 22 generators in the AFRN system. At contract end in May 2006, only 12 of the additional generators were installed."* The Integration Contract also provided for building out the AFRN data base, and *"on-the-job training program to transfer technical operations and maintenance knowledge that would enable Iraqi engineers and technicians to conduct operations and maintenance activities."* These efforts were, in truth, barely even started. What was executed, however, was an extensive and costly Integration Study that accomplished virtually nothing toward correcting the known issues in the AFRN system.

5. Administrative inaccuracies noted within the report:

a. The last sentence in the second paragraph on page 3 reads "the CPATT Directorate of Communications was responsible for program management of the radios purchased for the AFRN project." Additionally, the last paragraph under *First Responder Radios:* (on page 6) states MNSTC-I's Civilian Police Assistance Training Team (CPATT) Communications Directorate was responsible for the management of the AFRN radios...). These statements are incorrect in two ways: First, such an office does not

exist. There is a MNSTC-I J6 CPATT Support Division working within the CPATT building that has 8 personnel in it who are on the J6 JMD. One of those personnel worked with distribution of the AFRN radios. There was and is also an IRMO person working at the same location with this J6 person to help with the AFRN program. Second, and more importantly, the CPATT Support Division did not have program management responsibility for the radios or any other part of the program. This contract was let on behalf of IRMO and as no formal Program Manager seems to ever have been appointed, they are responsible for the program and the equipment, which includes the radios, under it. The IRMO employee, working with the AFRN radios at the CPATT building, was never given management responsibility of the radios or program.

b. Under **Design of the First Responder Network, *Communication, Command, and Control System:*"** The term "network communications center" should read Network Operation Center (NOC). The list does not include the Incident Control Center (ICC) – which is not now, and for all practical purposes has never been, operational. The discussion following this list includes reference to an "***AFRN Communications Center***" – there is actually no such entity. From the discussion, I believe this is actually the Network Operation Center (NOC). In addition, the National Coordination Center (NCC) is not addressed, nor are the 104 HF radios for emergency backup... which were never actually used for their intended purpose.

c. Based on the clarification in item 5a above, when the report mentions "CPATT personnel" as having provided statements under pages 12 and 13, this should be changed to reflect either the J6 CPATT Support Division person or the IRMO employee, they were the only two assisting IRMO with this program.

d. Under Acronyms on page 24: *GDC* is listed as *Governate Dispatch Office*, it should be Governate Dispatch Center.

6. Command Recommendation: Procurement practices should be developed, enforced or overhauled to ensure that the type of contract and manner of award are commensurate with the type of work to be done. The Federal Acquisition Regulation contains extensive guidance on these subjects, and although all the right signatures and approvals were obtained to award the AFRN contract, it is evident that exceptions or deviations were made which has directly resulted in the system not delivering the expected level of functionality or capabilities.

7. POC is LTC Glenn Botkin, MNSTC-I J6, Chief, CPATT Transition Support Division, DSN 318-239-7745.

GEORGE W. HAYS,
COL, USAF

# Management Comments
# Iraq Reconstruction Management Office

*Embassy of the United States of America*
Baghdad, Iraq

23 July 2006

INFORMATION MEMORANDUM
UNCLASSIFIED

TO: SIGIR

THROUGH: Chargé d'Affaires – Margaret Scobey

FROM: IRMO Chief of Staff – William Lynch

SUBJECT: Comments for SIGIR Review of the Advanced First Responder Network

Recognizing the prevailing security environment of Iraq in April 2004, the Coalition Provisional Authority initiated the Advanced First Responder Network (AFRN) in order to improve public safety. The AFRN is a communications network enabling interoperable communications for the Iraqi Ministry of Interior security and safety forces throughout Iraq. The cost of the AFRN design-build project, first responder radio procurement, and subsequent sustainment effort will total $220.1 million by the end of 2006.

Special Inspector General for Iraq Reconstruction (SIGIR) conducted a review of the AFRN project and published a draft report with recommendations to improve the performance of the AFRN.

The report touched on some of the shortfalls of the AFRN projects, specifically:

- the lack of fiber capacity to connect the three regional AFRN sub-networks;
- seven out of nine nonworking Governorate Dispatch Centers (GDC);
- missing radio handsets;
- insufficient training.

However, the recommendations were only made to improve the fiber network connectivity and account for all the radios. It is very critical to include recommendations to get all nine GDCs operating and in service with fully trained staff in order to realize the full potential of the system.

All recommendations are directed to the Commanding General, Multi-National Security Transition Command – Iraq team. None are directed to IRMO.

**Attachment:**
Draft Review of the Advanced First Responder Network

UNCLASSIFIED