## ...ITATION, OFFER AND AWARD

| 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | RATING | PAGE 1 OF PAGES 25 |
|---|---|---|

| ...TRACT NUMBER | 3. SOLICITATION NUMBER | 4. TYPE OF SOLICITATION | 5. DATE ISSUED | 6. REQUISITION/PURCHASE NUMBER |
|---|---|---|---|---|
| DABV01-03-C-0032 | DABV01-03-R-0025 | ☐ SEALED BID (IFB) ☒ NEGOTIATED (RFP) | 23OCT2003 | |

**7. ISSUED BY** CODE
CPA - CONTRACTING ACTIVITY
REPUBLICAN PRESIDENTIAL COMPOUND, Room M210
BAGHDAD, IRAQ, APO AE 09335

**8. ADDRESS OFFER TO** *(If other than Item 7)*
SAME AS BLOCK 7 or email to:
cpa_contracting_acti@orha.centcom.mil

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

### SOLICITATION

9. Sealed offers in original and 1 copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in See block 7, Room M210 until 17:00 *(Hour)* local time 7 NOV 2003 *(Date)*

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME | B. TELEPHONE *(NO COLLECT CALLS)* AREA CODE | NUMBER | EXT. | C. E-MAIL ADDRESS |
|---|---|---|---|---|---|
| | Frank V. Sharshel | | | | sharshelf@orha.centcom |

### 11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | | | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | F | DELIVERIES OR PERFORMANCE | | | | | |
| | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

### OFFER *(Must be fully completed by offeror)*

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within 30 calendar days *(60 calendar days unless a different period is inserted by the offeror)* from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT *(See Section I, Clause No. 52.232-8)* | 10 CALENDAR DAYS (%) | 20 CALENDAR DAYS (%) | 30 CALENDAR DAYS (%) | CALENDAR DAYS (%) |
|---|---|---|---|---|
| | 0.00 | 0.00 | 0 | 0 |

| 14. ACKNOWLEDGMENT OF AMENDMENTS *(The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated):* | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|
| | | | | |

**15A. NAME AND ADDRESS OF OFFEROR** CODE 3E1L6 FACILITY
AMERICAN RADIO INC.
6310 RIVERDALE STREET
SAN DIEGO, CA 92120

**16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER** *(Type or print)*
DOMINIC DI LUIGI - PRESIDENT

| 15B. TELEPHONE NUMBER AREA CODE | NUMBER | EXT. | 15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE. | 17. SIGNATURE | 18. OFFER DATE |
|---|---|---|---|---|---|
| 619 | 239-5020 | 201 | ☐ | [signature] | 12/17/03 |

### AWARD *(To be completed by Government)*

| 19. ACCEPTED AS TO ITEMS NUMBERED | 20. AMOUNT | 21. ACCOUNTING AND APPROPRIATION |
|---|---|---|
| | $5,957,380.00 | |

22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: ☐ 10 U.S.C. 2304(c) ( ) ☐ 41 U.S.C. 253(c) ( )

23. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ITEM

24. ADMINISTERED BY *(If other than Item 7)* CODE

25. PAYMENT WILL BE MADE BY CODE

26. NAME OF CONTRACTING OFFICER *(Type or print)*
FRANK V. SHARSHEL

27. UNITED STATES OF AMERICA [signature] *(Signature of Contracting Officer)*

28. AWARD DATE 12/21/03

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

STANDARD FORM 33 (REV. 9-97)
Prescribed by GSA - FAR (48 CFR) 53.214(c)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGES |
|---|---|---|
| | DABV01-03-R-0025 | 14 |

NAME OF OFFEROR OR CONTRACTOR
AMERICAN RADIO INC

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | TWO WAY RADIO SYSTEM FOR THE IRAQI POLICE DEPARTMENT THROUGHOUT IRAQ | | | | |
| 0001A | HAND-HELD 2 WAY RADIO FREQUENCY RANGE 430 - 470 MHZ WITH 12.5 / 25 KHZ SPACING WITH ULTRA CAPACITY RECHARGEABLE BATTERY, BELT CLIP, ANTENNA | 10,000 | EA | $329.00 | 3,290,000 |
| 0001B | BASE STATION RADIO WITH APPROPRIATE HARDWARE | 200 | EA | $1,856.62 | 373,124 |
| 0001C | REPEATERS, WHERE NEEDED TO ENSURE THAT THE HAND-HELD RADIOS FUNCTION PROPERLY WITHIN THE CITIES. ESTIMATED QUNATITY THROUGHOUT THE 83 CITIES | 120 | EA | $3,930.54 | 471,645 |
| 0001D | MISC CHARGES We accept all options that you proposed in accordance with your quote and revised quote | 1 | LO | $1,822,610.52 | 1,822,611 |
| | ADAVANCE PAYMENT OF UP TO 15 PERCENT AUTHORIZED. | | | | |
| | DELIVERY WILL BE MADE TO BAGHDAD, IRAQ | | | | |
| | SEE APPENDIX B FOR FULL TEXT OF ALL CLAUSES | | | | |
| | SEE SCOPE OF WORK ATTACHED | | | | |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA FAR (48 CFR) 53.110

## SECTION C - DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

### C.1 PURPOSE

C.1.1 A lack of tactical communications equipment for the Iraq Police has caused a critical shortfall in operational capability. The Contactor shall ensure a Land Mobile Network providing the Iraqi Police Force with reliable communications in order to maintain the stability of the country and the safety of their officers and the Iraqi people.

C.1.2 This requirement is to provide a low cost interim solution, which can be fielded in the near term.

### C.1.3 CONTRACT TYPE: COST PLUS FIXED FEE (CPFF)

C.1.4 COST REIMBURSABLE The dollar costs allowable shall be limited to reasonable, allocable and necessary costs.

### C.2 STATEMENT OF WORK

C.2.1 The Land Mobile Radio network shall provide the Iraqi Police force with reliable communications in order to maintain the stability of the country and safety of their officers and Iraqi people. The LMR network shall provide a reliable network for directing police to specific locations and to support normal operations between the police station and police on patrol. The outline requirements are listed below:

C2.2 **RADIO – mandatory requirements.** Radios are to meet the following minimum requirements:

a) Be capable of urban coverage of at least 5km from base station or repeater.
b) Have an Emergency Beacon facility.
c) Be capable of Mobile to Mobile calls.
d) Be capable of Frequency/Channel separation to allow different network. frequency between adjacent police stations or cities.
e) Have a Push to Talk response.
f) Have a Frequency range 430 – 470 Mhz with 12.5/25 Khz spacing.
g) Be capable of hand held operation.
h) Be capable of operation from a police vehicle.
i) Be supplied with a high capacity spare battery.
j) Be sufficiently robust and durable for reliable operation in the intended environment and role.
k) Be of sufficiently simple design and technology for reliable operation in the intended environment and role.
l) Be capable of communications between police stations within the same city.

