**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRAECOMM, INC d/b/a AMERICAN RADIO<br>Plaintiff, | ) | |
| v. | ) | No. 06-54C<br>(Judge Lettow) |
| THE UNITED STATES OF AMERICA,<br>Defendant. | ) | |

**<u>DECLARATION OF COLONEL JOHN L. GRAHAM</u>**

I, COL John L. Graham, U.S. Army, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge.

1. I am currently a U.S. Army Reserve retiree recalled on active duty as a U.S. Army Officer assigned to the 311th Theater Signal Command, Fort Meade, Maryland assigned for duty in Korea as the G6, 8th Army, Yongsan Army Post, Korea. Prior to this assignment I was deployed to Iraq from June 15, 2004 through May 25, 2005. I was the J-6 (officer in charge of communications) for the Multi National Security Transition Command – Iraq ("MNSTC-I") from August 1, 2004 until May 25, 2005. MNSTC-I's overall mission is to develop, organize, train, equip and sustain the Iraqi Security Forces ("ISF"). The ISF is composed of the Iraqi Armed Forces and Iraqi Police Service. As the J6, I was also responsible for the internal communications for the Staff and Service members of MNSTC-I.

2. As the Officer in Charge of Communications, I was also responsible for the oversight, management and implementation of the communications systems for all Iraqi

JLG

security forces. Since there was no remaining information infrastructure left after the first phase of the war, I was responsible for rapidly replacing all communications needed to run a modern security force. I was responsible for the Cellular Phone System we procured and installed at 16 military bases. I also provided 40,000 radios to the Iraqi Army.

3. The most critical communication capability for the developing Iraqi Security Forces was the use of radio networks. This equipment was, and is, critical because it allows the ISF units to communicate with each other to respond to emergencies as quickly as possible. The handheld radios also allow them to communicate with each other regarding enemy actions/movement.

4. There were three distinct phases of providing handheld radio capability to the Iraqi Police. The first phase was focused on equipping the Greater Baghdad City Police with basic handheld radio capability. This was accomplished through a contract with Motorola that was awarded and administered by the Coalition Provisional Authority ("CPA"). The second phase, known as the First Responders Network ("FRN") involved Mr. DiLuigi's company, known to me as "American Radio" (a.k.a. "PraeComm"). This phase was intended to provide basic radio capability to several cities *outside* of Baghdad. The initial FRN contracts for American Radio's system was awarded in late 2003 and administered by the CPA. The later commercial items contracts for the upgraded "trunked" network (Contracts 9001 and 9027) were awarded by the "Project and Contracting Office" ("PCO") which was later re-named as the "Joint Contracting Center" ("JCC"). The PCO was comprised largely of contracting personnel that assist the customer (such as MNSTC-I and the CPATT) with the contract solicitation, award and

JH

administration. Throughout 2003 and 2004 a more comprehensive system called the Advanced First Responders Network ("AFRN") was being planned by the staff of the Iraqi Reconstruction Management Office (IRMO), which was initially part of the CPA and then later fell under the U.S. State Department.

5. Although the AFRN system was intended to be a comprehensive system with an aggressive implementation plan, the number of cities that the AFRN system was going to cover was constantly shifting throughout the second half of 2004. Further, in September of 2004, I was told by Dr. Arno Kosco, the IRMO, Chief Advisor for the Ministry of Communications, that the AFRN system was experiencing delays and would likely be de-scaled to a point that it would not cover many of the cities that it was originally planned to cover. The AFRN contract for end user equipment was awarded in November 2004 to a company by the name of Sepura, Ltd. This award was protested by Lucent Technologies, Inc. Lucent was excluded from the competition based on an organizational conflict of interest because they were involved in designing the AFRN system. This protest further delayed the implementation of the AFRN system.

6. Although the equipment included in the American Radio systems that was installed in many cities throughout Iraq was functioning properly, the realities of the Iraqi combat environment were seriously eroding the effectiveness of those systems. Since the American Radio system was a non-truncated single-channel system, the security of the radio systems was jeopardized whenever a radio was lost, stolen or captured. Many times, those who were hired to serve as members of the Iraqi Police would abruptly quit the force and abscond with their handheld radios. Many of those who absconded would sell their radios to other Iraqis. Frequently, these handheld radios would show up in

JHG

marketplaces and U.S. forces would have to buy them back. Also, given the constant violent attacks on Iraqi Policemen, radios were often destroyed, lost or captured. An unaccounted for radio meant that the enemy could very well be listening in to communications on the system. This posed a serious danger to both Iraqi and Coalition Forces because it allowed enemy forces to track their movement. When a radio was lost, captured or stolen under the existing single channel system supplied by American Radio, all of the remaining radios needed to be reprogrammed by hand to eliminate the threat that the enemy was tracking U.S. and Iraqi forces with the missing radio.

7. As a result of this situation on the ground, I had discussions with Lieutenant Colonel ("LTC") Erik Fretheim regarding upgrading the radio systems to increase the security of the systems. LTC Fretheim was the C-6 (officer in charge of communications) for the Civilian Police Assistance and Transition Team ("CPATT") which focuses mainly on the Iraqi Police Forces – a portion of the overall Iraqi Security Forces. We recognized the need for a "trunked" handheld radio network. A trunked system, unlike a single channel system, allows for a missing radio to be individually disconnected from the network, allowing the other radios to continue operation without adjustment. Further, the existing single channel system did not allow room for significant bandwidth expansion on the system, which prevented the addition of new users. A trunked radio system, by contrast, increased the available bandwidth allowing more handheld radio users to operate within the system. In light of the need to upgrade the American Radio system and the delays and reported de-scaling of the AFRN system, I contacted Mr. DiLuigi regarding his company's ability to upgrade the system in the Fall of 2004. I explained to Mr. DiLuigi that we were seeking to upgrade the existing single channel radios delivered

JH

under Contract 0032 to a trunked system in the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Mr. DiLuigi's company was contacted because his company had already supplied handheld radios to these cities pursuant to Contract 0032.

8. I remember having several discussion with Mr. DiLuigi. LTC Erik Fretheim, the CPATT C-6 was also involved in those discussions. The discussions with Mr. DiLuigi were focused on the ability of his company to provide the upgraded network. I did not discuss the pricing of his radio equipment in any manner. I was looking at the issue from a technical and strategic planning perspective. I did not promise Mr. DiLuigi any future contracts. The information that I relayed to Mr. DiLuigi was accurate at the time that we discussed upgrading the American Radio systems. We were operating in a fluid combat environment where events on the ground were unpredictable and dictated constant changes to existing plans. In summary, all representations that were made to Mr. DiLuigi were in good faith and I am not aware of any evidence to the contrary.

9. Shortly after the award of the contract for the four cities mentioned above, LTC Fretheim and I decided that we wanted to similarly upgrade existing radio systems in approximately 12 additional Iraqi cities. This led to the award of Contract 9027 to American Radio.

10. After the two commercial items contracts for American Radio's systems were awarded, the number of cities and locations that were planned to fall under the AFRN system, continued to change. This was due in part to increasing violence in several cities that made the comprehensive installation work that was required to support the AFRN system virtually impossible. At the time that Contracts 9001 and 9027 were signed, I expected that they would go into the cities listed in those contracts. However, in a

JtG

combat environment like Iraq, plans changed in response to the fluctuating security situation. Contractors and military personnel had to deal with this constantly changing environment – and PraeComm was not exempt from this reality.

John L Graham

COL JOHN L.GRAHAM

2-22-07

DATE