# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRAECOMM, INC d/b/a AMERICAN RADIO<br>Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-54C |
| | ) | (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## DECLARATION OF LIEUTENANT COLONEL ERIK FRETHEIM

I, Erik Fretheim, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge.

1. I am currently an Individual Mobilization Augmentee with duty as an Assistant Professor in the Department of Electrical Engineering and Computer Science at The United States Military Academy at West Point, New York.

2. I was deployed to Iraq as a Signal Corps Officer from August 5, 2004 through December 15, 2004. Except for the last three weeks of that deployment, I served as the C-6 (officer in charge of communications) for the Civilian Police Assistance Training Team ("CPATT"). As the officer in charge of communications I was responsible for the communications equipment in support of the Iraqi Police Forces, and other Security Forces of the Iraqi Ministry of the Interior.

3. When I first arrived in Iraq, Baghdad's radio capability was being provided pursuant to a contract for handheld radios with Motorola. There was no comprehensive radio system for cities outside of Baghdad at the time I arrived. However, there were some simple radio systems being installed by companies such as American Radio (a.k.a

"PraeComm"). I was aware that PraeComm had installed single-channel radios into 16 Iraqi cities pursuant to a pre-existing contract that dated back to late 2003.

4. Although the FRN radio systems were having some success, the single-channel mode of the radio systems led to a series of problems. First of all, whenever a radio was lost, stolen or captured, all of the radios needed to be hand keyed to a new frequency to avoid the possibility that the enemy was listening to the communications of the Iraqi Police Forces. This was a labor-intensive distraction to the mission. Secondly, a single channel radio system limits the number of radios that can be added to the system. Since the Iraqi Police Forces were growing in numbers, we needed to find a way to link more handheld radios to the existing systems. Further, the ratio of Iraqi Police to a radio was reduced from 7:1 to 3:1. The original ratio had assumed that all police were deployed in larger groups, however this turned out not to be the case. A "trunked" radio system was seen as the solution for both problems outlined above. When a radio is unaccounted for on a trunked system, it can simply be shut out of the system by a central operator. Therefore, no hand-keying of radios is necessary with the trunked system. Further, a trunked system allows for increased bandwidth which allows more handheld radios to be linked into the system. It was this requirement for trunked radios that led to me contacting PraecComm's President, Mr. DiLuigi, regarding his company's ability to provide a trunked system for their pre-existing radio systems. I am very familiar with these two contracts. I wrote the statement of work for both of them and I discussed these contracts with Mr. Di Luigi before they were awarded.

5. The discussions with Mr. DiLuigi were focused on his company's ability to provide trunked network capability to the 16 Iraqi cities where PraeComm radios had

already been installed. Contract 9001 was the first contract that I was involved with that was awarded to PraeComm. Contract 9001 was limited to four cities because I knew that PraeComm had problems with the fielding of the radios in the past which had given them a mixed reputation within the command. I wanted to see how they would respond to this contract and establish a more favorable environment for them before awarding them with contracts for the cities listed in Contract 9027. From my observations, PraeComm responded positively to Contract 9001. Based on that and positive comments from others, I felt comfortable with awarding Contract 9027 to them a few months later. I would have liked to have had a longer period of time to test PraeComm's ability to satisfy the Government's requirements under Contract 9001, but I had money that I had to commit to the radio project immediately. If I had not committed the funding by the end of the week, it would have been moved to a different project. Further, I was leaving in December and I knew that if I did not get Contact 9027 awarded, there would have been a long delay before that contract would have been awarded. Both of these contracts were sole-sourced to PraeComm because PraeComm had already supplied the existing radios in the cities specified in contract 9001 and 9027, and the trunked radio system would reuse the existing equipment. There was no other manufacturer who made compatible equipment, and it would have been very costly to replace the entire installed base. In addition, with the other orders we had placed for radios, the encryption chips which were being used were back ordered and simply replacing the existing system with an encrypted system would have required a wait of at least one year.

6. I did not initiate pricing discussions with Mr. DiLuigi, but rather was presented with an initial proposal for placing trunked systems in all 16 cities. I then asked Mr.

DiLuigi to make a proposal for only 4 cities, for the previously-stated reasons. I did discuss the pricing of PraeComm's equipment for both contract 9001 or 9027 only to comment that the pricing in PraeComm's proposal was fairly consistent with the original pricing of the radios already in place, and that this was good as a significant increase would have made doing an upgrade more expensive than to simply replace the entire in-place systems. I also explained that the pricing in the first proposal should not be based on an expected second contract as (1) I could not guarantee that a second contract would be considered without visible results from the first one, and (2) I did not know whether funding would be available for a second contract even if we desired to more forward with a contract for the remaining cities.

7. Mr. DiLuigi never told me that he was giving the radio equipment to the Government at any sort of "discount." I did not promise Mr. DiLuigi any future contracts. My discussions with Mr. DiLuigi were focused on whether or not they could supply and install the trunked radio systems into these cities where they had already provided single channel radios. At the time that both of these contracts were signed, I believed that the radio equipment designated in these contracts would be going into the cities that were listed in the statements of work. All of my discussions with Mr. DiLuigi were in good faith and I am not aware of any bad faith on the part of the Government in regards to these contracts.

8. I asked the contracting officer to increase the labor CLIN for Contract 9001 from $35,000 to $50,000 because I believed that PraeComm had a legitimate payment that they were still owed for a previous contract. This stemmed from a loss of two pallets that were being shipped from Kuwait to Baghdad. The pallets included equipment

which had been received by the government as well as tool sets, test equipment, and some personal effects of PraeComm employees. I conferred with the legal department of the PCO, and was advised that either PraeComm could submit a request for reimbursement for the lost equipment, or we could include this in Contract 9001. Although both of these options would have resulted in the same net payment to PraeComm, the path chosen allowed PraeComm to be reimbursed more rapidly, which I realized was important to a small company.

8. Per the terms of the statement of work for Contract 9001, PraeComm was required to install the radio systems and to provide training and project management. Some of the programming and preparation for installation was completed prior to my leaving Iraq. However, there was still contractually required labor such as installation and training that PraeComm still needed to complete under the contract terms. The labor CLIN for Contract 9027 was strictly focused on the labor for that contract. In order to be paid for the labor CLINs associated with Contract 9027, PraeComm was required to perform the labor (including installation, training and project management) per the requirements set out in the statement of work.

LTC ERIK FRETHEIM

28 Feb 07
DATE