No. 06-54C
(Judge Lettow)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**PRAECOMM, INC., d/b/a AMERICAN RADIO,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, the United States respectfully submits the following proposed findings of fact in support of its contemporaneously filed Motion for Summary Judgment.

1. United States and coalition armed forces took control of Baghdad, Iraq, in March 2003. Approximately one month later, the Coalition Provisional Authority ("CPA") was established "to restore conditions of security and stability" in the country, and "facilitat[e] economic development, sustainable reconstruction, and development." A 3.

2. One priority for the CPA was the creation, training, and equipping of local police forces in cities and towns across Iraq. A 20-21.

3. The United States Government, through its Project and Contracting Office ("PCO") in Baghdad, awarded contract No. DABV01-03-C-0032 ("Contract 0032") to PraeComm (also

known as American Radio, Inc.) on December 17, 2003. A 119-127. Contract 0032 was for the provision and installation of single channel handheld radios in 83 cities in Iraq, as part of the "First Responders Network" ("FRN") which the CPA intended to furnish to the newly-created Iraqi Police Service ("IPS"). Id. Contract 0032, a Cost Plus Fixed Fee contract, was completed by the fall of 2004 and PraeComm was the full price of the contract as modified. Id. Contract 0032 is not in dispute in this case.

4. In April 2004, the CPA initiated the design and procurement of a far larger and more complex communications system known as the "Advanced First Responders Network" ("AFRN") to serve as a comprehensive long term solution for the Iraqi Police, Fire, EMS and related units. A 81. The goal of the AFRN was to "deploy a communications network to enable interoperable communications for Iraqi Ministry of Interior security and safety forces throughout Iraq to improve public safety." A 87. The Iraqi Police Service fell under the Iraqi Ministry of Interior, whose forces also included Highway Patrol, Border Police, the Civil Intervention Force, and the Emergency Response Unit. A 72. As of July 2004, the IPS was functional nationwide, with approximately 120,000 officers on the payroll; however, many police personnel had not been adequately trained, and the "immediate focus" was still "to reconstitute and reorganize the IPS and accelerate efforts to equip and train the force." A 44.

5. In the fall of 2004, Colonel John Graham and Lieutenant Colonel Eric Fretheim, two United States Army Officers involved in the training and assistance to the IPS, contacted PraeComm regarding the possibility of upgrading the existing single channel radios delivered under Contract 0032 to a trunked system in the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Graham Decl. at 1-2; Fretheim Decl. at 1-2.

6. Colonel Graham was the J-6 (Communications Officer) for the Multi National Security Transition Command - Iraq ("MNSTC-I") and Lieutenant Colonel Fretheim was the

officer in charge of communications systems for the Civilian Police Assistance Training Team ("CPATT"). Id.

7. PraeComm was sought out for this contract because the company had already supplied radio equipment in these four cities pursuant to Contract 0032, and because the larger, more comprehensive AFRN system that was going to replace FRN was experiencing mounting delays in implementation. Graham Decl. at 3, 5.

8. At this time, given that the Request for Proposals ("RFP") for the AFRN system was not issued until October 26, 2004, a fully functioning AFRN system was still many months or more away. A 129. The AFRN RFP was protested by the designer of the specifications, Lucent Technologies, who had been excluded from the procurement in November 2004 on the basis of an Organizational Conflict of Interest. A 128-139. This protest further delayed the implementation of the AFRN system. Graham Decl. at 3.

9. The need to transition from a single channel to a trunked radio network arose as an operational requirement because communication among security forces was critical and because many handheld radios were lost, stolen or captured in Iraq. Graham Decl. at 3-4. The loss of radios increased the threat that enemy personnel would be able to track the movements of U.S. and Iraqi forces. Id. When a radio was lost, captured or stolen under the existing single channel system supplied by PraeComm, all of the remaining radios needed to be reprogrammed by hand to eliminate the threat that the enemy was tracking U.S. and Iraqi forces with the missing radio. Id. ;Fretheim Decl. at 2.

10. A trunked system, by comparison, allows for a missing radio to be individually disconnected from the network, allowing the other radios to continue operation without adjustment. Graham Decl. at 4. Further, the single channel system did not allow room for significant bandwidth expansion on the system, which prevented the addition of new users. Id. A

trunked radio system increased the available bandwidth allowing more handheld radio users to operate within the system. Id.

11. The PCO awarded contract No. W914NS-050-9001 ("Contract 9001") to PraeComm on October 14, 2004. A 140-147. Contract 9001 was a commercial items contract for the replacement and upgrading of certain existing PraeComm radios (delivered under Contract 0032), namely the conversion from a single channel to a trunked network system in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Id. The contract was executed on the standard commercial items contract form (SF 1449) and incorporated a Statement of Work ("SOW"). A 144-145.

