**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| PRAECOMM, INC. d/b/a/ AMERICAN RADIO,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 06-54C<br>(Judge Lettow) |

**PLAINTIFF PRAECOMM, INC'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, Plaintiff Praecomm, Inc. d/b/a American Radio ("Praecomm") respectfully submits Praecomm's Responses to Defendant's Proposed Findings of Uncontroverted Fact in support of Praecomm's Opposition to Motion for Summary Judgment:

**Defendant's Proposed Finding No. 1: United States and coalition armed forces took control of Baghdad, Iraq, in March 2003. Approximately one month later, the Coalition Provisional Authority ("CPA") was established "to restore conditions of security and stability" in the country, and "facilitat[e] economic development, sustainable reconstruction, and development." A 3.**

**Praecomm's Response No. 1:** Praecomm does not dispute Defendant's first proposed finding of uncontroverted fact. Praecomm contends, however, that this fact is not material, as it does not affect the outcome of the suit under governing law.

**Defendant's Proposed Finding No. 2: One priority for the CPA was the creation, training, and equipping of local police forces in cities and towns across Iraq. A 20-21.**

**Praecomm's Response No. 2:** Praecomm disputes Defendant's second proposed finding of uncontroverted fact. Defendant's characterization of the CPA priorities relating to Iraqi police forces in cities and towns in Iraq is incomplete. In addition to those duties and responsibilities

outlined by the government, "The CPA activity has focused on vetting, hiring, training and deploying Iraqi police forces and other security forces to assist in establishing a secure and permissive environment." A 20. The "CPA has [also] had to provide virtually all equipment . . . to stand up the police capability." A 21.

**Defendant's Proposed Finding No. 3: The United States Government, through its Project and Contracting Office ("PCO") in Baghdad, awarded contract No. DABV01-03-C-0032 ("Contract 0032") to PraeComm (also known as American Radio, Inc.) on December 17, 2003. A 119-127. Contract 0032 was for the provision and installation of single channel handheld radios in 83 cities in Iraq, as part of the "First Responders Network" ("FRN") which the CPA intended to furnish to the newly-created Iraqi Police Service ("IPS"). Id. Contract 0032, a Cost Plus Fixed Fee contract, was completed by the fall of 2004 and PraeComm was [paid] the full price of the contract as modified [DID THE GOVERNMENT LEAVE OUT THE WORD "PAID?" NEED TO CHECK]. Id. Contract 0032 is not in dispute in this case.**

**Praecomm's Response No. 3:** Praecomm disputes Defendant's third proposed finding of uncontroverted fact. The United States Government, through the CPA, awarded Contract No. DABV01-03-C-0032 ("Contract 0032") to Praecomm on or about December 17, 2003. A 119-27; Compl. ¶ 15. The purpose of Contract 0032 was to "ensure a Land Mobile Network providing the Iraqi Police Force with reliable communications in order to maintain the stability of the country and the safety of their officers and the Iraqi people." A 121. Contract 0032 was for the provision and installation of a Land Mobile Network in 83 cities in Iraq, and was known as Interim First Responder network (IFRN), not FRN as defined by Defendant. Id. As stated in Contract line item ("CLIN") 0001, Contract 0032 called for a "TWO WAY RADIO SYSTEM FOR THE IRAQI POLICE DEPARTMENT THROUGHOUT IRAQ." A 120. CLIN 0001A called for 10,000 "Hand Held 2 way radios, frequency range 430 – 470 MHZ with 12.5/25 KHZ SPACING WITH ULTRA CAPACITY RECHARGEABLE BATTERY, BELT CLIP, ANTENNA," with a unit price of $329.00 each. CLIN 0001B called for 200 "BASE STATION RADIO WITH APPROPRIATE HARDWARE at a unit price of $1,856.62 each. CLIN 0001C

called for 120 "REPEATERS, WHERE NEEDED TO ENSURE THAT THE HAND-HELD RADIOS FUNCTION PROPERLY WITHIN THE CITIES, ESTIMATED QUANTITY THROUGHOUT THE 83 CITIES," at a unit price of $3,930.54 each. CLIN 0001D identified proposed "MISC CHARGES" in the amount of $1,822,610.52. Contract 0032 was not completed by the fall of 2004. In fact, 4,800 of the 10,000 hand held radios called for by CLIN 0001A of Contract 0032 and 24 of the 120 repeaters called for in CLIN 0001C of Contract 0032 were delivered under Contract W914NS-050F-9001 ("Contract 9001") and W914NS-05-F-9027 ("Contract 9027"). See Di Luigi Decl. ¶ 3. On October 16, 2004, two days after the award date of the Contract 9001, LTC Fretheim stated to Praecomm: "With that in mind, the delivery of the remaining 1920 conventional radios can be delayed until the completion of the current trunking project. At that time, we will be able to either convert them to trunking capable or provide further shipping instructions…. This delay is at our request." Pl. App. 7.

Defendant designed the concept of Advanced First Responder Network ("AFRN"), its infrastructure (i.e., the portion of the AFRN program that would indicate the type and use of first responder radios used), and designated certain cities where AFRN systems would be installed in March 2004. A 87. In March 2004, the Department of the Army awarded contract W914NS-04-D-005 to Lucent Technologies, Inc. ("Lucent") to restore Iraq's communication infrastructure. Under that contract, the CPA and its successor organization, the PCO and State Department, would issue task orders for specific projects within the communications sector. A 86. Only task orders issued under this Contract were for AFRN. Id. This network was intended to address the limited communication capabilities of emergency first responders: the police and medical personal. A81. However it was not a "larger and more complex communications system;" rather, it was a compilation of a series of different communication solutions, one of

which was first responder radios that were originally designed utilizing a TETRA based protocol[1]. See A 89; Di Luigi Decl. ¶ 4.

In August 2004, technical experts from the PCO, Baghdad, conducted market research regarding the "build out of the AFRN in additional Iraqi cities." Pl. App. 16. In September 2004, the JCC-I/A and PCO received a requested rough order or magnitude cost estimate for the entire AFRN system (less first responder radios). A 92. On October 26, 2004, Defendant sought to procure terrestrial trunked radios (TETRA) for the AFRN system under Solicitation W914NS-05-R-9003. Pl. App. 14-15. On November 22, 2004, Defendant increased the ceiling on a separate Indefinite Quantity/Indefinite Delivery ("IDIQ") contract, W914NS-04-D-0005, from $75 million to $150 million to enable the issuance of a task orders to build out the AFRN into 16 Iraq cities. Id. On November 24, 2004, Defendant awarded Sepura Limited Radio House ("Sepura") contract W914NS-05-D-9008 in response to Solicitation, W914NS-05-R-9003.

Praecomm has not alleged that Defendant breached Contract 0032. However, Contract 0032 is highly relevant to this case because it demonstrates: (1) Praecomm's pricing of certain radio equipment and (2) Praecomm's history of supplying equipment for the Iraqi cities that were promised to Praecomm in Contracts 9001 and 9027.

**Defendant's Proposed Finding No. 4: In April 2004, the CPA initiated the design and procurement of a far larger and more complex communications system known as the "Advanced First Responders Network" ("AFRN") to serve as a comprehensive long term solution for the Iraqi Police, Fire, EMS and related units. A 81. The goal of the AFRN was to "deploy a communications network to enable interoperable communications for Iraqi Ministry of Interior security and safety forces throughout Iraq to improve public safety." A 87. The Iraqi Police Service fell under the Iraqi Ministry of Interior, whose forces also included Highway Patrol, Border Police, the Civil Intervention Force, and the Emergency Response Unit. A 72. As of July 2004, the IPS was functional nationwide, with**

[1] The AFRN system includes: the national coordination center; network communications center, 9 governorate dispatch centers; 3 mobile switching offices; 66 base transceiver stations (equipment shelters and towers used to receive and transmit radio calls between the first responder and the dispatch center); and 104 high frequency radios for an emergency back up system. A 89.

**approximately 120,000 officers on the payroll; however, many police personnel had not been adequately trained, and the "immediate focus" was still "to reconstitute and reorganize the IPS and accelerate efforts to equip and train the force." A 44.**

**Praecomm's Response No. 4:** Praecomm disputes Defendant's fourth proposed finding of uncontroverted fact, in part. Praecomm does not dispute that "AFRN is a communications network designed to enable interoperable communications for Iraqi Ministry of Interior security and safety forces throughout Iraq to improve public safety." A 87. However, the references relied upon and cited by Defendant do not support Defendant's characterization of the Advanced First Responder Network ("AFRN") program.

In March 2004, the Department of the Army awarded contract W914NS-04-D-005 to Lucent to restore Iraq's communication infrastructure. Under that contract, the CPA and its successor organization [PCO and State Department] would issue task orders for specific projects within the communications sector. A 86. Under that contract, the CPA and its successor organization, the PCO and State Department, would issue task orders for specific projects within the communications sector. A 86. Only task orders issued under this Contract were for AFRN. Id. This network was intended to address the limited communication capabilities of emergency first responders: the police and medical personal. A81. However it was not a "larger and more complex communications system;" rather, it was a compilation of a series of different communication solutions, one of which was first responder radios that were originally designed utilizing a TETRA based protocol[2]. See A 89; Di Luigi Decl. ¶ 4.