C2.3 **RADIO – Optional requirements.** Proposals may include the provision of the optional requirements listed below, in particular Trunking, Digital technology and Project 25 compliance, but are to indicate clearly where these increase the cost over the Mandatory requirements:

a) Group Push to Talk response
b) Multigroup calls
c) System Wide calls (Broadcast)
d) Radio Inhibit
e) Radio Identification via signaling or ESN
f) Priority Safety response
g) Data services
h) Trunking
i) Project 25 Compliance

C2.3 **Base Stations.** Base Stations will be fielded in the cities listed at paragraph C2.6. Specific locations within each city are not yet to be detailed. Proposals should include intentions or recommendations for fielding and set to work of base stations and associated costs. Proposal is to include details of power supply and any intentions or recommendations with regard to UPS and associated costs.

C2.3 **Repeaters.** The proposal is to include the provision of repeaters to provide coverage across the cities listed at paragraph C2.6. Proposals should include recommended numbers of repeaters and intentions or recommendations for fielding and set to work of repeaters and associated costs. Proposal is to include details of power supply and any intentions or recommendations with regard to UPS and associated costs.

C2.4 **Battery Chargers.** The proposal is to include the provision of battery chargers at each base station. Assuming 50 radios per base station, the proposal should be scaled to allow the simultaneous charging of up to 50 spare batteries at each site.

C2.5 **Frequency/Channelisation.** Where radios require additional software or hardware to reprogram frequency or channels, the proposal is to include sufficient equipment to allow this function to take place at the 6 Division AO.

C2.6 **Fielding/Installation/Set to work.** Proposals should include intentions or recommendations for fielding of Radios, Base Stations (see para C2.3), Repeaters (see para C2.4) and include associated costs. Radios/Base stations and Repeaters will be fielded and operated in the cities listed below:

| GOVERNATE: | City Name: |
|---|---|
| As Sulaymaniyah | As Sulaymaniyah |
| DAHUK | Dahuk |
| IRBIL | Irbil |

| | |
|---|---|
| NINEVAH | Al Hadr |
| NINEVAH | Al Zumar |
| NINEVAH | Ash Shurah |
| NINEVAH | Avgani |
| NINEVAH | Biaj |
| NINEVAH | Hammam Al Alil |
| NINEVAH | Makhmur |
| NINEVAH | Mosul |
| NINEVAH | Qayyarah |
| NINEVAH | Rabi'ah |
| NINEVAH | Sinjar |
| NINEVAH | Sununi |
| NINEVAH | Tal Afar |
| AT TAMIM | Abbasy |
| AT TAMIM | Al Huwayjaha |
| AT TAMIM | Alton-Kupri |
| AT TAMIM | Daquq |
| AT TAMIM | Dibbs |
| AT TAMIM | Kirkuk |
| AT TAMIM | Laylan |
| AT TAMIM | Ryad |
| AT TAMIM | Taza Kharmatu |
| AT TAMIM | Zab |
| DIYALA | Abuseda |
| DIYALA | Al Mansuriah |
| DIYALA | As Sadiyah |
| DIYALA | Baqubah |
| DIYALA | Beladruz |
| DIYALA | Jalula |
| DIYALA | Khalis |
| DIYALA | Khaniqin |
| DIYALA | Kufri |
| DIYALA | Mandali |
| DIYALA | Muqdadiyah |
| SALAH AD DIN | Ad Dujayl |
| SALAH AD DIN | Ad Dululyah |
| SALAH AD DIN | Ad Dwar |
| SALAH AD DIN | Asaki |
| SALAH AD DIN | Balad |
| SALAH AD DIN | Bayji |
| SALAH AD DIN | Samarah |

| | |
|---|---|
| SALAH AD DIN | Sharquat |
| SALAH AD DIN | Tamiyah |
| SALAH AD DIN | Tikrit |
| SALAH AD DIN | Tuz |
| SALAH AD DIN | Yathrib |
| AL ANBAR | Al Fallujah |
| AL ANBAR | Al Qaim |
| AL ANBAR | Al Rutbah |
| AL ANBAR | Amiriyah |
| AL ANBAR | Ar Ramadi |
| AL ANBAR | Baghdadi |
| AL ANBAR | Hadithah |
| AL ANBAR | Hit |
| ALQADISIYAH | Ad Diwaniyah |
| AN NAJAF | An Najaf |
| BABIL | Al Hillah |
| WASIT | Al Kut |
| KARBALA | Karbala |
| ALMUTHANNA | As Samawah |
| BASRAH | Abu Al Khasib |
| BASRAH | Ad Dayr |
| BASRAH | Al Basrah |
| BASRAH | Al Faw |
| BASRAH | Al Huwayr |
| BASRAH | Al Madinah |
| BASRAH | Al Nashwa |
| BASRAH | Al Talha |
| BASRAH | Al Thugr |
| BASRAH | Al Zubayr |
| BASRAH | Ash Shafi |
| BASRAH | Ash Shirsh |
| BASRAH | Hamdan |
| BASRAH | Safwan |
| BASRAH | Umm Khayyal |
| BASRAH | Umm Qasr |
| DHI QAR | An Nasariyah |
| DHI QAR | As Sibah |
| MAYSAN | Al Amarah |
| MAYSAN | Al Qurnah |

C2.7 **Support plan.** Proposal is to include intentions for Service and Maintenance and specifically identify intentions for the following:

a) Equipment Turnaround time.
b) Length of Service and Maintenance contract
c) Intention to provide Company representation in Iraq.
d) Routine through life support and maintenance

C2.8 **Training.** Proposal is to include recommendations or intentions to provide training support appropriate to the type of radio and the environment and operations for which it is intended. It is to include recommendations and associated costs on:

a) Training equipment for Police training schools or stations.
b) Training package for training staff.
c) Training documentation.
d) Training software.
e) Ready use guide in English and Arabic.

C2.9 **Innovation.** Proposal may include any innovation or additional specification that may be considered to enhance the operational capability of the proposed system, but are to indicate clearly where these increase the cost over the Mandatory requirements.

QUALITY ASSURANCE EVALUATOR SURVEILLANCE PLAN

a. Key areas of performance will be surveyed utilizing the quality assurance procedures. This surveillance plan is subject to unilateral revision by the Government at any time during the contract period and is therefore not a binding document or made part of any resulting contact.

b. Inspection under the above plan do not preclude use of additional inspections of services which are or not included in the plan.

## QUANTITY VARIATION

The quantities contained in the bid schedule represent the Government's best estimate of its requirements for the period of contract performance. The Government reserves the right to order quantities in excess of the stated estimated quantities in the bid schedule. However, such additional quantities shall not exceed fifteen (15) percent above the total estimated contract dollar amount. It is estimated that the Government's requirements for any additional quantities of work for each Contract Line Item Number (CLIN) will be in approximately the same proportions that each CLIN currently bears relative to the entire estimate; however, mathematical precision is not required. The Contractor shall perform work on these additional quantities at the same bid price. The failure of the Government to issue task orders for any amounts exceeding the estimated amounts contained in the bid schedule shall not constitute grounds for requesting an equitable adjustment.

UNAUTHORIZED INSTRUCTIONS FROM GOVERNMENT OR OTHER PERSONNEL

The Contractor shall not accept instructions issued by any person employed by the US Government or otherwise, other than the Contracting Officer.

SUBCONTRACTING

Offeror represents that the estimated percentage of subcontracting contemplated for this acquisition is __________ percent.