12. The SOW for Contract 9001 included the following with respect to the Iraqi cities where the radio equipment would be used:

> 1.0 GENERAL. The Coalition Provisional Authority now MNSTC-I has a requirement to upgrade UHF radio systems in four cities to provide trunked communications.
>
> 2.0 BACKGROUND. The current radio systems in Ad Diwaniyah, An Najaf, Al Hillah and Karbala are FM single channel systems. These systems provide basic communications capabilities for the Iraqi Police Forces, however, the systems are encrypted with a Type I encryption system which requires hand keying the radios to change encryption. Because it is impractical to do so on a frequent basis, lost and captured radios can be used to monitor police communications. In addition, the capacity of these systems is limited. Converting these cities to trunked networks will allow compromised radios to be cut out of the system from a central station. In addition, the capacity of the current system will be increased.

A 144.

13. The SOW also described the specifications for the radio equipment, period of service, Government responsibilities, and contractor responsibilities. A 144-145. The contract required PraeComm to "provide distribution and installation of the radios at designated sites," "ensure the devices are properly fielded," and to "provide training on the systems." Id. The only

Government responsibilities stated in the Statement of Work were to "provid[e] a distribution plan and coordinate[e] a distribution schedule," and to "provide frequency plans." Id.

14. Contract 9001 also incorporated PraeComm's proposal. A 140, 146 (see boxes 15 and 20 on the SF 1449). PraeComm's proposal acknowledged that the tasking "would be focused on the following four cities: 1. Ad Diwaniyah, 2. An Najaf, 3. Al Hillah, [and] 4. Karbala." A 146. The proposal then identified the specific radio equipment to be installed. Id. The total contract price of $363,878 consisted of the 1,502 radios ($283,878), labor to install the radios ($50,000), and miscellaneous expenses such as travel ($30,000). A 140.

15. Neither the Statement of Work nor Contract 9001 made any representations as to the long term use of the radio equipment in the four cities specified for delivery, or the likelihood of PraeComm or any other supplier receiving a contract to supply additional radio equipment in the named cities (or any other cities) in the future. A 140-146.

16. Contract 9001 was awarded and administered by the PCO; however, the payment office for the contract was within the Army Corps of Engineers. A 140. PraeComm was the sole offeror for Contract 9001. Fretheim Decl. at 3.

17. Shortly after the award of Contract 9001, the PCO decided that it wanted to upgrade existing radio systems in several additional Iraqi cities by acquiring trunked radios similar to those provided under Contract 9001. Graham Decl. at 5; A 162-175.

18. The Statement of Work for this requirement, which eventually led to Contract No. W914NS-05-F-9027 ("Contract 9027"), specified that the vendor would provide 8-channel trunked radio systems in five cities and 6-channel trunked radio systems in nine other cities. A 154-155. The cities identified for delivery of the trunked radio systems were Samarra, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kapri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi. Id.

19. The Contract 9027 SOW provided the following background for the procurement:

> B. Background
>
> Over the past year, the coalition has installed ARI [American Radio, Inc. (plaintiff)] analog radio systems in a number of cities in Iraq to support the Iraqi Police Service. These radio systems were originally designed to provide initial support for a force of 85,000 officers. The radios were to be replaced in June 2004 with the Advanced First Responders Network. That network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. Additionally, the system will need to become a long term solution given that the AFRN will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network.
>
> In addition to adding capacity, the trunked system increases the security of the network by allowing the compromised stations to be shut off the network.

A 154.

20. The Contract 9027 SOW then listed the requirements that the successful contractor had to meet. A 154-155. Generally, the vendor was required to supply the specified radio equipment, including chargers, batteries, cables, and software; the vendor was also required to install the equipment and train users on its operation. Id.

21. Like Contract 9001, Contract 9027 was also a commercial items contract executed on a standard commercial items form SF 1449. A 149. PraeComm was the sole offeror for Contract 9027. Fretheim Decl. at 3.

22. The Statement of Work for Contract 9027 required PraeComm not only to provide the radio equipment, but also to install the equipment for use by the IPS:

> C. Requirements
>
> * * *
>
> 13. The vendor will provide engineering, project management, and support as needed to install and establish the trunked radio systems.

> 14. The vendor will provide periodic (weekly) status reports to the CPATT C-6 for the duration of the project.
>
> 15. All systems must be installed and functional within 60 days of the award of the project.

A 155.

23. PraeComm submitted an undated proposal in late November or early December 2004 to supply and install the radio equipment for $7,245,880. A 152. Consistent with the terms of the SOW, PraeComm's proposal called for five 8-channel base systems, seven 6-channel base systems, 11,440 radios, associated accessories, and labor for installation and training. Id.

24. The PCO accepted PraeComm's offer and awarded Contract 9027 to PraeComm on December 6, 2004, for the offered price of $7,295,880. A 149-150. According to plaintiff's proposal for Contract 9027 and the contract itself (CLIN 0012), the price for shipping and installation of the equipment was $500,000. A 150, 152.

25. In January 2005, the AFRN cities continued to change and the PCO determined that it wanted to acquire the same trunked radio equipment for use in the Iraqi cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah and As Sawawah. Graham Decl. at 5; A 156.

26. Bilateral Modification P00001 to Contract 9027, dated January 28, 2005, added the names of the six cities in place of several cities previously named in the original contract. A 159. The modification further explained that "all other terms and conditions of [the] contract remained the same." Id. Accordingly, the modification did not change either the number of radios, the radio systems (8-channel versus 6-channel), the installation requirement, or the contract pricing in any way. Id.