[2] The AFRN system includes: the national coordination center; network communications center, 9 governorate dispatch centers; 3 mobile switching offices; 66 base transceiver stations (equipment shelters and towers used to receive and transmit radio calls between the first responder and the dispatch center); and 104 high frequency radios for an emergency back up system. A 89.

Praecomm and Defendant discussed Praecomm's equipment as a long term "solution" to replace the First Responder radio portion of the AFRN. Pl. App. 23-29; see Di Luigi Decl. ¶ 5. Additionally, Contract 9027 stated:

> Over the past year, the coalition has installed [Praecomm, Inc.] analog radio systems in a number of cities in Iraq to support the Iraqi Police Service. These radio systems were originally designed to provide initial support for a force of 85,000 officers. The radios were to be replaced in June 2004 with the Advanced First Responder Network. That network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. Additionally, the system will need to become a *long term solution* given that the AFRN will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network.

A 154; Compl. ¶ 34; Answer ¶ 34 (admitting allegations contained in paragraph 34 of the Complaint to the extent supported by the contract cited). Praecomm does not dispute that Iraqi Police Service fell under the Iraqi Ministry of Interior, whose forces also included Highway Patrol, Border Police, the Civil Intervention Force, and the Emergency Response Unit. The Iraqi Ministry of Interior also included Special Police Commandos. A 72.

Praecomm also disputes Defendant's characterization of the state of Iraqi Police Forces contained in a July 2004 report cited by Defendant. In July 2004, the Office of Management and Budget submitted a Quarterly Update to Congress indicating that "Iraqi Police Services ("IPS") is functional nationwide" with "[a]bout 120,000 officers on the payroll." A 44. Although this report indicates that the Iraqi Police Services were "functional," the report also indicated that "not all personnel on duty have received sufficient police training" and the "immediate focus" was still "to reconstitute and reorganize the IPS and accelerate efforts to equip and train the force." Id.

**Defendant's Proposed Finding No. 5: In the fall of 2004, Colonel John Graham and Lieutenant Colonel Eric Fretheim, two United States Army Officers involved in the**

**training and assistance to the IPS, contacted PraeComm regarding the possibility of upgrading the existing single channel radios delivered under Contract 0032 to a trunked system in the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Graham Decl. at 1-2; Fretheim Decl. at 1-2.**

**Praecomm's Response No. 5:** Praecomm disputes Defendant's fifth proposed finding of uncontroverted fact. Defendant's statement is incomplete and inaccurate.

Defendant contacted Praecomm in the fall of 2004 to discuss whether Praecomm could provide an Over the Air Rekeying ("OTAR") encryption capability to its radio equipment. Di Luigi Decl. ¶ 5. In the fall of 2004, Defendant requested Praecomm propose a long term solution to provide radio equipment to replace the First Responder radio portion of AFRN. Defendant told Praecomm the AFRN program was experiencing delays and would be descoped and descaled to the point it would cover less cities. A 154; Pl. App. 23-29**;** Graham Decl. ¶ 7; Di Luigi Decl. ¶ 5.

On or before September 13, 2004, Defendant presented a list of six cities[3] to Praecomm and requested that Praecomm develop a comprehensive long term communication solution based on the city list and Praecomm's understanding of those cities as it had done extensive work in and around those cities under Contract 0032. Pl. App. 25-29; see Di Luigi Decl. ¶ 5. Accordingly, Praecomm and Defendant discussed Praecomm's equipment as a long term "solution" to replace the First Responder radio portion of AFRN. Pl. App. 25-29**;** See Di Luigi Decl. ¶ 5.

Praecomm proposed providing (MPT3200) radio systems which are unique to Praecomm's proprietary design, as a long term "solution" to replace the First Responder radio portion of the AFRN, because Defendant told Praecomm that the AFRN system was experiencing delays and was being descaled. Pl. App. 25-29; Di Luigi Decl. ¶ 5; Graham Decl. ¶

[3] The six cities are Ad Diwaniyah, An Najaf, Al Hillah, Karbala, Al Kut, and Al Fallujah.

7.

Praecomm sent LTC Fretheim an e-mail message on September 13, 2004 attaching an "IFRN Trunking Introduction and Continuation Proposal." Pl. App. 1-6. The IFRN Trunking Proposal demonstrates that Praecomm was solely responsible for the concept, design, and engineering of trunked radio systems versus conventional single channel repeaters. The IFRN Trunking Introduction and Continuation Proposal included "Six City Program information requested by LTC Fretheim," which identified Ad Diwaniyah, An Najaf, Al Hillah, Karbala, Al Kut and Al Fallujah as cities for proposed work. Id.; Compl. ¶ 17.

LTC Fretheim reviewed Praecomm's IFRN Trunking Introduction and Continuation Proposal[4] and set up a meeting at which Dominic Di Luigi and Shawn Campbell of Praecomm made a presentation to Colonel John Graham and LTC Fretheim. COL Graham verbally signed off on the plan for the six cities and said "That's enough Dom. I'm sold … you guys are the only game in town," or words to that effect. Pl. App. 25-29; see Di Luigi Decl. ¶ 6.

At a later date, LTC Fretheim identified a budget for the Four City Technology Demonstration Trunking Upgrade Proposal for the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala, of less than $400,000 and asked if Praecomm would be willing and able to make its proposal work in at least four of the six Iraq cities identified in Praecomm's six city proposal. The PCO awarded Contract 9001 to Praecomm on October 14, 2004. Compl. ¶ 21; Answer ¶ 21; A 140-47. LTC Fretheim represented that he urgently needed coverage in these four listed cities and that he would want to secure budgeting to and assign Praecomm at least twelve more Iraq cities to the FRN program, assuming that Praecomm's performance regarding the four listed cities went well. See Four City Technology Demonstration Trunking Upgrade Proposal at A

[4] The IFRN Trunking Introduction and Continuation Proposal initially included the cities of Ad Diwanijah, An Najaf, Al Hillah, Karbala, Al Kut and Al Fallujah.

146. Pl. App. 25-29**;** see Di Luigi Decl. ¶ 8. Based on Defendant's representation that Praecomm's equipment would be installed in four cities, language in Contract 9001 listing the four cities in which Praecomm's equipment would be installed, and Defendant's representation that it would implement Praecomm's proposal in at least twelve additional cities[5] if Praecomm's performance went well, Praecomm developed a discounted price, with the same solution and proposed implementation schedule. Pl. App. 25-29**;** see Di Luigi Decl. ¶ 8.

Unlike a standard equipment order, in which specific items are ordered in specified quantities at specific prices, Praecomm designed a comprehensive "long term solution" using MPT3200 trunking technology, a technology unique to Praecomm's design, for use in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala, and to work within the government's[6] budget constraints and need for urgent coverage. In addition, Contract 9001 included upgrading certain existing Praecomm radios and repeaters that had not yet been delivered to the Government under Contract 0032. See Contract 9001, "Retrofit of MPT Portables, quantity 1502." All of the initial proposals presented to Defendant by Praecomm were accepted in their entirety as presented with no exceptions. Pl. App. 1-6; 25-29; A 146.

Based on the four city proposal, LTC Fretheim presented Praecomm with another 12 cities[7] two of which were presented in the IFRN Trunking Proposal but did not make it to Contract 9001 due to budget limitations. Those two cities were later added to Contract 9027 IFRN Trunking Proposal. Pl. App. 25-29**.**

---

[5] The twelve additional cities that the government assigned were Samarra, Kirkuk, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, As Sulaymaniyah, Abbasiyah, Al Kut and Al Fallujah.

[6] The government entity responsible for this contract was the Multi-National Security Transition Command-Iraq Civilian Police Assistance Training Team, or MNSTCI/CPATT.

[7] The twelve cities were Samarra, Kirkuk, Al Hawayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, As Sulaymaniyah, Abbasiyah, Al Kut and Al Fallujah. Al Kut and Al Fallujah, which were not put on Contract 9001 due to budget limitations, were incorporated into Contract 9027 at the request of the government.

**<u>Defendant's Proposed Finding No. 6</u>: Colonel Graham was the J-6 (Communications Officer) for the Multi National Security Transition Command - Iraq ("MNSTC-I") and Lieutenant Colonel Fretheim was the officer in charge of communications systems for the Civilian Police Assistance Training Team ("CPATT"). Id.**

**<u>Praecomm's Response No. 6</u>:** Praecomm does not dispute Defendant's sixth proposed finding of uncontroverted fact with respect to positions held by Col. Graham and LTC Fretheim. Col. Graham served in this position from August 1, 2004 until May 25, 2005. Graham Decl. ¶ 1. LTC Fretheim served as a Signal Corps Officer from August 5, 2004 through December 15, 2004 and was the officer in charge of communications for the Civilian Police Assistance Training Team ("CPATT") for most of this time period. LTC Fretheim was not the officer in charge of communications for CPATT, however, from late November 2004 to December 15, 2004. Fretheim Decl. ¶ 2.