RESPONSIBILITY OF PROSPECTIVE CONTRACTORS

The Coalition Provisional Authority reserves the right, prior to making an award, to conduct a pre-award survey of the Bidder in order to make a determination of responsibility. Factors investigated may include, but are not limited to:

(a) Have sufficient financial resources to perform the contract, or have the ability to obtain them;
(b) Ability to meet the required or proposed delivery schedule;
(c) Satisfactory performance record on contracts involving Air Navigation Services;
(d) Satisfactory record of integrity and business ethics;
(e) Have the necessary organization, experience, accounting and operational controls, and technical skills to perform Air Navigation Services as specified, or the ability to obtain them;
(f) Have the necessary production and technical equipment and facilities, or the ability to obtain them; and
(g) Qualifications and eligibility to receive an award under applicable laws and regulations.

POINT OF CONTACT

The Contractor shall provide a local telephone number, or a long distance telephone number with reverse charges, that is answered 24 hours a day, seven (7) days a week at which he can be notified of emergency work. The Government shall not be expected to call a series of phone numbers in order to locate the Contractor or his designated representative.

GAO
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

**DOCUMENT FOR PUBLIC RELEASE**
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Lucent Technologies World Services Inc.

**File:** B-295462

**Date:** March 2, 2005

Kelley P. Doran, Esq., William A. Shook, Esq., G. Matthew Koehl, Esq., and Mark E. DeWitt, Esq., Preston Gates Ellis & Rouvelas Meeds, LLP, for the protester.
David S. Cohen, Esq., John J. O'Brien, Esq., and Rowena Laxa, Esq., Cohen Mohr, LLP, for Sepura Ltd., an intervenor.
Raymond M. Saunders, Esq., Maj. Frank A. March, and Maj. Gregory R. Bockin, Department of the Army, for the agency.
Jonathan L. Kang, Esq., and Michael R. Golden, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

**DIGEST**

Protest challenging agency's exclusion of an offeror from participation in a procurement is denied where the agency reasonably determined that the protester has an organizational conflict of interest arising from its preparation of technical specifications used by the agency in the solicitation.

**DECISION**

Lucent Technologies World Services Inc. protests its exclusion from participation in the competition under request for proposals (RFP) No. W914NS-05-R-9003, issued by the Department of the Army for Terrestrial Trunked Radio (TETRA) devices for use in the agency's Advanced First Responder's Network (AFRN) in Iraq.

We deny the protest.

BACKGROUND

The RFP anticipated the award of an indefinite-delivery, indefinite-quantity contract for TETRA devices, which consist of wireless radios and ancillary equipment that incorporate the TETRA communications standards used by emergency first responder personnel.

Lucent is the design/build contractor for the agency's Iraq Reconstruction Communication Sector (IRCS) contract, which requires "complete design-build services and procurement for communications design, construction, demolition, and rehabilitation services." Protest at 3. Task Order 2 of the IRCS contract required Lucent to validate conceptual designs for the AFRN, assess existing communications infrastructure, and design the Phase I AFRN systems and architecture "using an approach that will allow the earliest delivery of a fully functioning nationwide integrated, secure, network." Agency Report (AR), Tab 10, IRCS Task Order 2, at 3.

IRCS Task Order 2 also required Lucent to prepare a cost/benefit analysis of potential technologies for use in AFRN. See Protester's Comments, Exh. 3, E-mail from Agency to Lucent Regarding Task Order 2 (May 23, 2004). Lucent considered TETRA and two other potential alternative communications technologies for use in the AFRN, and solicited price and technical quotes from vendors. Protester's Comments at 5. Lucent also consulted the published standards for TETRA technology. Id. In its cost/benefit analysis of the competing technology standards, Lucent recommended that the TETRA technology be adopted for the AFRN. Protester's Comments at 7. The agency accepted Lucent's recommendation and IRCS Task Order 2 was subsequently modified to require Lucent to develop a solicitation for the procurement of the TETRA devices. Protester's Comments, Exh. 10, IRCS Task Order 2, Mod. 2, at 2-3. Lucent prepared "Schedule D -- Statement of Work," which set forth the technical specifications for the TETRA devices, and submitted it to the agency on July 22, 2004. AR, Tab 18.

The agency issued the initial RFP on October 26, 2004. An agency technical representative stated that he prepared the initial RFP requirements based on technical specifications found on computer files residing on the agency's local area network. Agency Technical Representative Decl., Jan. 3, 2005, at 1. These specifications were less detailed than those in Lucent's Schedule D, and the parties agree that these specifications were not supplied by Lucent or based on Lucent specifications.

The agency received questions from offerors regarding the TETRA device specifications in the initial RFP, including one from Sepura Ltd. that observed that the RFP "device specifications" appeared to have been based on a specific Motorola design, and asked whether the procurement was restricted to Motorola specifications. AR, Tab 17, E-Mail from Sepura to Agency Technical Representative (Oct. 29, 2004). Following these questions, the agency suspended the RFP.

The agency asked Lucent to assist in responding to the offerors' questions and ensuring that the technical specifications in the initial RFP were appropriate for use in the AFRN. Lucent refused, however, citing its intent to submit a proposal to provide the TETRA devices. Contracting Officer's Statement at 1; Agency Technical Representative Decl. at 2. The agency's technical representative sought assistance from contracting personnel for the AFRN portion of the IRCS contract, and was provided Schedule D, Lucent's specifications for the TETRA devices. Schedule D

became the basis for the technical specifications that were issued in the revised RFP on November 4. RFP amend. 2, at 3-10. This revised RFP incorporated several changes to the TETRA device specifications, which the agency states were intended to increase competition by removing requirements that were perceived as vendor-specific. Agency Technical Representative Decl. at 2 ("I then reviewed the specifications, and removed any items which were vendor specific, such as exact sizes, button configurations, etc.")

The contracting officer notified Lucent on November 5, 2004 that she had determined that the firm had an OCI under FAR § 9.505-2 that prohibited it from receiving the award of the TETRA device contract. AR, Tab 4, Initial Exclusion Notice. Lucent responded to the notice on November 10, seeking details regarding the basis of the OCI determination. AR, Tab 5. The contracting officer issued a "Final Determination" on November 16, confirming that Lucent was prohibited from participating in the TETRA device competition because the agency found an OCI under FAR § 9.505-2(a)(1) arising from Lucent's work under the IRCS contract. AR, Tab 8. This FAR provision states:

> If a contractor prepares and furnishes complete specifications covering nondevelopmental items, to be used in a competitive acquisition, that contractor shall not be allowed to furnish these items, either as a prime contractor or as a subcontractor, for a reasonable period of time including, at least, the duration of the initial production contract.

The agency awarded the contract to Sepura on November 24, and this protest followed.

DISCUSSION

Lucent argues that its exclusion from the competition was unreasonable because the contracting officer improperly relied upon the authority in FAR § 9.505-2(a)(1) in determining that Lucent had an OCI. In particular, Lucent argues that FAR § 9.505-2(a)(1) applies only to "complete specifications" for "non-developmental items" (NDI), and that those definitions do not apply to Lucent's activities here. Lucent also argues that the agency failed to reasonably determine whether Lucent could actually benefit from the alleged OCI or skew the competition in its favor. Finally, Lucent contends that the agency failed to consider whether exemptions under the FAR or other factors mitigated the OCI so as to render Lucent's participation in the competition appropriate.[1]

---

[1] Lucent makes several additional allegations that the OCI determination was unreasonable. Although we have addressed the most significant issues in this decision, we have reviewed all of Lucent's contentions and find the balance of those not discussed in detail to lack merit. In addition, the agency and the intervenor have (continued...)