27. Numerous e-mails record messages between the Army and plaintiff's principal, Dom DiLuigi, in which the issue of which cities would ultimately be included in AFRN was

discussed. A 193-233. The lists of cities slated for AFRN versus cities slated for FRN frequently changed. Id.

28. Mr. DiLuigi wrote in a March 5, 2005 e-mail, "I've seen so many 'lists' on this AFRN/FRN project I can't count them." A 193. Mr. DiLuigi later acknowledged in an August 15, 2005 e-mail to the contracting officer: "The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it." A 243.

29. In March 2005, Major Robert Sile, who had replaced Lieutenant Colonel Fretheim as the new CPATT C-6 (lead communications officer), analyzed the progress on the AFRN system and saw that AFRN was now expected to cover some of the cities where the Government was planning on setting up the PraeComm FRN system. Sile Decl. at 2-3. Based on the projected roll-out, Major Sile decided to redirect PraeComm's radio systems to other cities that would not come under the AFRN umbrella until later. Id. Major Sile recognized that it would have been unworkable and redundant to have technologically disparate radio systems (AFRN and FRN) in the same city at the same time. Id.

30. Major Sile wrote Mr. DiLuigi on March 5, 2005:

> Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [PraeComm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.

A 193.

31. Of the 17 cities expected to use PraeComm's FRN equipment at the time the contracts were executed, 12 were now (as of March 2005) expected to be included in the AFRN system network. A 193-195.

32. In response, Mr. DiLuigi informed Major Sile that PraeComm had "provided extremely aggressive pricing to the PCO to be able to enter this market in the cities and manner we had been contracted to." A 196-197.

33. Thereafter, efforts were made to plan the fielding and installation of PraeComm's radios in five of the 17 cities contemplated in Contracts 9001 and 9027, as well as follow-on fielding in a number of other Iraqi cities. A 216, 218, 223. PraeComm made several more-costly counter-proposals to get its equipment into certain Iraqi cities; however, none of these plans was accepted by the Army. A 201-204, 210-220.

34. The list of AFRN and FRN cities continued to change between April and August 2005. A 223-225, 228-233. Army personnel believed that the contract could be changed at no cost to substitute the new cities for installation of the equipment; the overall number of cities and quantity of radio equipment would not change. A 230. However, a modification was never agreed upon by the parties.

35. Mr. DiLuigi sent an e-mail to the Army on July 17, 2005, claiming that that he had provided pricing for Contracts 9001 and 9027 "based on quantity of order and likelihood of future sales/business," and that he had given the Army a 25 percent discount "designed to get us into the larger cities." A 239-241.

36. Plaintiff shipped the radio equipment ordered under Contracts 9001 and 9027 in several shipments between February and August 2005. A 176-190. The radios were delivered to Iraq and stored in a warehouse in Baghdad where they remain today. Sile Decl at 5; Folgate Decl. at 3.

37. The contracts were never modified to delete the required tasks to install the radio equipment in the designated cities and train local personnel on its use. Nonetheless, the Army

paid plaintiff $363,878, the full contract price in Contract 9001, and $7,295,880, the full price in Contract 9027. A 192.

38. PraeComm sent the Contracting Officer a letter dated August 14, 2005, demanding an equitable adjustment of $13,657,500 for what it called a "constructive cardinal change" to Contracts 9001 and 9027. A 252-254. In this letter, PraeComm asserted that it had given the Army a 30 percent discount on the equipment ordered under Contracts 9001 and 9027. Id.

39. The contracting officer told PraeComm the following by e-mail dated September 23, 2005:

> It is my understanding the equipment provided by American Radio, which is currently stored in a warehouse, will be used in the future. It would be wrong not to use equipment which has been bought and paid for. At this time nobody can tell exactly which cities the equipment will be used in nor can they tell what specific technical requirements will be changed.

A 250.

40. By letter dated October 14, 2005, another contracting officer formally responded to PraeComm's August 14, 2005 letter. She informed PraeComm that she was unable to consider the request for equitable adjustment because the Government had made the final payments due under Contracts 9001 and 9027, and the contracts had been closed. A 255.

41. PraeComm then sent a certified claim for $17,974,281.29 to the contracting officer dated November 8, 2005. A 256-264. PraeComm asserted that the basis of its claim was the decision of the Army not to install its radio equipment in "major" Iraqi cities. Id.

42. The contracting officer did not respond to the claim. PraeComm then filed suit in this Court on January 23, 2006.

43. PraeComm never installed its FRN radio equipment or trained Iraqi police forces on its use. Folgate Decl. at 2-3. The equipment is currently still being held by the United States in storage in a warehouse in Baghdad. Id.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

OF COUNSEL:

PATRICK BUTLER
Litigation Attorney
U.S. Army Litigation Division
901 N. Stuart Street
Arlington, VA 22203

s/ Gregg M. Schwind
GREGG M. SCHWIND
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tel: (202) 353-2345
Fax: (202) 514-8624

Attorneys for Defendant

March 1, 2007