**<u>Defendant's Proposed Finding No. 7</u>: PraeComm was sought out for this contract because the company had already supplied radio equipment in these four cities pursuant to Contract 0032, and because the larger, more comprehensive AFRN system that was going to replace FRN was experiencing mounting delays in implementation. Graham Decl. at 3, 5.**

**<u>Praecomm's Response No. 7</u>:** Praecomm disputes Defendant's seventh proposed finding of uncontroverted fact. Praecomm was sought out for Contract 9001 because, among other reasons, the company already successfully supplied radio equipment in the same four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala pursuant to Contract . Compl. ¶ 17; Graham Decl. ¶ 7. Praecomm was also sought out to provide solutions for encryption of the conventional radios, which led to Praecomm to propose trunking as a better, long term solution. Pl. App. 25-29; Di Luigi Decl. ¶ 5.

In the fall of 2004, Praecomm proposed providing its radio equipment as a long term "solution" to replace the First Responder radio portion of the AFRN, because Defendant told Praecomm that the AFRN system was experiencing delays and was being descaled. Pl. App. 25-

29; Di Luigi Decl. ¶ 5; Graham Decl. ¶ 7. Accordingly, Praecomm and Defendant discussed Praecomm's equipment as a long term "solution" to replace the First Responder radio portion of AFRN. Pl. App. 25-29**;** see Di Luigi Decl. ¶ 5. Additionally, Contract 9027 later stated that the AFRN network had been "delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005." A 154; Compl. ¶ 34; Answer ¶ 34 (admitting allegations contained in paragraph 34 of the Complaint to the extent supported by contract 9027).

On December 6, 2004, Contract 9027 was modified. Contract 9027's Schedule of Supplies and Services listed CLIN 0012 as "Shipping and Installation" in the amount of $500,000. A 150; Pl. App. The Statement of Work ("SOW") of Contract 9027 SOW, states:

> The network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. ***Additionally, the system will need to become a long term solution given that the AFRN will not be put into many cities***. The solution is to upgrade the existing analogue system to a trunked radio network.

(emphasis added). A 154.

**Defendant's Proposed Finding No. 8: At this time, given that the Request for Proposals ("RFP") for the AFRN system was not issued until October 26, 2004, a fully functioning AFRN system was still many months or more away. A 129. The AFRN RFP was protested by the designer of the specifications, Lucent Technologies, who had been excluded from the procurement in November 2004 on the basis of an Organizational Conflict of Interest. A 128-139. This protest further delayed the implementation of the AFRN system. Graham Decl. at 3.**

**Praecomm's Response No. 8:** Praecomm disputes Defendant's eighth proposed finding of uncontroverted fact. Defendant designed the concept of AFRN, its infrastructure (i.e., the portion of the AFRN program that would indicate the type and use of first responder radios used), and designated certain cities where AFRN systems would be installed in March 2004. A 87. In August 2004, technical experts from the PCO conducted market research regarding the

"build out of the AFRN in additional Iraqi cities." A 129. In September 2004, the Joint Contracting Command-Iraq/Afghanistan (JCC-I/A) and PCO received a requested rough order or magnitude cost estimate for entire AFRN system (less first responder radios)] A 92. On October 26, 2004, Defendant sought to procure terrestrial trunked radios (TETRA) for the AFRN system under Solicitation W914NS-05-R-9003. Pl. App. 14-15. On November 22, 2004, Defendant increased the ceiling on a separate Indefinite Quantity/Indefinite Delivery ("IDIQ") contract, W914NS-04-D-0005, from $75 million to $150 million to enable the issuance of a task orders to build out the AFRN into 16 Iraq cities. Pl. App. 14. On November 24, 2004, Defendant awarded Sepura Limited Radio House ("Sepura") contract W914NS-05-D-9008 in response to Solicitation, W914NS-05-R-9003.

At the same time Defendant was building up the AFRN program, Defendant told Praecomm that the AFRN system was being delayed and descaled. Pl. App. 25-29**;** Di Luigi Decl. ¶ 5; Graham Decl. ¶ 7. Praecomm was also told that the AFRN program was being descaled to the point where it would cover fewer cities. A 154; Compl. ¶ 34; Answer ¶ 34 (admitting allegations contained in paragraph 34 of the complaint to the extent supported by contract 9027).

Although Lucent Technologies protested the award of contract W914NS-05-D-9008 to the Government Accountability Office ("GAO") (A 128-139), this protest did not delay Defendant's implementation of AFRN systems in Iraqi cities. By January 22, 2005, one month after Defendant awarded Contract 9027 to Praecomm and while the Lucent Technologies protest was pending at the GAO, CPATT had already received and transferred 28,417 first responder radios that had been matched to existing AFRN/TETRA existing network parameters to representatives of the Iraqi government. A 99. By January 26, 2005, the Advanced First

Responders Network National Coordination Center and base transceiver stations were installed in Iraq and were ready for activation. Pl. App. 49; 76. By February 16, 2005, Defendant had programmed and distributed over 1,700 user radios to policeman at Iraqi Police stations and continued to install AFRN infrastructure in Baghdad. Pl. App. 101. By February 23, 2005, all AFRN base stations were on line in Baghdad and an additional 50 base stations were set for construction in 15 other cities. Pl. App. 128.

**Defendant's Proposed Finding No. 9: The need to transition from a single channel to a trunked radio network arose as an operational requirement because communication among security forces was critical and because many handheld radios were lost, stolen or captured in Iraq. Graham Decl. at 3-4. The loss of radios increased the threat that enemy personnel would be able to track the movements of U.S. and Iraqi forces. Id. When a radio was lost, captured or stolen under the existing single channel system supplied by PraeComm, all of the remaining radios needed to be reprogrammed by hand to eliminate the threat that the enemy was tracking U.S. and Iraqi forces with the missing radio. Id.; Fretheim Decl. at 2.**

**Praecomm's Response No. 9:** Praecomm disputes Defendant's ninth proposed finding of uncontroverted fact. The transition from a single channel radio to a trunked radio network was proposed by Praecomm. Defendant contacted Praecomm in the fall of 2004 to discuss whether Praecomm could provide an Over the Air Rekeying ("OTAR") encryption capability to its radio equipment. Di Luigi Decl. ¶ 5. Praecomm provided a trunking solution to Defendant as a better alternative. Di Luigi Decl. ¶ 6; Pl. App. 1-6.

**Defendant's Proposed Finding No. 10: A trunked system, by comparison, allows for a missing radio to be individually disconnected from the network, allowing the other radios to continue operation without adjustment. Graham Decl. at 4. Further, the single channel system did not allow room for significant bandwidth expansion on the system, which prevented the addition of new users. Id. A trunked radio system increased the available bandwidth allowing more handheld radio users to operate within the system. Id.**

**Praecomm's Response No. 10:** Praecomm disputes Defendant's tenth proposed finding of uncontroverted fact to the extent that it does not correctly describe the technical aspects of single channel and trunked systems.

Bandwidth is "expanded" the same way on a conventional radio system (referred to as a single channel system and used in Contract 0032) as it is on a trunked system. The "expansion" of bandwidth is only accomplished by adding more channels (thus adding bandwidth). In other words, you would only have to add one or more additional "single channel" conventional channels to the existing "single channel" system, in order to provide an increase of system capacity. Trunking, among other things, allows for the convenience of organizing talk groups and better utilization of the bandwidth provided by multiple channels and is not an "expansion" of bandwidth.

**Defendant's Proposed Finding No. 11: The PCO awarded contract No. W914NS-050-9001 ("Contract 9001") to PraeComm on October 14, 2004. A 140-147. Contract 9001 was a commercial items contract for the replacement and upgrading of certain existing PraeComm radios (delivered under Contract 0032), namely the conversion from a single channel to a trunked network system in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Id. The contract was executed on the standard commercial items contract form (SF 1449) and incorporated a Statement of Work ("SOW"). A 144-145.**

**Praecomm's Response No. 11:** Praecomm disputes Defendant's eleventh proposed finding of uncontroverted fact. The PCO awarded contract No. W914NS-050-9001 ("Contract 9001") to Praecomm on October 14, 2004. Compl. ¶ 21; Answer ¶ 21; A 140-47. Contract 9001 was a contract for upgrading certain existing Praecomm radios and repeaters that had not yet been delivered to the Government under Contract 0032. The radios that were to be upgraded would be converted from a single channel system to a trunked system in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Id. The contract was executed on the Standard Form 1449 ("SF 1449") and incorporated a Statement of Work ("SOW") and Praecomm's Proposal. A 140-145.

**Defendant's Proposed Finding No. 12: The SOW for Contract 9001 included the following with respect to the Iraqi cities where the radio equipment would be used:**

**1.0 GENERAL. The Coalition Provisional Authority now MNSTC-I has a**

> **requirement to upgrade UHF radio systems in four cities to provide trunked communications.**
>
> **2.0 BACKGROUND. The current radio systems in Ad Diwaniyah, An Najaf, Al Hillah and Karbala are FM single channel systems. These systems provide basic communications capabilities for the Iraqi Police Forces, however, the systems are encrypted with a Type I encryption system which requires hand keying the radios to change encryption. Because it is impractical to do so on a frequent basis, lost and captured radios can be used to monitor police communications. In addition, the capacity of these systems is limited. Converting these cities to trunked networks will allow compromised radios to be cut out of the system from a central station. In addition, the capacity of the current system will be increased.**

**A 144.**

**Praecomm's Response No. 12:** Praecomm disputes Defendant's twelfth proposed finding of uncontroverted fact. Defendant's quotation of the SOW for Contract 9001 is incomplete. In addition to the portion quoted by Defendant, the SOW for Contract 9001 states:

> 3.0 SPECIFICATIONS:
>
> > 3.1 Retrofit 1502 portable radios to MPT trunked capable systems.
> >
> > 3.2 Install and configure upgrades to convert the 4 cities to trunked systems.
>
> 4.0 PERIOD OF SERVICE
>
> > 4.1 The warranty period will not be less than one year.