The FAR instructs agencies to identify potential OCIs as early as possible in the procurement process, and to avoid, neutralize, or mitigate significant conflicts before contract award so as to prevent unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity. FAR §§ 9.501, 9.504, 9.505; PURVIS Sys., Inc., B-293807.3, B-293807.4, Aug. 16, 2004, 2004 CPD ¶ 177 at 7. The responsibility for determining whether a contractor has a conflict of interest and should be excluded from competition rests with the contracting officer, who must exercise "common sense, good judgment and sound discretion" in assessing whether a significant potential conflict exists and in developing appropriate ways to resolve it. FAR §§ 9.504, 9.505; Aetna Gov. Health Plans, Inc.; Foundation Health Fed. Servs., Inc., B-254397, et al., July 27, 1995, 95-2 CPD ¶ 129 at 12. We will not sustain a protest challenging an agency's determination that a contractor should be excluded from a procurement based on an OCI unless that determination is shown to be unreasonable. SSR Eng'rs, Inc., B-282244, June 18, 1999, 99-2 CPD ¶ 27 at 2.

Identification of the OCI

Lucent argues that the contracting officer's reliance on FAR § 9.505-2 renders the OCI determination unreasonable, as certain factual predicates of that provision are missing here. Lucent contends that it did not provide "complete specifications" for the TETRA devices, and that the devices are not NDI, as that term is used in the FAR OCI provision.

As a general matter, FAR § 9.505 describes the broad duties and responsibilities of contracting officers to identify and address OCIs, and explains that contracting officers are given broad discretion in the handling of OCIs. Examples of circumstances where contractors with OCIs should be prohibited from competition are discussed in FAR §§ 9.505-1 to 9.505-5 and 9.508, along with exemptions from those provisions. The FAR makes clear, however, that the specific examples listed are considered guidelines, and that situations other than those specifically enumerated may also constitute impermissible OCIs:

> The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations. Some illustrative examples are provided in 9.508. Conflicts may arise in situations not expressly covered in this section 9.505 or in the examples in 9.508. Each individual contracting situation

---

(...continued)
challenged the timeliness of several aspects of Lucent's protest. We have reviewed these arguments and find no basis to find Lucent's protest untimely.

> should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it.

FAR § 9.505.

The contracting officer here cited FAR § 9.505-2 in her November 5 determination, stating that this provision "precludes award to Lucent or any of its subsidiaries." AR, Tab 4. In her November 16 determination, the contracting officer further explained that FAR § 9.505-2(a)(1) "clearly prohibits Lucent from furnishing" the TETRA devices. AR, Tab, 8.

During the telephone hearing conducted by our Office in this matter, the contracting officer stated that, aside from her reliance on the FAR provisions cited in her November 5 and 16 determinations, she had an overarching concern regarding Lucent's role in the procurement:

> Well, in my mind, aside from, you know, 9. -- the FAR reference that I've been talking about; in my mind too, it's my responsibility to ensure that there is full, open and fair competition. To me, Lucent had an unfair advantage because you drafted the specification that was being used in the RFP and you knew this information several months ahead of anybody else in the field. I don't think that it would be fair -- it would not be an even playing field if I had allowed Lucent to participate.

Hearing Transcript (Tr.) at 36:19-37:9.

The parties do not dispute that the revised RFP specifications were based on Lucent's Schedule D, nor do the parties dispute that Lucent sought to submit a proposal to provide those devices.[2] We conclude, therefore, that the contracting officer's determination that Lucent's role in the preparation of the TETRA device specifications and its role as the IRCS contractor and its responsibilities for the AFRN gave rise to an OCI was reasonable, and thus were sufficient to warrant exclusion of Lucent from the competition.

Although we discuss below Lucent's arguments regarding the definitions of complete specifications and NDI under FAR § 9.505-2, our decision denying this protest relies

---

[2] In fact, Lucent notes that it "drafted Schedule D in such a way that it contemplated Lucent would procure the TETRA devices under its existing IDIQ." Lucent Comments at 8.

primarily upon the broad discretion available to contracting officers under FAR § 9.505 in performing their duties to identify and address conflicts of interest.[3] Because the OCI determination was reasonable under the general authority granted to contracting officers, we find no basis to question the decision to exclude Lucent from the competition.[4]

Complete Specifications and NDI Definitions

Lucent argues that the contracting officer's OCI determination was flawed because Lucent did not provide "complete specifications" for the TETRA devices, as that term is used in FAR § 9.505-2(a). Specifically, Lucent contends that it developed the specifications in Schedule D in conjunction with the agency, and that the agency further altered or revised the specifications in Schedule D when it issued the revised RFP.

As a preliminary matter, the FAR does not define the term "complete specifications." A reasonable interpretation of the term suggests that a firm that provides specifications that are necessary and sufficient to inform the solicitation has provided "complete specifications." Based on our review of the record, we agree with the agency that Lucent's Schedule D was the source for the technical

---

[3] Our conclusion here does not pose, as the protester suggests, a concern regarding the weight afforded to the agency's position taken in response to a protest, as compared to a position established during the procurement. In our decision in Boeing Sikorsky Aircraft Support, B-277263.2, B-277263.3, Sept. 29, 1997, 97-2 CPD ¶ 91, we stated that we will accord less weight to agency arguments that are first made in response to a protest, and that do not reflect contemporaneous facts or judgments that are supported by the record. Whereas the agency in Boeing sought to support its source selection decision with a cost/technical tradeoff analysis that it might have made, but did not make, during the procurement, here the contracting officer has always maintained that a disqualifying OCI existed. To the extent the contracting officer relied upon a very specific paragraph of FAR subpart 9.5, of arguably questionable relevance, to support her OCI determination, we see no reason to discount or dismiss the more general authority in FAR subpart 9.5 that she testified that she relied upon in making the OCI determination.