A144.

**Defendant's Proposed Finding No. 13: The SOW also described the specifications for the radio equipment, period of service, Government responsibilities, and contractor responsibilities. A 144-145. The contract required PraeComm to "provide distribution and installation of the radios at designated sites," "ensure the devices are properly fielded," and to "provide training on the systems." Id. The only Government responsibilities stated in the Statement of Work were to "provid[e] a distribution plan and coordinate[e] a distribution schedule," and to "provide frequency plans." Id.**

**Praecomm's Response No. 13:** Praecomm disputes Defendant's thirteenth proposed finding of uncontroverted fact. Defendant's characterization of Praecomm and the Government's

responsibilities is incomplete. The SOW for Contract 9001 states:

> 5.0 CONTRACTOR RESPONSIBILITIES
>
> > 5.1 Will provide unit programming software, cable for both PC download/unit to unit cloning, documentation and training.
> >
> > 5.2 Will provide distribution and installation of the radios at designated sites.
> >
> > 5.3 Will provide an efficient and effective project management and tracking mechanism to ensure the devices are properly fielded.
> >
> > 5.4 Will provide training on the systems.
>
> 6.0 GOVERNMENT RESPONSIBILITIES
>
> > 6.1 Providing a distribution plan and coordinating a distribution schedule.
> >
> > 6.2 Provide frequency plans.
>
> 7.0 CONTRACTOR RESPONSIBILITIES
>
> > 7.1 Submit status updates in writing to the CPATT C6 as directed by the CPATT C6.
> >
> > 7.2 Provide proper documentation (CPATT approved) to tracking the issue and installation for each location prior to submitting and request for payment.
> >
> > 7.3 Coordinate the delivery schedule with the CPATT C-6 to ensure that deliveries to priority locations are met first.
> >
> > 7.4 Will provide the government all codes and programming data files in writing and electronically.
> >
> > 7.5 Provide accurate tracking data of each shipment.
>
> 8.0 PROJECT MANAGEMENT: The vendor will provide project management to coordinate the installation. This project manager will be responsible for but not limited to:
>
> > 8.1 Accurately tracking installation status.
> >
> > 8.2 Inventory status and accounting.
> >
> > 8.3 Reporting status as required to CPATT.

8.4 Training and engineer planning.

A 144-45.

**<u>Defendant's Proposed Finding No. 14</u>: Contract 9001 also incorporated PraeComm's proposal. A 140, 146 (see boxes 15 and 20 on the SF 1449). PraeComm's proposal acknowledged that the tasking "would be focused on the following four cities: 1. Ad Diwaniyah, 2. An Najaf, 3. Al Hillah, [and] 4. Karbala." A 146. The proposal then identified the specific radio equipment to be installed. Id. The total contract price of $363,878 consisted of the 1,502 radios ($283,878), labor to install the radios ($50,000), and miscellaneous expenses such as travel ($30,000). A 140.**

**<u>Praecomm's Response No. 14</u>:** Praecomm disputes Defendant's fourteenth proposed finding of uncontroverted fact. Contract 9001 incorporated Praecomm's proposal. A 140, 146 (<u>see</u> boxes 15 and 20 on the SF 1449). Defendant's characterization of the tasking and equipment description portions of Praecomm's proposal is incomplete. In full, the statement about the tasking reads: "Our initial proposal to demonstrate technology and begin program would be focused on the following four cities, the list for which was provided by LTC Fretheim. 1. Ad Diwaniyah, 2. An Najaf, 3. Al Hillah, 4. Karbala." A 146. The full listing of radio equipment listed in Praecomm's proposal is as follows:

1. 4 – Six channel MPT combined trunked single site repeater system, 24 channels total, all of which are already awarded via contract 0032.

   Total Price: $0.00

2. 1378 MPT portable radios already awarded: $0.00

3. With 24 Trunked channels @ 100-120 units load capacity per Trunked repeater channel, number of recommended units would be roughly 2880 units with 1378 already contracted for. Balance remaining would be 1502 MPT portable radios which will be upgraded from conventional units to MPT trunked units @ 179 [handwritten strikethrough, interlineation of 189] per unit.

   Retrofit price for an additional 1502 MPT portables: $268,858.00 [handwritten strikethrough, interlineations of $283 878.00]

4. Base stations are already awarded with 116 units yet to be assigned

Base Stations Awarded via contract 0032: $0.00

5. Labor; to include 4 travel days for single commitment of one week or 7 days for 3 technicians; 11 days total (21 day minimum applies) for 3 technicians or 63 working days

Total for 63 [handwritten strikethrough, interlineation of 100] days minimum [handwritten strikethrough, interlineation of maximum] @ $500 per day: $31,500.00 [handwritten strikethrough, interlineation of $50,000.00

6. Miscellaneous expenses: Travel, expedite fees, etc. $30,000.00

Four City Total: $330,358.00

A 146.

**<u>Defendant's Proposed Finding No. 15</u>: Neither the Statement of Work nor Contract 9001 made any representations as to the long term use of the radio equipment in the four cities specified for delivery, or the likelihood of PraeComm or any other supplier receiving a contract to supply additional radio equipment in the named cities (or any other cities) in the future. A 140-146.**

**<u>Praecomm's Response No. 15</u>:** Praecomm disputes Defendant's fifteenth proposed finding of uncontroverted fact. The nature of the equipment provided under Contract 9001 and the installation of that radio equipment in the designated cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala in the Statement of Work and in Praecomm's proposal suggests long term use of the radio equipment in the four cities. Pl. App. 23-24. Contract 9001 Statement of Requirements states: "the capacity of the current system will be increased"); A 144 (SOW for Contract 9027 provides: "the system will need to become a long term solution given that the AFRN will not be put into many cities"). As of December 6, 2004, the succeeding Contract 9027 required all the equipment from Contract 9001 (2,880 portables and four trunked systems) and the balance of remaining equipment from Contract 0032 (1,920 handsets). Pl. App. 23-24; <u>See</u> Pl. App. 7.

**<u>Defendant's Proposed Finding No. 16</u>: Contract 9001 was awarded and administered by the PCO; however, the payment office for the contract was within the Army Corps of**

**Engineers. A 140. PraeComm was the sole offeror for Contract 9001. Fretheim Decl. at 3.**

**Praecomm's Response No. 16:** Praecomm disputes the second sentence in Defendant's sixteenth proposed finding of uncontroverted fact. Praecomm does not dispute that Contract 9001 was awarded and administered by the PCO and that the payment office for the contract was within the Army Corps of Engineers. A 140. Although Praecomm had already supplied existing radios under Contract 0032 in some of the same cities identified in Contracts 9001 and 9027, Defendant was soliciting, and other offerors were bidding for, work to provide first responder radio equipment in the cities identified in Contract 9001. Praecomm incorporates herein its Response to No. 8 *supra*. Praecomm also notes that Contract 9001 covered the retrofit of portable radios. However, Contract 9001 also included accessories such as programming software and cables. A 144.

**Defendant's Proposed Finding No. 17: Shortly after the award of Contract 9001, the PCO decided that it wanted to upgrade existing radio systems in several additional Iraqi cities by acquiring trunked radios similar to those provided under Contract 9001. Graham Decl. at 5; A 162-175.**

**Praecomm's Response No. 17:** Praecomm does not dispute Defendant's seventeenth proposed finding of uncontroverted fact except to add that LTC Fretheim provided a list of cities "for the next phase of trunking" on November 11, 2004. Pl. App. 10-13. This list included Samara, Kikuk, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, As Sulaymaniyah, Abbasiyah, Al Kut and Al Fallujah.

**Defendant's Proposed Finding No. 18: The Statement of Work for this requirement, which eventually led to Contract No. W914NS-05-F-9027 ("Contract 9027"), specified that the vendor would provide 8-channel trunked radio systems in five cities and 6-channel trunked radio systems in nine other cities. A 154-155. The cities identified for delivery of the trunked radio systems were Samarra, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kapri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi. Id.**

**Praecomm's Response No. 18:** Praecomm disputes Defendant's eighteenth proposed finding of

uncontroverted fact. Defendant's characterization of the requirements under Contract 9027 is inaccurate and incomplete. The first two requirements under the Statement of Work for Conversion to Trunked Radio Network for Iraqi Police Services in Contract 9027 identified the work in the following cities:

> C. Requirements
>
> 1. The Vendor will provide 8 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 5 cities: Samarra, Kirkuk, Al Sulaymaniyah, Al Kut and Al Fallujah. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station radios.
>
> 2. The vendor will provide 6 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan.[sic] Ryad, Abbasiyah, Tikrit and Ramadi. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station radios[.]

A 154.