[4] Lucent also argues that the IRCS contract lacked OCI provisions informing Lucent that it might be barred from supplying items for the system it designed. The lack of OCI clauses in a contract, however, does not limit the agency's obligations to identify and address potential OCIs in a procurement that is affected by that contract, nor does the absence of OCI clauses prohibit the agency from barring a potential offeror from a competition based on an OCI determination. See DSD Labs., Inc. v. United States, 46 Fed. Cl. 467, 473 (2000), citing NKF Eng'g, Inc. v. United States, 805 F.2d 372 (Fed Cir. 1986).

specifications in the revised RFP and that the specifications provided by Lucent are nearly identical to those listed in the amended RFP. Compare RFP, Amend. 2, at 3-10 with AR, Tab 18, Lucent Schedule D.[5]

Lucent characterizes its work on Schedule D as a collaboration with the agency, and thus argues it did not provide complete specifications. FAR § 9.505-2(a)(1)(ii) provides that the OCI exclusion rule does not apply where contractors prepare specifications under the supervision and control of government representatives. Lucent's references to the record do not, however, conclusively establish that the agency played a joint role in developing the TETRA device specifications, or one that would rise to the level of supervision and control by the agency. At best, correspondence cited by Lucent suggests that the agency was kept apprised of Lucent's progress on the Schedule D specifications, participated in some discussions regarding Lucent's development of the specifications, and provided some comments or feedback prior to the final version of the specifications. See Protester's Comments, Exh. 9, E-mail Correspondence Between Agency Technical Representatives for IRCS Contract and Lucent; id., Exh. 1, Decl. of Lucent Technical Manager, at 1; id., Exh. 2, Decl. of Lucent Technical Consultant, at 1. The record clearly shows that Lucent provided technical specifications for the TETRA devices under IRCS Task Order 2, and that the agency incorporated those specifications into the revised RFP.[6]

Lucent next argues that the agency's modifications to the specifications as part of their incorporation into the revised RFP precluded a determination that Lucent's specifications were "complete." The agency contends that its modifications to Schedule D were for the limited purpose of removing unduly restrictive, vendor-

---

[5] Lucent does not dispute this point, and acknowledges, "The Army apparently used a 'Schedule D' document that Lucent had developed jointly with the Army program personnel in July 2004 as the starting point for the amended solicitation." Protester's Comments at 16.

[6] Lucent cites our decision in American Artisan Prods., Inc., B-292559, B-292559.2, Oct. 7, 2003, 2003 CPD ¶ 176, to support its argument that it was exempted from the FAR OCI provisions because it did not provide "complete specifications." In American Artisan we agreed with the agency that the awardee did not have a disqualifying OCI arising from its subcontractor's work preparing certain specifications for the solicitation. Among other reasons for denying the protest, we found that the awardee's subcontractor was one of several contractors that worked on the development and design work, and thus did not provide "complete" specifications. Here, in contrast, Lucent was the only contractor that provided the technical specifications for the TETRA devices, and, as discussed above, Lucent has not demonstrated that the agency substantively collaborated in developing those specifications.

specific provisions. Memorandum of Law at 5; Agency Technical Representative Decl. at 2. The contracting officer testified that she reviewed the scope of changes to Schedule D that were incorporated into the amended RFP and was informed by agency technical representatives that the changes eliminated overly restrictive provisions. See Tr. at 30:21-33:17. Based on this information, the contracting officer found no basis to consider the specifications sufficiently changed to eliminate the OCI concern regarding Lucent's participation:

> I would have to say that, you know, whenever we were thinking about how we could resolve this particular situation -- even with the minor changes that were made, I mean, there were only like minor changes to about 16 of the specifications, I believe. You know, with the whole -- pages and pages of specifications, there are so few changes that I didn't see how the OCI issue would disappear because of the minor changes that were made.

Tr. at 34:17-35:6.

We agree with the agency that these changes, individually and taken as a whole, do not constitute a major revision of the Lucent-prepared specifications, particularly in light of the fact that the vast majority of the technical specifications remain unchanged. The protester cites no authority to suggest that any degree of alteration of specifications provided by a potential offeror will preclude a finding that the offeror has an OCI based on preparation of specifications.[7] We therefore cannot conclude that the contracting officer was unreasonable in determining that the agency's changes to the specifications did not eliminate the OCI concerns regarding Lucent.

With regard to the definition of NDI, the parties agree that the TETRA devices are commercial items, in that they are sold commercially. The parties dispute, however, whether the TETRA devices are NDI, as that term is used in the FAR. The FAR defines NDI as:

> (1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;

---

[7] Lucent's position is particularly unreasonable because that position suggests that an agency's efforts to expand the scope of competition by revising certain overly restrictive portions of contractor-prepared specifications would negate the agency's ability to eliminate that contractor from participation in a procurement based on those specifications if an OCI was identified. Such a rigid rule is not consistent with the broad authority granted to contracting officers to address OCIs under FAR § 9.505.

(2) Any item described in paragraph (1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or
(3) Any item of supply being produced that does not meet the requirements of paragraphs (1) or (2) solely because the item is not yet in use.

FAR § 2.101. NDI is also listed under the definition of "commercial item," which lists NDI as one of eight categories of items that are considered commercial: "A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local governments." Id. Furthermore, NDI is defined under the Federal Acquisition Streamlining Act (FASA) as "any of the following: (A) Any commercial item . . . ." 41 U.S.C. § 403(13) (2000).

Lucent argues that because the TETRA devices are sold in substantial quantities in the commercial marketplace, they do not meet the "used exclusively for governmental purposes" definition of NDI under in FAR § 2.101. We acknowledge that, if the definition of NDI means only those items used exclusively for governmental purposes, then the contracting officer's reliance on FAR § 9.505-2 may have been in error. Although an argument could be made that NDIs cannot reasonably be limited to items used exclusively by the government, and the agency and intervenor advance the commercial item definitions in the FAR and FASA to support a broader definition of NDI, we need not resolve a dispute regarding the definition of NDI. As discussed above, we conclude that the contracting officer's intent was to exclude Lucent based on its role in preparing the specifications for the TETRA devices. To the extent that the contracting officer's reliance on FAR § 9.505-2(a) was misplaced based on interpretations of the NDI definition, we do not believe that any potential error here prejudiced Lucent. To succeed in its protest, the protester must demonstrate not only that the agency failed to follow established procedures, but also that the failure could have materially affected the outcome of the competition. McDonald Bradley, B-270126, Feb. 8, 1996, 96-1 CPD ¶ 54 at 3; see Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). As discussed above, the contracting officer had an independent legal basis for barring Lucent from the competition based on her broad, inherent authority to address OCIs.

Advantage From The OCI

Lucent next argues that even if the agency determined that there was a potential OCI, the agency failed to establish that Lucent would receive an actual benefit from its role in preparing the technical specifications, or that the competition would actually be skewed as a result of Lucent's role. Lucent argues that the OCI provisions do not apply to it because it does not manufacture or commercially resell the TETRA devices, and that FAR § 9.505-2(a)(2) only permits excluding a contractor

from a competition to "avoid the situation where the contractor could prepare specifications favoring its own products or capabilities."

The contracting officer testified that she considered Lucent to have an OCI because of the advantage conferred by preparation of the TETRA device specifications and the resulting knowledge of those specifications prior to the issuance of the RFP: "Well, [Lucent] fit into [the OCI concern] because they furnished the specifications. And it's very clear that they're not allowed to furnish the specifications and then turn around and furnish the items." Tr. at 24:7-11; see also, Tr. at 36:14-37:9.[8]

Contracting officers are required to address both actual and apparent OCIs, and the facts necessary to establish an OCI are those that pertain to the existence of the conflict, rather than its precise impact. Aetna Gov. Health Plans, Inc., supra, at 16 ("It is true that a determination to exclude an offeror must be based on hard facts, rather than mere suspicion . . . The facts that are required, however, are those which establish the existence of the organizational conflict of interest, not the specific impact of that conflict.") Agencies may reasonably conclude that a contractor's preparation of specifications for a contract give that contractor an inherent advantage sufficient to warrant exclusion from the competition. See, e.g., SSR Eng'g, Inc., supra, at 3-4; Basile, Baumann, Prost & Assocs., Inc., B-274870, Jan. 10, 1997, 97-1 CPD ¶ 15 at 4-5. Where, as here, the agency and protester dispute the actual utility of the alleged advantage conferred upon the conflicted contractor, we will not overturn the agency's determination unless it is clearly unreasonable. SSR Eng'g, Inc., supra. In our view, even the appearance of an unfair competitive advantage may compromise the integrity of the procurement process, thus justifying a contracting officer's decision to err, if at all, on the side of avoiding the appearance of a tainted competition. Based on the record here, we have no basis to question the agency's determination that Lucent's role in preparing the specifications gave that contractor an unfair competitive advantage.