**<u>Defendant's Proposed Finding No. 19</u>: The Contract 9027 SOW provided the following background for the procurement:**

> **B. Background**
>
> **Over the past year, the coalition has installed ARI [American Radio, Inc. (plaintiff)] analog radio systems in a number of cities in Iraq to support the Iraqi Police Service. These radio systems were originally designed to provide initial support for a force of 85,000 officers. The radios were to be replaced in June 2004 with the Advanced First Responders Network. That network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. Additionally, the system will need to become a long term solution given that the AFRN will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network.**
>
> **In addition to adding capacity, the trunked system increases the security of the network by allowing the compromised stations to be shut off the network**

**A 154.**

**<u>Praecomm's Response No. 19</u>:** Praecomm does not dispute Defendant's nineteenth proposed finding of uncontroverted fact.

**<u>Defendant's Proposed Finding No. 20</u>: The Contract 9027 SOW then listed the requirements that the successful contractor had to meet. A 154-155. Generally, the vendor was required to supply the specified radio equipment, including chargers, batteries, cables, and software; the vendor was also required to install the equipment and train users on its operation. Id.**

**<u>Praecomm's Response No. 20</u>:** Praecomm disputes Defendant's twentieth proposed finding of uncontroverted fact. Defendant's characterization of the "Requirements" portion of Contract 9027 (A154-55) is incomplete. The requirements section of Contract 9027 states as follows:

> C. Requirements
>
> 1. The Vendor will provide 8 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 5 cities: Samarra, Kirkuk, As Sulaymaniyah, Al Kut, Al Fallujah. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station radios.
>
> 2. The vendor will provide 6 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan.[sic] Ryad, Abbasiyah, Tikrit and Ramadi. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station radios.
>
> 3. The vendor will provide MPT3200 upgrades to 1920 existing ARI portable (hand held) radios with encryption, and passcode protection.
>
> 4. The vendor will provide an additional 11440 MPT 3200 portable radios with encryption and password protection.
>
> 5. The vendor will provide 1620 220 Volt multi-unit (6 unit) chargers for portable radios.
>
> 6. The vendor will provide 1720 220 Volt single unit chargers for portable radios.
>
> 7. The vendor will provide 11440 ultra high capacity NIMH back up batteries for the portable radios.
>
> 8. The vendor will provide 50 cloning cables for the portable radios.
>
> 9. The vendor will provide 15 copies of Windows based programming software for the portable radios.

10. The vendor will provide 18 ACU-1000 with 3 DSP-2 Radio and Network Interface modules. These systems will be used to connect other radio networks to the trunking system. At least one channel of these systems will be provided with Transcrypt 460 series encryption capabilities. One of these systems will be included in each of the radio networks provided under this statement of work. The additional four will be provided to the four ARI trunked radio systems already installed.

11. The vendor will program existing portable, mobile and base station radios to operate on the installed trunked networks.

12. The vendor will install additional existing government owned. base stations on the trunked networks.

13. The vendor will provide engineering, project management and support as needed to install and establish the trunked radio systems.

14. The vendor will provide periodic (weekly) status reports to the CPATT C-6 for the duration of the project.

15. All systems must be installed and functional within 60 days of the award of the project.

A 154-55.

**<u>Defendant's Proposed Finding No. 21</u>: Like Contract 9001, Contract 9027 was also a commercial items contract executed on a standard commercial items form SF 1449. A 149. PraeComm was the sole offeror for Contract 9027. Fretheim Decl. at 3.**

**<u>Praecomm's Response No. 21</u>:** Praecomm disputes Defendant's twenty-first proposed finding of uncontroverted fact. Contract 9027 was executed on the Standard Form 1449 (SF 1449). Defendant was soliciting and other offerors were bidding for work to provide first responder radio equipment in the cities identified in Contract 9027. Praecomm incorporates herein its Response to No. 8 *supra*.

**<u>Defendant's Proposed Finding No. 22</u>: The Statement of Work for Contract 9027 required PraeComm not only to provide the radio equipment, but also to install the equipment for use by the IPS:**

**C. Requirements**

*** * ***

**13. The vendor will provide engineering, project management, and support as**

**needed to install and establish the trunked radio systems.**
**14. The vendor will provide periodic (weekly) status reports to the CPATT C-6 for the duration of the project.**
**15. All systems must be installed and functional within 60 days of the award of the project.**

**A 155.**

**<u>Praecomm's Response No. 22</u>:** Praecomm does not dispute Defendant's twenty-second proposed finding of uncontroverted fact, except that Praecomm incorporates herein its Response to No. 20 *supra*, which provides the complete set of requirements for the Statement of Work under Contract 9027. In particular, Praecomm notes that the SOW for Contract 9027 at C.1 and C.2 state that Praecomm will provide radio systems for fourteen listed cities. A 154.

**<u>Defendant's Proposed Finding No. 23</u>: Praecomm submitted an undated proposal in late November or early December 2004 to supply and install the radio equipment for $7,245,880. A 152. Consistent with the terms of the SOW, Praecomm's proposal called for five 8-channel base systems, seven 6-channel base systems, 11,440 radios, associated accessories, and labor for installation and training. Id.**

**<u>Praecomm's Response No. 23</u>:** Praecomm disputes Defendant's twenty-third proposed finding of uncontroverted fact. Defendant's characterization of Praecomm's proposal and its relationship to the Statement of Work is inaccurate and incomplete. Praecomm's proposal called for five 8-channel 100 Watt MPT3200 Single Site systems with Network Capability; seven 6-channel 100 Watt MPT3200 Singe Site systems with Network Capability; 2 6-channel 100 Watt MPT 3200 Single Site system with Network Capability for Tikrit and Ramadi: 11,440 MPT 3200 portable radios with failsafe revert encryption and passcode protection; 1,920 MPT3200 portable radio upgrades with failsafe revert encryption and passcode protection; 1,620 220V Multi (6 Unit) charges for Portable radios; 1,720 220V Single unit charger for portable radios; 11,440 Ultra high capacity NIMH batteries; 50 cloning cables; 15 Windows based programming software for portable radios; 18 ACU-1000s with 3 DSP-2 radio and network interface modules;

and $375,000 in labor, $125,000 in miscellaneous expenses. Notes In Praecomm's proposal indicate that the cities where these items were to be used were Samara, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad and Abbasiyah. A second note in the proposal indicates "Proposed City Add for future networking," "Tikrit" and "Ramadi . A third note in the proposal indicates that the "Proposed City Adds are included on line item 0003 at no extra cost to the Government based on the quotations current numbers elsewhere." A 152. There is no reference in Praecomm's proposal to installation and training. A 152.

**Defendant's Proposed Finding No. 24: The PCO accepted PraeComm's offer and awarded Contract 9027 to PraeComm on December 6, 2004, for the offered price of $7,295,880. A 149-150. According to plaintiff's proposal for Contract 9027 and the contract itself (CLIN 0012), the price for shipping and installation of the equipment was $500,000. A 150, 152.**

**Praecomm's Response No. 24:** Praecomm disputes Defendant's twenty-fourth proposed finding of uncontroverted fact. Defendant awarded Praecomm Contract 9027 on December 6, 2004. A 149; Compl ¶ 31; Answer ¶ 31. The total award amount of the contract was $7,295,880. A 149. Praecomm's proposal listed the items identified in Praecomm's Response to No. 20 *supra*, which is incorporated into the contract. Praecomm's proposal did not reference installation and training. However, Praecomm's proposal did list "Labor." A 152. The total price for "Labor" listed in Praecomm's proposal, was $375,000, and $125,000 for miscellaneous, which was incorporated into Contract 9027. A 150-152. On December 6, 2004, Contract 9027 was modified. Contract 9027's Schedule of Supplies and Services listed CLIN 0012 as "Shipping and Installation" in the amount of $500,000. A 150; Pl. App. 154-155. This labor involved upgrading four single site systems from Contract 9001 to make the single site systems network trunking capable, upgrading four systems from Contract 9001 to include ACU-1000 interface capability, and reprogramming systems and portable radios to alternate modified

frequency plans to accommodate Defendant's modification of the city list. On June 28, 2005, Defendant issued a Material Inspection and Receiving Report on a DD Form 250 indicating Defendant's acceptance of the labor and miscellaneous expenses under CLIN 0012 of Contract 9027. Pl. App. 156.

**Defendant's Proposed Finding No. 25: In January 2005, the AFRN cities continued to change and the PCO determined that it wanted to acquire the same trunked radio equipment for use in the Iraqi cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah and As Sawawah. Graham Decl. at 5; A 156.**

**Praecomm's Response No. 25:** Praecomm disputes Defendant's twenty-fifth proposed finding of uncontroverted fact. The documents cited by Defendant (Graham Decl. at 5; A 156) do not support this proposed finding of fact. The cities designated for the AFRN program did not change. Praecomm incorporates herein its Response to No. 8 *supra*.

The cities under Praecomm's contracts were changed. Contract 9027 was formally modified on January 28, 2005. Compl. ¶ 47; Answer ¶ 47; A 159. The purpose of this modification was to incorporate changes to the SOW. A 159. Specifically, the modification replaced Section C, paragraph 2 of the SOW with the following: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 8 cities: Tikrit, Ramadi, Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah. One additional system will be held as operational reserve by CPATT, C-6. The Systems must be compatible with existing ARI MPT3200 portable (hand held), mobile and base station radios." Compl. ¶ 48; Answer ¶ 48; A 159. The original Section C, paragraph 2 of the SOW in Contract 9027 read as follows: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site Trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi." Further, Modification P00001 to Contract 9027 substituted the cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As

Samawah in place of Al Huywayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad and Abbasiyah. All other terms and conditions of Contract 9027 remained unchanged by this modification. Id.