Exemption from OCI Provisions

Lucent also argues that it is exempted from an OCI disqualification under the FAR provisions regarding preparation of work statements by offerors who perform "development and design" work. The FAR provision cited by Lucent states that:

---

[8] The agency expresses concern that Lucent prepared the specifications in a manner that would favor a Motorola-based product, and that Lucent intended to provide the TETRA devices through a relationship or arrangement with Motorola. Lucent contends that the agency has not demonstrated that such a relationship existed. Because we conclude that the agency's concern regarding Lucent's role in preparing the specifications, in and of itself, was sufficient to warrant excluding Lucent from the competition, we need not address further the agency's concern in this regard.

> (b)(1) If a contractor prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services-or provides material leading directly, predictably, and without delay to such a work statement-that contractor may not supply the system, major components of the system, or the services unless- . . .
> (ii) It has participated in the development and design work . . .

FAR § 9.505-2(b)(1)(ii).

The contracting officer testified that she considered whether the exceptions for development and design contractors applied, and found that the facts here did not exempt Lucent from the OCI. See Tr. at 19:17-21:5, 38:18-42:4. In any case, we find that the development and design exemption under FAR § 9.505-2(b) is not relevant to the OCI at issue here, as the exemption applies to the system or services being competitively acquired, and not other systems or services that the potentially conflicted offeror provides. Lucent does not claim that it was the developer of the TETRA technology itself. Instead, Lucent prepared the TETRA device specifications for the procurement here as part of its work under IRCS Task Order 2 based on Lucent's request for information from vendors and review of existing technological standards. Thus, Lucent cannot credibly argue that it should be exempted from the OCI provisions at FAR § 9.505-2 based on the exemption that applies to "development and design" contractors of the technology to be acquired.

Mitigation of the OCI

Lucent finally contends that the agency failed to properly consider whether the OCI could have been mitigated. The contracting officer stated that she "saw no potential means of mitigating this OCI given the clear language of the FAR regarding contractors who design specifications for the government, and given the extent to which Lucent was involved both with the program office and the specification." Contracting Officer's Statement at 2. The contracting officer also advised the head of the contracting activity of Lucent's request for a waiver of the OCI, and the request was denied. Contracting Officer's Statement at 2.

Although Lucent argues that it should have been provided an opportunity to submit a mitigation plan, it had an opportunity to do so during its exchanges with the agency. FAR § 9.504 requires the contracting officer to provide an offeror the opportunity to respond to an OCI determination if the contracting officer intends to withhold award based on that determination. Lucent submitted several written objections to the OCI determination following the contracting officer's November 5 determination and prior to and following her final determination on November 16. See AR, Tab 5, Letter from Lucent to the Contracting Officer (Nov. 10, 2004); Tab 6, Letter from Lucent to the Contracting Officer (Nov. 15, 2004); Tab 9, Letter from Lucent to the Contracting Officer (Nov. 23, 2004). Lucent's decision to contest the basis of the OCI

determination rather than submit a proposal to mitigate the agency's concern provides no basis to challenge its exclusion from the competition.

The protest is denied.

Anthony H. Gamboa
General Counsel

## SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

1. REQUISITION NO. W915WE42852257
PAGE 1 OF

2. CONTRACT NO. W914NS-05-F-9001
3. AWARD/EFFECTIVE DATE 14 Oct 04
4. ORDER NO.
5. SOLICITATION NO.
6. SOLICITATION ISSUE DATE

7. FOR SOLICITATION INFORMATION CALL:
a. NAME Robert Mueller email Robert.mueller@CPA-IQ.ORG
b. TELEPHONE NO. (No collect calls) 703-343-9222
8. OFFER DUE DATE/LOCAL TIME

9. ISSUED BY CODE
PCO- Contracting Activity
Republican Presidential Compound
Baghdad, Iraq
APO AE 09316

10. THIS ACQUISITION IS ☒ UNRESTRICTED ☐ SET ASIDE: % FOR ☐ SMALL BUSINESS ☐ SMALL DISADV. BUSINESS ☐ 8(A)
SIC:
SIZE STD:

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED ☐ SEE SCHEDULE
12. DISCOUNT TERMS **Net 30**
☐ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING
14. METHOD OF SOLICITATION ☐ RFQ ☐ IFB ☐ RFP

15. DELIVER TO CODE
IN ACCORDANCE WITH CONTRACTOR PROPOSAL AND STATEMENT OF WORK

16. ADMINISTERED BY CODE
Same as block 9

17a. CONTRACTOR/OFFEROR CODE FACILITY CODE
American Radio In
6310 Riverdale Street
San Diego Ca 92120
TELEPHONE NO. 619 [illegible] 5020 EMAIL: dom@americanradio.us

18a. PAYMENT WILL BE MADE BY CODE
US Army Corps of Engineers Financial Center
Attn: CEFC-FP
5722 Integrity Drive
Millington, TN 38054-5005
Attn: Capt Matthew Carver
PCO Comptroller Office 703 343 9246
cefc-P0invoices@usace.army.mil

☐ 17b CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED ☐ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | IN ACCORDANCE WITH CONTRACTOR PROPOSAL AND STATEMENT OF WORK | | | | |
| 0001 | Retrofit of MPT portables (FFP partial payments authorized) | 1502 | Ea | $189.00 | $283,878.00 |
| 0002 | Miscellaneous expenses (FFP – Final payment only) | 1 | Jb | $30,000.00 | $30,000.00 |
| 0003 | Labor (partial payments authorized – not to exceed (NTE) amount, contractor entitled only to actuals up to NTE amount) | nte 100 | Days | $500.00 | NTE $50,000.00 |
| | Delivery 30 Nov 04 | | | | |
| | *(Attach Additional Sheets as Necessary)* | | | | |

25. ACCOUNTING AND APPROPRIATION DATA
21 11 2004 1096.0103 P0 2004 CP CP01 024000 40044 25GY 2LFC63

26. TOTAL AWARD AMOUNT *(For Govt. Use Only)* NOT TO EXCEED: $363,878.00

☐ 27a SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED.
☐ 27b CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☒ ARE ☐ ARE NOT ATTACHED.

☐ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN.