**Defendant's Proposed Finding No. 26: Bilateral Modification P00001 to Contract 9027, dated January 28, 2005, added the names of the six cities in place of several cities previously named in the original contract. A 159. The modification further explained that "all other terms and conditions of [the] contract remained the same." Id. Accordingly, the modification did not change either the number of radios, the radio systems (8-channel versus 6-channel), the installation requirement, or the contract pricing in any way. Id.**

**Praecomm's Response No. 26:** Praecomm disputes Defendant's twenty-sixth proposed finding of uncontroverted fact. Praecomm incorporates herein its Response to No. 25 *supra*.

**Defendant's Proposed Finding No. 27: Numerous e-mails record messages between the Army and plaintiff's principal, Dom DiLuigi, in which the issue of which cities would ultimately be included in AFRN was discussed. A 193-233. The lists of cities slated for AFRN versus cities slated for FRN frequently changed. Id.**

**Praecomm's Response No. 27:** Praecomm disputes Defendant's twenty-seventh proposed finding of uncontroverted fact. After the modification of Contract 9027 numerous email messages between the Government and Praecomm principal, Dom Di Luigi, continued to discuss the cities in which Praecomm's radios would be used. A 193-233. For example, on March 5, 2005, 1LT Andrew Radano provided Mr. Di Luigi with a list identifying "cities designated for AFRN, leaving only (5)[8] for FRN." A 199.

In response to Mr. Radano's email at 7:34 p.m., Mr. Di Luigi stated (to both Mr. Radano and Major Sile), in part:

> I've seen so many 'lists' on this AFRN/FRN project I can't count them…regarding your email, my information on the 'proposed' FRN cities is not my information and is not a proposal, we're contracted from the FRN to do so…it's way [past] the proposal point…not sure if you have reviewed all contracts and attachments I sent you, you may want to re-review them and confirm you most recent send…we will take it from there based on your response

[8] See A 199. The list assigns the following cities to the AFRN program: (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala. The list assigns the remaining five cities to FRN: (1) As Sulaymaniyah; (2) Al Fallujah; (3) Dahuk; (4) Irbil; (5) Al Amarah.

> that I will be looking for on an every hour on the hour basis until I see it come through…if you are in fact correct and our portion is now reduced to 5 remaining cities then I would say we are looking at a significant problem that will need to be addressed on our end first thing Monday morning here at home…

A 198 (alterations in original).

That same evening, at 8:53 p.m. Major Robert Sile responded to Mr. Di Luigi, in part:

> Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [Praecomm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.
>
> I presume that what you need is a MOD from PCO to the contract specifying different cities. I would presume here that I can substitute one city for another on a one-for-one basis. That seems a bit simplistic so please let me know what I've overlooked. What I'd like to do is work with your to decide those "city pairs" so we agree together on what old city was and substitute is.

A 198.

In response to Major Sile's email, Mr. Di Luigi informed Major Sile at 9:59 p.m., among other things, that Praecomm had provided "extremely aggressive pricing to the PCO to be able to enter this market in the cities and the manner we had been contracted to.[9]" A 197; Pl. App. 1-6.

On March 12, 2005, Major Robert Sile sent an email message to Dom Di Luigi, stating "[w]e want to have FRN installed, at least initially in the five cities.[10]" Major Sile, in referencing the five Iraq cities from his March 12, 2005 email, continued, "We'd still like [sic] the other 12 cities installed but not into cities where AFRN is fielded as that causes the situation where two systems service a single city and that's operationally not supportable." A 203. Major

[9] As Major Sile was not involved in the formation of Contract 9001 or Contract 9027, he would not be aware that Praecomm's pricing was aggressively discounted in consideration for the installation and use of Praecomm's radio equipment in the cities identified in Contract 9001 and 9027.

[10] The list assigns the remaining five cities to FRN: (1) As Sulaymaniyah; (2) Al Fallujah; (3) Dahuk; (4) Irbil; (5) Al Amarah.

Sile was referencing the following twelve Iraq cities that were lost to AFRN: (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala.

Praecomm incorporates herein its Response to No. 8 *supra*. None of the documents contained in A 193-233 indicate that the AFRN cities changed.

**<u>Defendant's Proposed Finding No. 28</u>: Mr. DiLuigi wrote in a March 5, 2005 e-mail, "I've seen so many 'lists' on this AFRN/FRN project I can't count them." A 193. Mr. DiLuigi later acknowledged in an August 15, 2005 e-mail to the contracting officer: "The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it." A 243.**

**<u>Praecomm's Response No. 28</u>:** Praecomm disputes Defendant's twenty-eighth proposed finding of uncontroverted fact. Defendant's descriptions of the documents are incomplete and the quotations identified by Defendant it its twenty-eighth proposed finding of uncontroverted fact are not relevant to a determination of liability or damages for Defendant's breach of contract. On March 5, 2005, Dom Di Luigi stating, in part:

> I've seen so many 'lists' on this AFRN/FRN project I can't count them…regarding your email, my information on the 'proposed' FRN cities is not my information and is not a proposal, we're contracted from the PCO to do so…it's way the proposal point…not sure if you have reviewed all contracts and attachments I sent you, you may want to re-review them and confirm your most recent send…we will take it from there based on your response that I will be looking for on an every hour on the hour basis until I see it come through…if you are in fact correct and our portion is now reduced to 5 remaining cities then I would say we are looking at a significant problem that will need to be addressed on our end first thing Monday morning here at home…

A 193 (alterations in original). On August 15, 2005, Dom Di Luigi sent an email message to Thomas F. Zubel stating, in part:

> Background: Our Company has been involved with wireless communications in Iraq since early 2003. Through three contracts, 0032, 9001 and 9027 we have to date provided roughly 16k portable handsets and 18 systems that applies solely to the program known as FRN.

> The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it.
>
> Recently, our company has been made aware of the scaling back of the FRN program in lieu of a digitalized version known as AFRN. Our company currently holds contract [sic] to provide FRN or at least our communication solution, slotted for the FRN program application, to 17 out of the roughly 20 or 21 major cities in Iraq. This recent change about will cost our company 12 of the 17 major cities we currently hold contract for, and substitute our product with that of our competitor.

A 243.

**<u>Defendant's Proposed Finding No. 29</u>: In March 2005, Major Robert Sile, who had replaced Lieutenant Colonel Fretheim as the new CPATT C-6 (lead communications officer), analyzed the progress on the AFRN system and saw that AFRN was now expected to cover some of the cities where the Government was planning on setting up the PraeComm FRN system. Sile Decl. at 2-3. Based on the projected rollout, Major Sile decided to redirect PraeComm's radio systems to other cities that would not come under the AFRN umbrella until later. Id. Major Sile recognized that it would have been unworkable and redundant to have technologically disparate radio systems (AFRN and FRN) in the same city at the same time. Id.**

**<u>Praecomm's Response No. 29</u>:** Praecomm disputes Defendant's twenty-ninth proposed finding of uncontroverted fact in part. Defendant designated which cities AFRN equipment would be installed and used in 2004. Praecomm incorporates herein its Response to No. 8 *supra*. The cities designated for the AFRN program did not change in January 2005, as Major Robert Sile suggests on page 2 of his declaration. Contrary to Major Robert Sile's declaration, by January 22, 2005, one month after Defendant awarded Contract 9027, CPATT received 28,417 first responder radios under the AFRN program. A 99. CPATT had received and transferred 28,417 first responder radios under the AFRN program "to the AFRN contractor for programming to an exisiting TETRA network, from the contractor back to CPATT and then from CPATT to the Iraqi Ministry of Interior") This equipment provided 87% of the total loadout; or the entire first year's loadout requirement for the AFRN program). A 99. By January 26, 2005, the Advanced

Fist Responders Network National Coordination Center and base transceiver stations were installed in Iraq and were ready for activation. Pl. App. 49;76. By February 16, 2005, Defendant had programmed and distributed over 1,700 user radios to policeman at Iraqi Police stations and continued to install AFRN infrastructure in Baghdad. Pl. App. 101. By February 23, 2005, all AFRN base stations were on line in Baghdad and an additional 50 base stations were set for construction in 15 other cities. Pl. App. 128.

Praecomm does not dispute that Defendant decided to redirect Praecomm's radio systems to other cities that would not come under the AFRN umbrella. Sile Decl. ¶ 4. However, Praecomm disputes any notion that the balance of the cities remaining the AFRN umbrella at any date. See Folgate Decl. Praecomm does not dispute that it would have been unworkable and redundant to have technologically disparate radio systems (AFRN and FRN) in the same city at the same time. Sile Decl. ¶ 4.

**<u>Defendant's Proposed Finding No. 30</u>: Major Sile wrote Mr. DiLuigi on March 5, 2005:**

> **Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [PraeComm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.**

**A 193.**

**<u>Praecomm's Response No. 30</u>**: Praecomm disputes Defendant's thirtieth proposed finding of uncontroverted fact. Defendant's quotation is incomplete and neglects relevant portions of the March 5, 2005 e-mail. Major Robert Sile wrote Dom Di Luigi on March 5, 2005, in part:

> Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same

> city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [Praecomm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.
>
> I presume that what you need is a MOD from PCO to the contract specifying different cities. I would presume here that I can substitute one city for another on a one-for-one basis. That seems a bit simplistic so please let me know what I've overlooked. What I'd like to do is work with your to decide those "city pairs" so we agree together on what old city was and substitute is.