☐ 29. AWARD OF CONTRACT: REFERENCE OFFER DATED ______. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR [signature]
31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) [signature]

30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT) Don Driscoll - President
30c. DATE SIGNED 10-14-04
31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT) ROBERT R. MUELLER
31c. DATE SIGNED 15 Oct 04

32a. QUANTITY IN COLUMN 21 HAS BEEN ☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED
33. SHIP NUMBER ☐ PARTIAL
34. VOUCHER NUMBER
35. AMOUNT VERIFIED CORRECT FOR
36. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐
37. CHECK NUMBER
32b. SIGNATURE OF AUTHORIZED GOVT REPRESENTATIVE
32c. DATE
38. S/R ACCOUNT NO.
39. S/R VOUCHER NO.
40. PAID BY
42a. RECEIVED BY (Print)
41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT
41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER
41c. DATE
42b. RECEIVED AT (Location)
42c. DATE REC'D (YY/MM/DD)
42d. TOTAL CONTAINERS

AUTHORIZED FOR LOCAL REPRODUCTION
Computer Generated
SEE REVERSE FOR OMB CONTROL NUMBER AND PAPERWORK BURDEN STATEMENT
STANDARD FORM 1449 (10-95)
Prescribed by GSA - FAR (48 CFR) 53.212

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

1. REQUISITION NO. W915WE42852257
PAGE 1 OF

2. CONTRACT NO. W914NS-05-F-9001
3. AWARD/EFFECTIVE DATE 14 Oct 04
4. ORDER NO.
5. SOLICITATION NO.
6. SOLICITATION ISSUE DATE

7. FOR SOLICITATION INFORMATION CALL ▶
a. NAME Robert Mueller email Robert.mueller@CPA-IQ.ORG
b. TELEPHONE NO. *(No collect calls)* 703-343-9222
8. OFFER DUE DATE/LOCAL TIME

9. ISSUED BY CODE
PCO- Contracting Activity
Republican Presidential Compound
Baghdad, Iraq
APO AE 09316

10. THIS ACQUISITION IS
☒ UNRESTRICTED
☐ SET ASIDE: % FOR
☐ SMALL BUSINESS
☐ SMALL DISADV. BUSINESS
☐ 8(A)
SIC:
SIZE STD:

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
☐ SEE SCHEDULE

12. DISCOUNT TERMS
Net 30

☐ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING

14. METHOD OF SOLICITATION
☐ RFQ ☐ IFB ☐ RFP

15. DELIVER TO CODE
IN ACCORDANCE WITH CONTRACTOR PROPOSAL AND STATEMENT OF WORK

16. ADMINISTERED BY CODE
Same as block 9

17a. CONTRACTOR/OFFEROR CODE FACILITY CODE
American Radio Inc
6310 Riverdale Street
San Diego Ca 92120
TELEPHONE NO. 619 239 5020 EMAIL: dom@americanradio.us

18a. PAYMENT WILL BE MADE BY CODE
US Army Corps of Engineers Financial Center
Attn: CEFC-FP
5722 Integrity Drive
Millington, TN 38054-5005
Attn: Capt Matthew Carver
PCO Comptroller Office 703 343 9246
cefc-P0invoices@usace.army.mil

☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED ☐ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | IN ACCORDANCE WITH CONTRACTOR PROPOSAL AND STATEMENT OF WORK | | | | |
| 0001 | Retrofit of MPT portables (FFP partial payments authorized) | 1502 | Ea | $189.00 | $283,878.00 |
| 0002 | Miscellaneous expenses (FFP – Final payment only) | 1 | Jb | $30,000.00 | $30,000.00 |
| 0003 | Labor (partial payments authorized – not to exceed (NTE) amount, contractor entitled only to actuals up to NTE amount) | nte 100 | Days | $500.00 | NTE $50,000.00 |
| | Delivery: 30 Nov 04 | | | | |
| | *(Attach Additional Sheets as Necessary)* | | | | |

25. ACCOUNTING AND APPROPRIATION DATA
21 11 2004.1096.0103 P0 2004 CP CP01 024000 40044 25GY 2LFC63

26. TOTAL AWARD AMOUNT *(For Govt. Use Only)*
NOT TO EXCEED: $363,878.00

☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED.

☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☒ ARE ☐ ARE NOT ATTACHED.

☐ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN __1__ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN.

☐ 29. AWARD OF CONTRACT: REFERENCE ________ OFFER DATED ________. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR

31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)*

30b. NAME AND TITLE OF SIGNER *(TYPE OR PRINT)*
30c. DATE SIGNED

31b. NAME OF CONTRACTING OFFICER *(TYPE OR PRINT)*
ROBERT R. MUELLER
31c. DATE SIGNED

32a. QUANTITY IN COLUMN 21 HAS BEEN
☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED

33. SHIP NUMBER
☐ PARTIAL
34. VOUCHER NUMBER
35. AMOUNT VERIFIED CORRECT FOR

36. PAYMENT
☐ COMPLETE ☐ PARTIAL ☐
37. CHECK NUMBER

32b. SIGNATURE OF AUTHORIZED GOVT REPRESENTATIVE
32c. DATE

38. S/R ACCOUNT NO.
39. S/R VOUCHER NO.
40. PAID BY

42a. RECEIVED BY *(Print)*

41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT
41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER
41c. DATE

42b. RECEIVED AT *(Location)*
42c. DATE REC'D *(YY/MM/DD)*
42d. TOTAL CONTAINERS

AUTHORIZED FOR LOCAL REPRODUCTION
Computer Generated

SEE REVERSE FOR OMB CONTROL NUMBER AND PAPERWORK BURDEN STATEMENT

**STANDARD FORM 1449** (10-95)
Prescribed by GSA - FAR (48 CFR) 53.212

# MANDATORY SHIPPING DIRECTIONS

## PCO Logistics:

PCO Logistics is required to track equipment, materials and goods coming into Iraq under the Re-building Iraq effort. This tracking and inherent accountability process will assist in assuring that all equipment materials and goods are able to cross the borders and move to final destination with minimal delay and at reduced risk. However, in order to accomplish this mission, maximum cooperation is necessary. Prompt notification and compliance with our information requirements will assist in providing advance notice to the point of entry of all inbound shipments. This process affords coordination in the movement of all convoys which will enable improved monitoring and de-conflicted convoy schedule. Prompt notification also improves security coordination through the operations center.
To get started follow the following steps:

Step One:
Upon contract award the contractor is required to provide the necessary logistical information needed by PCO Logistics. This information can be provided and updated as necessary by going to the PCO website (http://www.rebuilding-iraq.net) and logging in by selecting "Contractor/Vendor Log In" under the Logistic heading. Initial log in will require the user to request a user name and password. Once the username and password is provided the user can identify and grant access to the other members or subcontractors. Should there be any problems with this process contact the Logistics Movement Coordination Center (LMCC) Watch Officer directly at the following e-mail address: pcolmcc@halliburton.com and the necessary assistance will be provided. If the interim process is still in place the contractor will find four (4) forms listed and available under the logistics heading (Logistics Information Requirements Form, Reconstruction Levy Exemption Form, Cargo Plaques and Logistical Support Request). Those forms should be individually completed and, with the exception of the cargo plaque, sent electronically to the above mentioned e-mail address for the LMCC. The first form submitted will be the Logistics Information Requirements Form. The Logistics Information Requirements Form should be completed upon award of contract and updated as necessary. All updates and changes to this form should be sent to the same e-mail address as the original form. Additional contact information is available on the website mentioned above. Always reference the contract number.