A 193.

Praecomm also disputes the factual premise of Major Robert Sile's email that the list of cities designated for AFRN equipment had changed prior to March 2005. In particular, Praecomm disputes that the AFRN designated cities had changed prior to November 2004. A 92 (As of September 14, 2004, the PCO had received a rough order of magnitude cost estimate for the entire AFRN system). The AFRN designated cities were set in stone sometime prior to November 2004. Praecomm incorporates herein its Response to No. 8 *supra*.

**Defendant's Proposed Finding No. 31: Of the 17 cities expected to use PraeComm's FRN equipment at the time the contracts were executed, 12 were now (as of March 2005) expected to be included in the AFRN system network. A 193-195.**

**Praecomm's Response No. 31:** Praecomm disputes Defendant's thirty-first proposed finding of uncontroverted fact. The list provided by Andrew Radano on March 2005 "represents cities that are designated for AFRN." A 194. This is not a new or modified list, as Defendant contends in its thirty-first proposed finding of uncontroverted fact. During the time Contracts 9001 and 9027 were being executed in October and December 2004, Defendant planned on installing at AFRN systems and radio equipment in at least 12 of the cities identified in Contracts 9001 and 9027 (i.e., : (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala). Pl. App. 14-17**.** By January 22, 2005, one month after Defendant awarded Contract 9027 to

Praecomm, CPATT had received and transferred 28,417 first responder radios under the AFRN program "to the AFRN contractor for programming to an exisiting TETRA network, from the contractor back to CPATT and then from CPATT to the Iraqi Ministry of Interior") This equipment provided 87% of the total loadout; or the entire first year's loadout requirement for the AFRN program). A 99. By January 26, 2005, the Advanced Fist Responders Network National Coordination Center and base transceiver stations were installed in Iraq and were ready for activation. Pl. App. 49**.** By February 16, 2005, Defendant had programmed and distributed over 1,700 user radios to policeman at Iraqi Police stations and continued to install AFRN infrastructure in Baghdad. Pl. App. 101. By February 23, 2005, all AFRN base stations were on line in Baghdad and an additional 50 base stations were set for construction in 15 other cities. Pl. App. 128. Praecomm incorporates herein its Response to No. 8 *supra*

**<u>Defendant's Proposed Finding No. 32</u>: In response, Mr. DiLuigi informed Major Sile that PraeComm had "provided extremely aggressive pricing to the PCO to be able to enter this market in the cities and manner we had been contracted to." A 196-197.**

**<u>Praecomm's Response No. 32</u>:** Praecomm disputes Defendant's thirty-second proposed finding of uncontroverted fact. Defendant's characterization of Mr. Di Luigi's message is incomplete. A 197. Mr. Di Luigi informed Major Sile, among other things, that Praecomm had provided "extremely aggressive pricing to the PCO to be able to enter this market in the cities and the manner we had been contracted to." As Mr. Sile was not involved in the formation of Contract 9001 or Contract 9027, he would not be aware that Praecomm's Pricing was aggressively discounted in consideration for the installation and use of Praecomm's radio equipment in the cities identified in Contract 9001 and 9027. Pl. App. 106, A 140-161.

In its proposal for Contract 9027, Praecomm stated that "Proposed City Adds are included on line item 0003 at no extra cost to the Government based on the quotations current

numbers elsewhere." A 152. Praecomm offered to outfit those cities (the two cities of Tikrit and Ramadi) in contract 9027 to gain those cities to the Praecomm network and LTC Fretheim obliged and authorized those two cities to Praecomm as well.

The Contracting agent, Robert Mueller, questioned the reason why CLIN 0003 was included at no charge to the Government in an email dated 12/5/04. In an email responding to Robert Mueller (cc: Fretheim) later that day on 12/5/04, Dom DiLuigi writes: We would like [Tikrit and Ramadi] included in the network eventually and the requirement does not call for them at this point…please remember that all systems we will be providing are 'network capable' meaning they are designed to be linked together…we believe the two cities represented in CLIN 0003 will be called for once the other systems are in place due to their proximity to Fallujah and Samarra…these two additional systems linked with Fallujah and Samarra will provide roughly 4 times the total coverage pattern in that region then can be provided in a single site alone…." Mueller responded to this email stating: "I will get you an order in the morning for the quoted amount on this last email." No objections were voiced by LTC Fretheim and Contract 9027 proceeded and was awarded to Praecomm with the inclusion of Tikrit and Ramadi at no additional cost to the Government. Pl. App. 18-19.

**<u>Defendant's Proposed Finding No. 33</u>: Thereafter, efforts were made to plan the fielding and installation of PraeComm's radios in five of the 17 cities contemplated in Contracts 9001 and 9027, as well as follow-on fielding in a number of other Iraqi cities. A 216, 218, 223. PraeComm made several more-costly counter-proposals to get its equipment into certain Iraqi cities; however, none of these plans was accepted by the Army. A 201-204, 210-220.**

**<u>Praecomm's Response No. 33</u>:** Praecomm disputes Defendant's thirty-third proposed finding of uncontroverted fact only to the extent that it characterizes Praecomm's proposal as "more-costly". Although the impact to their business was great, Praecomm were team players; Praecomm would have accepted the five city list if additional handsets and/or any other

accessories[11] to round out their order for equipment had been accepted. Praecomm was being flexible and willing to negotiate a modification to Contracts 9001 and 9027 in good faith. They never attempted to stop the process or file a formal process, but instead tried to reason with the government. A 99; Pl. App. __. However, none of these plans was accepted by the government. A 201-204, 210-220; Pl. App. 149-153.

**Defendant's Proposed Finding No. 34: The list of AFRN and FRN cities continued to change between April and August 2005. A 223-225, 228-233. Army personnel believed that the contract could be changed at no cost to substitute the new cities for installation of the equipment; the overall number of cities and quantity of radio equipment would not change. A 230. However, a modification was never agreed upon by the parties.**

**Praecomm's Response No. 34:** Praecomm disputes Defendant's thirty-fourth proposed finding of uncontroverted fact. Praecomm incorporates herein its Response to No. 27 *supra*. The cities designated for the AFRN program did not change. Only the cities slated for Praecomm's radios changed . Praecomm incorporates herein its Response to No. 8 *supra*.

On April 8, 2005, Major Robert Sile sent an email message to Praecomm's Dom Di Luigi, Praecomm's Shawn Campbell and Contracting Officer Danny Nearn indicating that he wanted Praecomm's radio equipment to be installed in Dahuk, Irbil, Fallujah, Al Amarah, As Sulaymaniya. A 223. In the same message, Major Sile also identified five smaller cities for Praecomm's radios. Id. By July 2005, the Government was still trying to "formulate a list of cities for the FRN project" for Contracts 9001 and 9027. A 228. More specifically, on July 24, 2005, Lt. Andrew Radano sent an email message to Praecomm's Dom Di Luigi indicating that efforts "continue to finalize last, definitive list of FRN cities. Currently back up to (15) cities, including both definite and tentative choices. Unfortunately, cities lost to AFRN in no way can be recouped." A 230, 233. The referenced "cities lost to AFRN" in Lt. Radano's email were

[11] See Types of Equipment referencing accessories in Table 5, A 99.

Samarra; Kirkuk; Al Kut; Tikrit; Ramadi; Baqubah; An Nasariyah; As Samawah; Ad Diwaniyah; An Najaf; Al Hillah; Karbala. All of these cities were either listed in Contracts 9001 and 9027 or in a contract modification. A formal modification to Contracts 9001 and 9027 was never agreed to or executed by the parties.

Praecomm disputes that Army personnel believed that the contract could be changed at no cost to substitute the new cities for installation of the equipment because the overall number of cities and quantity of radio equipment would not change. Praecomm incorporates herein its Response to No. 8 *supra*.

**Defendant's Proposed Finding No. 35: Mr. DiLuigi sent an e-mail to the Army on July 17, 2005, claiming that that he had provided pricing for Contracts 9001 and 9027 "based on quantity of order and likelihood of future sales/business," and that he had given the Army a 25 percent discount "designed to get us into the larger cities." A 239-241.**

**Praecomm's Response No. 35:** Praecomm disputes Defendant's thirty-fifth proposed finding of uncontroverted fact. Defendant's characterization is incomplete and inaccurate.

On July 17, 2005, Mr. DiLugi's sent and email message to Administrative Contracting Officer Karen Parris providing an overview of the contracts and the decision by the government to take away 12 of Praecomm's contracted cities. A 239-41. Mr. Di Luigi also gave a detailed account of Praecomm's pricing of contracts 9001 and 9027. Mr. Di Luigi indicated that "pricing was given to the PCO based on our company providing the communication solution to those cities," because there was "one solution type per city" and because "[Praecomm's] technology will not work with our competition's." A 240. The cities which Mr. Di Luigi was referencing were the cities of (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala. Later, Mr. Di Luigi indicated:

> The pricing was designed to get us into the larger cities in the market, the cities

> as the were presented to us…we gave a 25% discount on equipment and we gave systems away literally…an example would be, we gave two systems for 'free,' on contract 9027, in order to gain market share in the larger cities those systems were to be used in…now, those cities are no longer going to be installed by us, they will be re-assigned to Lucent [for installation of Lucent's AFRN] . . . .