Step Two:
**CPA 1-47 CUSTOMS LEVY EXEMPTION AND SHIPMENT REQUIREMENTS FOR RECONSTRUCTION PROJECTS UNDER PROJECT AND CONTRACTING OFFICE (PCO)**

Effective 15 April 2004 Tariff Regulations pursuant to CPA Orders #54, as amended by Order #70 (Orders #54 and #70 are posted on the website), require commercial importations into Iraq to pay a 5% levy except for food, books, medicine, medical equipment, clothes and oil. Additional exemptions include NGO's, International Organizations, **Reconstruction Projects under PCO**, and single exempt donations. Items shipped under this contract are exempt from this "Levy" provided a completed Reconstruction Levy Exemption Form is attached and included with each invoice and packing slip.

**The contractor is required to fill out the Reconstruction Levy Exemption Form and attach the duty free form to each shipment of goods under this contract that crosses the border into Iraq in order to qualify for the exemption. The contractor must submit one copy of the completed duty free form and a copy of the first page of the primary contract, for customs verification, to the contracting officer and the PCO Logistics Office at pcocustoms@halliburton.com) 72 hours prior to the planned arrival date at the Iraq point of entry.**

Step Three:
The items being acquired are for Iraqi Reconstruction and as per the "Packing and Marking Instructions" of this contract, and shall be Packaged and Marked accordingly. Additionally, a Cargo Plaque is available from the website at http://www.rebuilding-iraq.net under the logistics tab located at the top of the page. There is a memorandum posted that explains how to complete the plaques. There are three plaques, one is for shipments arriving into Baghdad International Airport, one is for shipments arriving into the Port of Umm Qasr, and the third one is for all other shipments. The use of these plaques will ensure they are properly identified as PCO shipments and will reduce risk of loss or pilferage. Each shipment must have a cargo plaque affixed to all sides of each container, pallet, or package.

Step Four:
If this contract has the shipment bound for a PCO warehouse location and will require PCO Logistics to assist in the shipment from the point of entry into Iraq or material handling equipment support at the warehouse, a Logistical Support Request (LSR) must be completed and submitted 48 hours prior to expected movement of the shipment or its arrival at the point of entry. The LSR can be found at the above mentioned web site under the logistics tab.

It is the contractor's responsibility to provide all the requested information mentioned above as well as using the identified cargo plaques in sufficient time to allow for required delivery. Failure to comply with these instructions may result in a delay of the goods and materials being shipped from arriving at their final destination. Delays resulting from failure to follow the above steps may be assigned as the contractor's responsibility.

# STATEMENT OF REQUIREMENTS FOR

# TRUNKED UHF RADIO UPGRADE

# FOR

# IRAQI SECURITY FORCES

1.0 **GENERAL** The Coalition Provisional Authority now MNSTC-I has a requirement to upgrade UHF radio systems in four cities to provide trunked communications.

2.0 **BACKGROUND** The current radio systems in Ad Diwaniyah, An Najaf, Al Hillah and Karbala are FM single channel systems. These systems provide basic communications capabilities for the Iraqi Police Forces, however, the systems are encrypted with a Type I encryption system which requires hand keying the radios to change encryption. Because it is impractical to do so on a frequent basis, lost and captured radios can be used to monitor police communications. In addition, the capacity of these systems is limited. Converting these cities to trunked networks will allow compromised radios to be cut out of the system from a central station In addition, the capacity of the current system will be increased.

3.0 **SPECIFICATIONS:**

3.1 Retrofit 1502 portable radios to MPT trunked capable systems.
3.2 Install and configure upgrades to convert the 4 cities to trunked systems.

.0 **PERIOD OF SERVICE**
4.1 The warranty period will not be less than one year

5.0 **CONTRACTOR RESPONSIBILITIES**
5.1 Will provide unit programming software, cable for both PC download/unit to unit cloning, documentation and training.
5.2 Will provide distribution and installation of the radios at designated sites.
5.3 Will provide an efficient and effective project management and tracking mechanism to ensure the devices are properly fielded.
5.4 Will provide training on the systems.

6.0 **GOVERNMENT RESPONSIBILITIES**
6.1 Providing a distribution plan and coordinating a distribution schedule.
6.2 Provide frequency plans.

7.0 **CONTRACTOR RESPONSIBILITIES**
7.1 Submit status updates in writing to the CPATT C6 as directed by the CPATT C6.
7.2 Provide proper documentation (CPATT approved) to tracking the issue and installation for each location, prior to submitting and request for payment.
7.3 Coordinate the delivery schedule with the CPATT C-6 to ensure that deliveries to priority locations are met first.
7.4 Will provide the government all codes and programming data files in writing and electronically

7.5 Provide accurate tracking data of each shipment.

8.0 **PROJECT MANAGEMENT:** The vendor will provide project management to coordinate the installation. This project manager will be responsible for but not limited to:

8.1 Accurately tracking installation status.

8.2 Inventory status and accounting.

8.3 Reporting status as required to CPATT.

8.4 Training and engineer planning.

**Four City Technology Demonstration Trunking Upgrade Proposal**

Our initial tasking proposal to demonstrate technology and begin program would be focused on the following four cities, the list for which was provided by LTC Fretheim.

1. Ad Diwaniyah
2. An Najaf
3. Al Hillah
4. Karbala

Our recommendation for these four cities is as follows:

1. 4 – Six channel MPT combined trunked single site repeater system, 24 channels total, all of which are already awarded via contract 0032.

   Total price: $0.00

2. 1378 MPT portable radios already awarded: $0.00

3. With 24 Trunked channels @ 100-120 units load capacity per Trunked repeater channel, number of recommended units would be roughly 2880 units with 1378 already contracted for. Balance remaining would be 1502 MPT portable radios which will be upgraded from conventional units to MPT trunked units @ ~~179~~ 189 per unit.

   Retrofit price for an additional 1502 MPT portables: ~~$268,858.00~~ $283,878.00

4. Base Stations are already awarded with 116 units yet to be assigned

   Base Stations Awarded via contract 0032: $0.00

5. Labor; to include 4 travel days for a single commitment of one week or 7 days for 3 technicians; 11 days total (21 day minimum applies) for 3 technicians or 63 working days

   Total for ~~63~~ 100 days ~~minimum~~ maximum @ $500 per day: ~~$31,500.00~~ $50000.00

6. Miscellaneous expenses: Travel, expedite fees, etc. $30,000.00

Four City Total: $330,358.00

Note: Our Company holds a Federal Supply Schedule with the US General Services Agency, or GSA. All products and service are available to be purchased through this contracting medium for ease of process.

Note: Should the four city plan be adopted for action, we would commence preparation immediately; anticipated start date roughly 30 from receipt of order; 7 days to completion.

# Memorandum of Record
# W914NS-05-F-9001
# Best Value Determination
# 15 Oct 04

This purchase is a natural follow on to retrofit radios previously bought from American Radio. The issues considered for this job was familiarity of the products and their locations, affect on the existing warranties and ability to do the job in a timely manner.

ARI knows where all the radios are currently deployed. They have personnel currently on the ground in country assisting with the dissemination of the radios to be retrofitted and can start immediately with this project. For this reason ARI is determined to represent the best value to the government.

Robert R. Mueller, MSgt, USAF
Contracting Officer