A 240.

**<u>Defendant's Proposed Finding No. 36</u>: Plaintiff shipped the radio equipment ordered under Contracts 9001 and 9027 in several shipments between February and August 2005. A 176-190. The radios were delivered to Iraq and stored in a warehouse in Baghdad where they remain today. Sile Decl at 5; Folgate Decl. at 3.**

**<u>Praecomm's Response No. 36</u>:** Praecomm does not dispute Defendant's thirty-sixth proposed finding of uncontroverted fact, except to note that the statement of Lieutenant Commander Idella Folgate, J-6 Ministry of the Interior Transition Division Chief, that Praecomm's radios have been delivered and are being stored in a warehouse in Baghdad is in paragraph 5, on page 2 of her declaration and that there is no page 5 of the Sile Declaration.

**<u>Defendant's Proposed Finding No. 37</u>: The contracts were never modified to delete the required tasks to install the radio equipment in the designated cities and train local personnel on its use. Nonetheless, the Army paid plaintiff $363,878, the full contract price in Contract 9001, and $7,295,880, the full price in Contract 9027. A 192.**

**<u>Praecomm's Response No. 37</u>:** Praecomm disputes Defendant's thirty-seventh proposed finding of uncontroverted fact. Praecomm incorporates herein its Response to No. 25 *supra*. Contract 9027 was formally modified on January 28, 2005 to change the cities initially listed on the contract. Compl. ¶ 47; Answer ¶ 47; A 159. The purpose of this modification was to incorporate changes to the SOW. A 159. Specifically, the modification replaced Section C, paragraph 2 of the SOW with the following: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 8 cities: Tikrit, Ramadi, Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah. One additional system will be held as operational reserve by CPATT, C-6. The Systems must be compatible with existing

ARI MPT3200 portable (hand held), mobile and base station radios." Compl. ¶ 48; Answer ¶ 48; A 159. The original Section C, paragraph 2 of the SOW in Contract 9027 read as follows: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site Trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi." Further, Modification P00001 to Contract 9027 substituted the cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah in place of Al Huywayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad and Abbasiyah. As a result of the modification, the seven small cities in Contract 9027 were replaced with six large cities.

All other terms and conditions of Contract 9027 remained unchanged by this modification. A 159. Defendant accepted the labor and miscellaneous expenses provided under Contract 9027. Pl. App. 156. Defendant did not allow Praecomm to install the radio equipment in the designated cities and train local personnel on its use.

In addition, with respect to Contract 9001, the Defendant did not provide frequency plans to Plaintiff; Defendant did not provide a distribution plan; Defendant did not coordinate a distribution schedule; and Defendant did not allow the installation of MPT3200 radio networks in the contractually identified cities pursuant to the written terms of the contract. Id. With respect to Contract 9027, Defendant did not allow the installation of MPT3200 radio networks in the contractually identified cities pursuant to the written terms of the contract. Id.

The Defendant changed the city plan at the Civilian Police Assistance Training Team (CPATT) level preventing installations from taking place under the terms of Contract 9027. The Defendant insisted on having equipment re-programmed to new frequencies based on its frequency management department's insistence but then failed to ever provide those frequencies to Praecomm. Finally, the Defendant did not provide a formal contract modification to Contract

9027 to indicate its new list of cities post re-assignment of Praecomm's contracted cities to AFRN and at the same time did not allow contracted equipment to be distributed per the contract directive.

**<u>Defendant's Proposed Finding No. 38</u>: PraeComm sent the Contracting Officer a letter dated August 14, 2005, demanding an equitable adjustment of $13,657,500 for what it called a "constructive cardinal change" to Contracts 9001 and 9027. A 252-254. In this letter, PraeComm asserted that it had given the Army a 30 percent discount on the equipment ordered under Contracts 9001 and 9027. Id.**

**<u>Praecomm's Response No. 38</u>:** Praecomm disputes Defendant's thirty-eighth proposed finding of uncontroverted fact. Praecomm sent the Contracting Officer a letter dated August 14, 2005 regarding Contracts 9001 and 9027. A 252-54. Among other things, this letter indicated that it was Praecomm's understanding that the PCO intended to further modify Praecomm's contracts to again change the cities in which the equipment supplied by Praecomm would be installed. The letter indicated that a "change to the contractually specified major cities would be a cardinal change and a breach of American Radio's contracts. Such actions by the PCO will have a significant adverse impact on American Radio for which American Radio would be entitled to an equitable adjustment." A 252. The letter also indicated that "[b]ased on the PCO's representation that [Praecomm's] would be the supplier in the contractually specified cities, [Praecomm] reduced its price in the contracts by 30 percent and agreed to supply two 6 channel 100 watt MPT3200 network capable trunked radio systems for Tikrit and Ramadi at no[] charge." A 253. The letter noted that Defendant's decision not to place Praecomm's equipment in the promised cities was "in the very least, a constructive cardinal change" to Contracts 9001 and 9027. <u>Id.</u>

**<u>Defendant's Proposed Finding No. 39</u>: The contracting officer told PraeComm the following by e-mail dated September 23, 2005:**

> **It is my understanding the equipment provided by American Radio, which is**

> **currently stored in a warehouse, will be used in the future. It would be wrong not to use equipment which has been bought and paid for. At this time nobody can tell exactly which cities the equipment will be used in nor can they tell what specific technical requirements will be changed.**

**A 250.**

**Praecomm's Response No. 39:** Praecomm does not dispute Defendant's thirty-ninth proposed finding of uncontroverted fact, except to note that the word "do" appears between "nor" and "can," in the last sentence of the above-quoted paragraph A 250.

**Defendant's Proposed Finding No. 40: By letter dated October 14, 2005, another contracting officer formally responded to PraeComm's August 14, 2005 letter. She informed PraeComm that she was unable to consider the request for equitable adjustment because the Government had made the final payments due under Contracts 9001 and 9027, and the contracts had been closed. A 255.**

**Praecomm's Response No. 40:** Praecomm disputes Defendant's fortieth proposed finding of uncontroverted fact. By letter dated October 14, 2005, another contracting officer [WHO] formally responded to Praecomm's August 14, 2005 letter. She informed Praecomm that she was unable to consider the request for equitable adjustment because the modifications were made pursuant to the Changes Clause, FAR 52.243-1(c). She informed Praecomm that the Contracting Officer may receive and act upon a request for equitable adjustment before final payment of the contract, but she was unable to consider the request because final payments were made and the contracts closed pursuant to Praecomm invoices for payment of total quantities delivered following receipt, inspection and acceptance. A 255.

**Defendant's Proposed Finding No. 41: PraeComm then sent a certified claim for $17,974,281.29 to the contracting officer dated November 8, 2005. A 256-264. PraeComm asserted that the basis of its claim was the decision of the Army not to install its radio equipment in "major" Iraqi cities. Id.**

**Praecomm's Response No. 41**: Praecomm disputes Defendant's forty-first proposed finding of uncontroverted fact. Praecomm sent a certified claim for $17,974,218.29 to the contracting

officer dated November 8, 2005. A 256-264. The claim argued that the (1) PCO changed the Contractually Specified Cities in Praecomm's contracts, that (2) Praecomm relied on the PCO's representations as well as the terms of Contract 9001 and Contract 9027; and (3) the Government breached its duty of good faith and fair dealing. *Id.* Praecomm requested a written final decision of the contracting officer pursuant to 41 U.S.C.§ 605. A 256.

**Defendant's Proposed Finding No. 42: The contracting officer did not respond to the claim. PraeComm then filed suit in this Court on January 23, 2006.**

**Praecomm's Response No. 42:** Praecomm disputes Defendant's forty-second proposed finding of uncontroverted fact. The contracting officer did not respond to Praecomm's claim and pursuant to 41 U.S.C. § 605(c)(5), Praecomm filed suit in the Court of Federal Claims on January 23, 2006.

**Defendant's Proposed Finding No. 43: PraeComm never installed its FRN radio equipment or trained Iraqi police forces on its use. Folgate Decl. at 2-3. The equipment is currently still being held by the United States in storage in a warehouse in Baghdad. Id.**

**Praecomm's Response No. 43:** Praecomm disputes Defendant's forty-third proposed finding of uncontroverted fact. Defendant never allowed Praecomm to install its FRN equipment or train Iraqi police forces on its use. The Praecomm radios that Praecomm shipped to Baghdad in 2005, including the MPT3200 and ACU-1000 equipment, are being stored at a warehouse in Baghdad. The equipment is currently being held by the United States in a warehouse in Baghdad. Folgate Decl. ¶ 5.

Respectfully submitted,

/s/ ____________________
Joseph J. Summerill IV
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (telephone)
(202)-331-3101 (facsimile)

*Counsel for Plaintiff, Praecomm., Inc.*

OF COUNSEL:

Debra McGuire Mercer
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (telephone)
(202)-331-3101 (facsimile)

Dated: May 2, 2007