**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRAECOMM, INC. d/b/a/ AMERICAN RADIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 06-54C |
| | ) | (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF PRAECOMM, INC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Joseph J. Summerill IV
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, D.C. 20006
(202) 331-3100 (telephone)
(202) 331-3101 (facsimile)

*Counsel for Plaintiff, Praecomm., Inc.*

OF COUNSEL:

Debra McGuire Mercer
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, D.C. 20006
(202) 331-3100 (telephone)
(202) 331-3101 (facsimile)

Dated: May 2, 2007

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

I. SUMMARY OF THE CASE .......... 2

II. STATEMENT OF FACTS .......... 3

History of AFRN Program .......... 3

Contract 0032 .......... 4

Contract 9001 .......... 5

Contract 9027 .......... 9

Pracomm's Requests for Equitable Adjustment .......... 16

ARGUMENT .......... 19

I. INTRODUCTION .......... 19

II. SUMMARY JUDGMENT STANDARD .......... 19

III. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE BREACH ON CONTRACTS CLAIMS. .......... 21

A. The Government Misrepresents Plaintiff's Breach of Contract Claims. .......... 21

B. Contracts 9001 and 9027 Required Installation of Praecomm's Equipment in Certain Specified Cities. .......... 22

C. Questions of Fact Concerning the Parties' Intent Preclude Summary Judgment. .......... 24

D. The Government Is Not Entitled to Summary Judgment on Lost Profits. .......... 25

IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSTRUCTIVE CHANGE CLAIMS .......... 28

V. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING .......... 31

CONCLUSION .......... 33

# TABLE OF AUTHORITIES

**Page**

**Cases**

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) ........ 20
AMP Inc. v. United States, 182 Ct.Cl. 86, 389 F.2d 448 (1968) ........ 22
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........ 19, 20
Arizona v. United States, 575 F.2d 855, 863, 216 Ct.Cl. 221 (1978) ........ 23, 24
Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir.1988) ........ 25
Blubonnet Sav. Bank, FSB v. United States, 266 F.3d 1348 (Fed. Cir. 2001) ........ 26
California Federal Bank, FSB v. United States, 245 F.3d 1342 (Fed. Cir. 2001) ........ 26
Clearwater Constructors, Inc. v. U.S, 65 Fed.Cl. 657 (2005) ........ 31
Conner Bros. Const. Co., Inc. v. U.S., 65 Fed. Cl. 657 (2005) ........ 31
Defenders of Wildlife v. Hogarth, 330 F.3d 1358 (Fed. Cir. 2003) ........ 20
Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002) ........ 25
Erwin v. United States, 19 Cl. Ct. 47 (1989) ........ 25
Firestone Tire & Rubber Co. v. United States, 444 F.2d 547 (Ct.Cl. 1971) ........ 25
First Annapolis Bancorp, Inc. v. United States , 75 Fed.Cl. 586 (2007) ........ 29
First Fed. S&L Ass'n of Rochester v. U.S., 2007 WL 1160294 (Fed.Cl. April 13, 2007) ........ 19
FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411 (Fed.Cir.1987) ........ 25
Franklin Federal Savings Bank v. United States, 55 Fed. Cl. 108 (2003) ........ 26
H.F. Allen Orchards v. United States, 749 F.2d 1571 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985) ........ 20
In Re Boston Shipyard Corp., 886 F.2d 451, 456 (1st Cir. 1989) ........ 29
Landmark Land Co. v. FDIC, 256 F.3d 1365 (Fed. Cir. 2001) ........ 28
Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158 (Fed. Cir. 1985) ........ 20
Long Island Savings Bank, FSB v. United States, 60 Fed.Cl. 80 (2007) ........ 27
M.A. DeAtley Constr., Inc. v. U.S., 75 Fed.Cl. 575 (Fed.Cl. 2007) ........ 31
Martin Lane Company, Inc. v. United States, 193 Ct.Cl. 203, 432 F.2d 1013 (1970) ........ 23
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ........ 20
Meyers v. Asics Corp., 974 F.2d 1304 (Fed. Cir. 1992) ........ 20
North Star Alaska Hous. Corp. v. U.S., 2007 WL 1041442 (Fed. Cl. April 2, 2007) ........ 19
Precision Pine & Timber, Inc. v. United States, 63 Fed.Cl. 122 (2004) ........ 27, 28

Southern California Edison v. United States, 58 Fed.Cl. 313 (2003) .......... 32

Standard Federal Bank v. United States, 62 Fed.Cl. 265 (2004) .......... 20

Stone Forest Indus., Inc. v. United States, 973 F.2d 1548 (Fed. Cir. 1992) .......... 29

Swanson Group, Inc. v. U.S., 2007 WL 1031715 (Fed. Cl. Mar. 26, 2007) .......... 19

Travelers Casualty and Surety of America v. United States, 74 Fed.Cl. 75 (2006) .......... 23

United States v. Diebold, Inc., 369 U.S. 654 (1962) .......... 20

Webster University v. United States, 20 Cl.Ct. 429 (1990) .......... 25

**Statutes**

41 U.S.C. § 605 .......... 18

41 U.S.C. § 605(c)(5) .......... 18

**Rules**

RCFC 56(c) .......... 20

**Treatises**

C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* 2d § 2730.1 at 265 (1983) . 25

Willston on Contracts § 38:15 at 437 .......... 32

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRAECOMM, INC. d/b/a/ AMERICAN RADIO,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 06-54C<br>(Judge Lettow) |

**PLAINTIFF PRAECOMM, INC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, Plaintiff Praecomm, Inc. d/b/a American Radio ("Praecomm" or "American Radio") respectfully opposes the Defendant's Motion for Summary Judgment. There are numerous genuine issues of material fact that preclude summary judgment. Moreover, Defendant is not entitled to summary judgment as a matter of law. Defendant's failure to allow Praecomm to install equipment, decision to modify material terms to the contracts by changing the cities in which equipment was to be installed, and decision to allow another vendor to install its equipment in certain Iraqi cities in which Praecomm was supposed to install its equipment pursuant to contracts with Defendant entitle Praecomm to the relief it seeks. Based on this brief, the attached declaration and appendix, and Praecomm's Response to Defendant's Proposed Findings of Uncontroverted Fact, Defendant requests the Court to deny summary judgment in favor of Defendant.

**STATEMENT OF THE ISSUES**

1. Whether the Defendant's failure to allow Praecomm to install equipment in certain major Iraqi cities, while contracting with another vendor to install similar equipment in

those same cities, constituted a breach of Contract No. W914NS-050F-9001 and Contract No. W914NS-05-F-9027 between Defendant and Praecomm.

2. Whether the Defendant's unilateral change to Contract No. W914NS-050F-9001 and Contract No. W914NS-05-F-9027 by removing certain major Iraqi cities listed in the contracts and failing to allow Praecomm to install equipment in those cities, constituted a constructive change to these contracts that entitles Praecomm to damages.

3. Whether the Defendant breached its duty of good faith and fair dealing by misrepresenting the need for Praecomm's equipment in certain Iraqi cities in Contract No. W914NS-050F-9001 and Contract No. W914NS-05-F-9027 and then accepting Praecomm's deeply discounted prices, free equipment, and upgrades for these contracts knowing that these deeply discounted prices, free equipment and upgrades were being offered by Praecomm to Defendant based upon the Defendant's misrepresentations.

**STATEMENT OF THE CASE**

**I. SUMMARY OF THE CASE**

Praecomm filed a Complaint against Defendant United States of America (hereinafter "Government" or "Iraq Project and Contracting Office" or "PCO" or "United States Army Corps of Engineers") on January 23, 2006, claiming breach of contract, constructive change, and breach of the duty of good faith and fair dealing. Praecomm's claims are based upon the Government's written contracts and representations with the United States Corps of Engineers and the Project Contracting Office ("PCO") in Iraq under which Praecomm agreed to supply First Responder Network ("FRN") equipment for installation in contractually identified Iraqi cities. Praecomm complied with the terms of these contracts by supplying the PCO with FRN equipment for installation in the contractually identified cities. However, the PCO breached these contracts by refusing to allow the installation of Praecomm's FRN equipment in the

contractually identified major Iraqi cities while simultaneously contracting with another vendor to provide similar equipment in those same cities. Alternatively, the PCO unilaterally modified the contractually identified Iraqi cities in the PCO's contracts with Praecomm in which Praecomm's FRN equipment would be installed pursuant to the terms of Praecomm's contracts. Alternatively, the PCO's actions in modifying the contractually identified Iraqi cities in the PCO's contracts with Praecomm constituted a breach of the duty of good faith and fair dealing since the PCO misrepresented the need for Praecomm's equipment in certain major Iraqi cities during negotiation of the contracts and then accepted Praecomm's deeply discounted prices, free equipment, and upgrades knowing that Praecomm's prices were offered based upon the Defendant's misrepresentations.

## II. STATEMENT OF FACTS

This action for breach of contract, unilateral change, and breach of duty of good faith and fair dealing is based upon the Governments' representations and written contracts with Praecomm, under which Praecomm agreed to supply FRN equipment for installation in contractually identified Iraqi cities. The United States and coalition armed forces took control of Baghdad, Iraq, in March 2003. Approximately one month later, the Coalition Provisional Authority ("CPA") was established "to restore conditions of security and stability" in the country, and "facilitat[e] economic recovery, sustainable reconstruction, and development." A 3.

**History of AFRN Program**

Defendant designed the concept of Advanced First Responder Network ("AFRN"), its infrastructure (i.e., the portion of the AFRN program that would indicate the type and use of first responder radios used), and designated certain cities where AFRN systems would be installed in March 2004. A 87. In March 2004, the Department of the Army awarded contract W914NS-04-D-005 to Lucent Technologies, Inc. ("Lucent") to restore Iraq's communication infrastructure.

Under that contract, the CPA and its successor organization, the PCO and State Department, would issue task orders for specific projects within the communications sector. A 86. Only task orders issued under this Contract were for AFRN. Id. This network was intended to address the limited communication capabilities of emergency first responders: the police and medical personal. A81. However it was not a "larger and more complex communications system;" rather, it was a compilation of a series of different communication solutions, one of which was first responder radios that were originally designed utilizing a TETRA based protocol[1]. See A 89; Di Luigi Decl. ¶ 4.

In August 2004, technical experts from the PCO, Baghdad, conducted market research regarding the "build out of the AFRN in additional Iraqi cities." Pl. App. 16. In September 2004, the JCC-I/A and PCO received a requested rough order or magnitude cost estimate for the entire AFRN system (less first responder radios). A 92. On October 26, 2004, Defendant sought to procure terrestrial trunked radios (TETRA) for the AFRN system under Solicitation W914NS-05-R-9003. Pl. App. 16. On November 22, 2004, Defendant increased the ceiling on a separate Indefinite Quantity/Indefinite Delivery ("IDIQ") contract, W914NS-04-D-0005, from $75 million to $150 million to enable the issuance of a task orders to build out the AFRN into 16 Iraq cities. Pl. App. 14. On November 24, 2004, Defendant awarded Sepura Limited Radio House ("Sepura") contract W914NS-05-D-9008 in response to Solicitation, W914NS-05-R-9003.

**Contract 0032**

The United States Government awarded contract No. DABV01-03-C-0032 ("Contract 0032") to Praecomm on or about December 17, 2003. A 119-27; Compl. ¶ 15. The purpose of

[1] The AFRN system includes: the national coordination center; network communications center, 9 governorate dispatch centers; 3 mobile switching offices; 66 base transceiver stations (equipment shelters and towers used to receive and transmit radio calls between the first responder and the dispatch center); and 104 high frequency radios for an emergency back up system. A 89.

Contract 0032 was to "ensure a Land Mobile Network providing the Iraqi Police Force with reliable communications in order to maintain the stability of the country and the safety of their officers and the Iraqi people." A 121. Contract 0032 was for the provision and installation of a Land Mobile Network in 83 cities in Iraq. Id. As stated in Contract Line Item Number ("CLIN") 0001, Contract 0032 called for a "TWO WAY RADIO SYSTEM FOR THE IRAQI POLICE DEPARTMENT THROUGHOUT IRAQ." A 120. Contract 0032 was not completed by the fall of 2004. On October 16, 2004, two days after the award date of Contract 9001, LTC Fretheim, CPATT C6 told Mr. Di Luigi that, "the delivery of the remaining 1,920 conventional radios can be delayed until the completion of the current trunking program. In fact, 4,800 of the 10,000 hand held radios called for by CLIN 0001A of Contract 0032 and 24 of the 120 repeaters called for in CLIN 0001C of Contract 0032 were delivered under later awarded contracts - Contract W914NS-050F-9001 ("Contract 9001") and W914NS-05-F-9027 ("Contract 9027"). See Di Luigi Decl. ¶ 3.

**Contract 9001**

Defendant contacted Praecomm in the fall of 2004 to discuss whether Praecomm could provide an Over the Air Rekeying ("OTAR") encryption capability to its radio equipment. In the fall of 2004, Defendant requested Praecomm propose a long term solution to provide radio equipment to replace the First Responder radio portion of AFRN. Defendant told Praecomm the AFRN program was experiencing delays and would be descoped and descaled to the point it would cover less cities. A 154; Pl. App. 25-29; Graham Decl. ¶ 5; Di Luigi Decl. ¶ 5.

On or before September 13, 2004, Defendant presented a list of six cities[2] to Praecomm and requested that Praecomm develop a comprehensive long term communication solution based

[2] The six cities are Ad Diwaniyah, An Najaf, Al Hillah, Karbala, Al Kut, and Al Fallujah.

on these six cities and Praecomm's understanding of those cities as it had done extensive work in and around those cities under Contract 0032. Pl. App. 1-6**;** see Di Luigi Decl. ¶ 5. Accordingly, Praecomm and Defendant discussed Praecomm's equipment as a long term "solution" to replace the First Responder radio portion of AFRN. Id.

Praecomm sent LTC Freitheim an e-mail message on September 13, 2004 attaching an "IFRN Trunking Introduction and Continuation Proposal." Pl. App. 1-6. The IFRN Trunking Proposal demonstrates that Praecomm was solely responsible for the concept, design, and engineering of trunked radio systems versus conventional single channel repeaters. The IFRN Trunking Introduction and Continuation Proposal included "Six City Program information requested by LTC Fretheim," which identified Ad Diwaniyah, An Najaf, Al Hillah, Karbala, Al Kut and Al Fallujah as cities for proposed work. Id.; Compl. ¶ 17.

LTC Fretheim reviewed Praecomm's IFRN Trunking Introduction and Continuation Proposal[3] and set up a meeting at which Dominic Di Luigi and Shawn Campbell of Praecomm made a presentation to Colonel John Graham and LTC Fretheim. COL Graham verbally signed off on the plan for the six cities and said "That's enough Dom. I'm sold … you guys are the only game in town," or words to that effect. See Di Luigi Decl. ¶ 6.

At a later date, LTC Fretheim identified a budget for the Four City Technology Demonstration Trunking Upgrade Proposal for the cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala, of less than $400,000 and asked if Praecomm would be willing and able to make its proposal work in at least four of the six Iraq cities identified in Praecomm's six city proposal. The PCO awarded Contract 9001 to Praecomm on October 14, 2004. Compl. ¶ 21; Answer ¶ 21; A 140-47. LTC Fretheim represented that he urgently needed coverage in these four listed cities

[3] The IFRN Trunking Introduction and Continuation Proposal initially included the cities of Ad Diwanijah, An Najaf, Al Hillah, Karbala, Al Kut and Al Fallujah.

and that he would want to secure budgeting to and assign Praecomm at least twelve more Iraq cities to the FRN program, assuming that Praecomm's performance regarding the four listed cities went well. See Four City Technology Demonstration Trunking Upgrade Proposal at A 146; see Di Luigi Decl. ¶ 7. Based on Defendant's representation that Praecomm's equipment would be installed in four cities, language in Contract 9001 listing the four cities in which Praecomm's equipment would be installed, and Defendant's representation that it would implement Praecomm's proposal in at least twelve additional cities[4] if Praecomm's performance went well, Praecomm developed a discounted price, with the same solution and proposed implementation schedule. Pl. App. 10-13**;** see Di Luigi Decl. ¶ 7.

Unlike a standard equipment order, in which specific items are ordered in specified quantities at specific prices, Praecomm designed a comprehensive "long term solution" using MPT3200 trunking technology, a technology unique to Praecomm's design, for use in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala, and to work within the government's[5] budget constraints and need for urgent coverage. In addition, Contract 9001 included upgrading certain existing Praecomm radios and repeaters that had not yet been delivered to the Government under Contract 0032. See Contract 9001, "Retrofit of MPT Portables, quantity 1502." A. 141. All of the initial proposals presented to Defendant by Praecomm were accepted in their entirety as presented with no exceptions. Id.

The radios that were to be upgraded would be converted from a single channel system to a trunked system in the four cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala. The contract was executed on the Standard Form 1449 ("SF 1449") and incorporated a Statement of

---

[4] The twelve additional cities that the government assigned were Samarra, Kirkuk, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, As Sulaymaniyah, Abbasiyah, Al Kut and Al Fallujah.

[5] The government entity responsible for this contract was the Multi-National Security Transition Command-Iraq Civilian Police Assistance Training Team, or MNSTCI/CPATT.

Work ("SOW") and Praecomm's Proposal. A 140-146.

The SOW for Contract 9001 included the following with respect to the Iraqi cities where the radio equipment would be used:

> 1.0 GENERAL. The Coalition Provisional Authority now MNSTC-I has a requirement to upgrade UHF radio systems in four cities to provide trunked communications.
>
> 2.0 BACKGROUND. The current radio systems in Ad Diwaniyah, An Najaf, Al Hillah and Karbala are FM single channel systems. These systems provide basic communications capabilities for the Iraqi Police Forces, however, the systems are encrypted with a Type I encryption system which requires hand keying the radios to change encryption. Because it is impractical to do so on a frequent basis, lost and captured radios can be used to monitor police communications. In addition, the capacity of these systems is limited. Converting these cities to trunked networks will allow compromised radios to be cut out of the system from a central station. In addition, the capacity of the current system will be increased.

A 144. The SOW for Contract 9001 further states that the Government was responsible for: Providing a distribution plan and coordinating a distribution schedule. Id. at paragraphs 6.1 and 6.2. Defendant did not provide frequency plans and a distribution plan, coordinate a distribution schedule, nor allow the installation of MPT3200 radio networks in the contractually identified cities pursuant to the written terms of the contract.

Contract 9001 incorporated Praecomm's proposal in its entirety as presented with no exceptions. A 140, 146 (see boxes 15 and 20 on the SF 1449). In Praecomm's proposal, it listed several items at no charge, including: 4 – Six channel MPT combined trunked single site repeater systems, 24 channels total; 1,378 MPT3200 portable radios; and base stations with 116 units yet to be assigned. A 146. The nature of the equipment provided under Contract 9001 and the installation of that radio equipment in the designated cities of Ad Diwaniyah, An Najaf, Al Hillah and Karbala in the Statement of Work and in Praecomm's proposal suggests long term use of the radio equipment in the four cities. A 144.

**Contract 9027**

Shortly after the award of Contract 9001, the PCO decided that it wanted to upgrade existing radio systems in several additional Iraqi cities by acquiring trunked radios similar to those provided under Contract 9001. Graham Decl. at 5; A 162-175. More specifically, LTC Fretheim provided a list of cities[6] "for the next phase of trunking" on November 11, 2004. Pl. App. 10-12. On January 21, 2004, CPATT employee, CPT James "Andy" Timmerman wrote Dom Di Luigi an email and stated the following: "Our boss [COL Graham] has decided that we will stick with the original plan. Hopefully, we can get our network installed way before the State Dept. gets theirs…. To confirm with you, we are now looking at installs in the following cities: Hillah, Samarra, Tikrit, Karbala, An Nasariyah, Kirkuk, Ramadi, Dahuk, As Samawah, Al Sulaymaniyah, Ad Diwaniyah, Irbil, Al Kut, An Najaf, Baqubah, Al Fallujah and Al Amarah." On January 28, 2005, an Amendment of Solicitation/Modification was signed replacing Section C, paragraph 2 of the SOW with the following: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for eight cities: Tikrit, Ramadi, Duhuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah." Pl. App. 35.

The first two requirements under the Contract No. 9027's Statement of Work for Conversion to Trunked Radio Network for Iraqi Police Services, which was part of Contract No. 9027, identified the work in the following cities:

C. Requirements

> 1. The Vendor will provide 8 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 5 cities: Samarra, Kirkuk, Al Sulaymaniyah, Al Kut and Al Fallujah. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station

[6] See supra n. 3.

radios.

2. The vendor will provide 6 Channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan.[sic] Ryad, Abbasiyah, Tikrit and Ramadi. The systems must be compatible with existing ARI MPT3200 portable (hand held), mobile, and base station radios[.]

A 154.

The Contract 9027 SOW also stated the following:

B. Background

Over the past year, the coalition has installed ARI [American Radio, Inc. (Praecomm)] analog radio systems in a number of cities in Iraq to support the Iraqi Police Service. These radio systems were originally designed to provide initial support for a force of 85,000 officers. The radios were to be replaced in June 2004 with the Advanced First Responders Network. That network has been delayed and descaled to the point where it will cover fewer cities and not be in place until June 2005. As a result of the police force expansion to 135,000 officers, the current radio systems will not be sufficient to support the expanded requirements. Additionally, the system will need to become a long term solution given that the AFRN will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network.

In addition to adding capacity, the trunked system increases the security of the network by allowing the compromised stations to be shut off the network.

A 154.

Praecomm submitted an updated proposal in late November or early December 2004 to supply and install the radio equipment called for in Contract 9027 for $7,245,880. A 152. Notes in Praecomm's proposal cited the following cities for installation: Samara, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad and Abbasiyah. Id. A second note in the proposal indicates "Proposed City Add for future networking," "Tikrit" and "Ramadi." Id. A third note in the proposal indicates that the "Proposed City Adds are included on line item 0003 at no extra cost to the Government based on

the quotations current numbers elsewhere[7].” Id.

Defendant awarded Praecomm Contract 9027 on December 6, 2004. A 149; Compl ¶ 31; Answer ¶ 31. The total award amount of the contract was $7,295,880. A 149. Praecomm’s proposal did not reference installation and training. However, Praecomm’s proposal did list “Labor.” A 152. The total price for “Labor” listed in Praecomm’s proposal, was $375,000, and $125,000 for miscellaneous, which was incorporated into Contract 9027. A 150-152. On December 6, 2004, Contract 9027 was modified. Contract 9027’s Schedule of Supplies and Services listed CLIN 0012 as “Shipping and Installation” in the amount of $500,000. A 150; Pl. App. 154-55. Among other things, CLIN 0012 was modified to include “Labor and Miscellaneous Expenses” in the amount of $500,000. This labor involved upgrading four single site systems from Contract 9001 to make the single site systems network trunking capable, upgrading four systems from Contract 9001 to include ACU-1000 interface capability, and reprogramming systems and portable radios to alternate modified frequency plans to accommodate Defendant’s modification of the city list. On June 28, 2005, Defendant issued a Material Inspection and Receiving Report on a DD Form 250 indicating Defendant’s acceptance of the labor and miscellaneous expenses under CLIN 0012 of Contract 9027. Pl. App. 156.

---

[7] The Contracting agent, Robert Mueller, questioned the reason why CLIN 0003 was included at no charge to the Government in an email dated 12/5/04. In an email responding to Robert Mueller (cc: Fretheim) later that day on 12/5/04, Dom DiLuigi writes: We would like [Tikrit and Ramadi] included in the network eventually and the requirement does not call for them at this point…please remember that all systems we will be providing are ‘network capable’ meaning they are designed to be linked together…we believe the two cities represented in CLIN 0003 will be called for once the other systems are in place due to their proximity to Fallujah and Samarra…these two additional systems linked with Fallujah and Samarra will provide roughly 4 times the total coverage pattern in that region then can be provided in a single site alone….” Mueller responded to this email stating: “I will get you an order in the morning for the quoted amount on this last email.” No objections were voiced by LTC Fretheim and Contract 9027 proceeded and was awarded to Praecomm with the inclusion of Tikrit and Ramadi at no additional cost to the Government. Pl. App. 18.

Contract 9027 was formally modified on January 28, 2005 to change the cities initially listed on the contract. Compl. ¶ 47; Answer ¶ 47; A 159. The purpose of this modification was to incorporate changes to the SOW. A 159. Specifically, the modification replaced Section C, paragraph 2 of the SOW with the following: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site trunked radio systems with network capability for 8 cities: Tikrit, Ramadi, Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah. One additional system will be held as operational reserve by CPATT, C-6. The Systems must be compatible with existing ARI MPT3200 portable (hand held), mobile and base station radios." Compl. ¶ 48; Answer ¶ 48; A 159. The original Section C, paragraph 2 of the SOW in Contract 9027 read as follows: "The vendor will provide 6 channel 100 Watt MPT3200 Single Site Trunked radio systems with network capability for 9 cities: Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi." Further, Modification P00001 to Contract 9027 substituted the cities of Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah in place of Al Huywayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad and Abbasiyah.

After the modification of Contract 9027, numerous email messages between the Government and Praecomm principal, Dom Di Luigi, continued to discuss the cities in which Praecomm's radios would be used. A 193-233. For example, on March 5, 2005, 1LT Andrew Radano provided Mr. Di Luigi with a list identifying "cities designated for AFRN, leaving only (5)[8] for FRN." A 199.

In response to Mr. Radano's email at 7:34 p.m., Mr. Di Luigi stated (to both Mr. Radano and Major Sile), in part:

---

[8] See A 199. The list assigns the following cities to the AFRN program: (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala. The list assigns the remaining five cities to FRN: (1) As Sulaymaniyah; (2) Al Fallujah; (3) Dahuk; (4) Irbil; (5) Al Amarah.

> I've seen so many 'lists' on this AFRN/FRN project I can't count them…regarding your email, my information on the 'proposed' FRN cities is not my information and is not a proposal, we're contracted from the PCO to do so…it's way [past] the proposal point…not sure if you have reviewed all contracts and attachments I sent you, you may want to re-review them and confirm you most recent send…we will take it from there based on your response that I will be looking for on an every hour on the hour basis until I see it come through…if you are in fact correct and our portion is now reduced to 5 remaining cities then I would say we are looking at a significant problem that will need to be addressed on our end first thing Monday morning here at home…

A 193 (alterations in original).

That same evening, at 8:53 p.m. Major Robert Sile responded to Mr. Di Luigi, in part:

> Dom, I think the AFRN city listing is now cast in stone. What we would want to do is shift cities such that we do NOT implement FRN and AFRN into the same city. That would be an operational and political nightmare. I suspect that what happened before was [that] they specified cities in the [Praecomm] contract while AFRN city list was shifting. Now we have the fielding list and want to position FRN for success.
>
> I presume that what you need is a MOD from PCO to the contract specifying different cities. I would presume here that I can substitute one city for another on a one-for-one basis. That seems a bit simplistic so please let me know what I've overlooked. What I'd like to do is work with your to decide those "city pairs" so we agree together on what old city was and substitute is.

A 198.

In response to Major Sile's email, Mr. Di Luigi informed Major Sile at 9:59 p.m., among other things, that Praecomm had provided "extremely aggressive pricing to the PCO to be able to enter this market in the cities and the manner we had been contracted to.[9]" A 197.

On March 12, 2005, Major Robert Sile sent an email message to Dom Di Luigi, stating "[w]e want to have FRN installed, at least initially in the five cities.[10]" Major Sile, in referencing

[9] As Major Sile was not involved in the formation of Contract 9001 or Contract 9027, he would not be aware that Praecomm's pricing was aggressively discounted in consideration for the installation and use of Praecomm's radio equipment in the cities identified in Contract 9001 and 9027.

[10] The list assigns the remaining five cities to FRN: (1) As Sulaymaniyah; (2) Al Fallujah; (3) Dahuk; (4) Irbil; (5) Al Amarah.

the five Iraq cities from his March 12, 2005 email, continued, "We'd still like the other 12 cities installed but not into cities where AFRN is fielded as that causes the situation where two systems service a single city and that's operationally not supportable." A 203. Major Sile was referencing the following twelve Iraq cities that were lost to AFRN: (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala.

Thereafter, efforts were made to plan the fielding and installation of Praecomm's radios in five of the 17 cities contemplated in Contracts 9001 and 9027, as well as follow-on fielding in the smaller cities of Balad, Umm Qasr, Al Qubbah, Tal Afar, and Al Muqdadiyah. A 223. Praecomm made counter-proposals to get its equipment into certain Iraqi cities. A 216, 218, 223. Although the impact to their business was great, Praecomm were team players; Praecomm would have accepted the five city list if additional handsets and/or any other accessories[11] to round out their order for equipment had been accepted. Praecomm was being flexible and was wiling to negotiate a modification to Contracts 9001 and 9027 in good faith. Pl. App. 149-52. However, none of these plans was accepted by the government. A 201-204, 210-220; Pl. App. 153.

On April 8, 2005, Major Robert Sile sent an email message to Praecomm's Dom Di Luigi, Praecomm's Shawn Campbell and Contracting Officer Danny Nearn indicating that he wanted Praecomm's radio equipment to be installed in Dahuk, Irbil, Fallujah, Al Amarah, As Sulaymaniya. A 223. In the same message, Major Sile also identified five smaller cities for Praecomm's radios. Id. By July 2005, the Government was still trying to "formulate a list of cities for the FRN project" for Contracts 9001 and 9027. A 228. More specifically, on July 24,

[11] See Types of Equipment referencing accessories in Table 5, A 99.

2005, Lt. Andrew Radano sent an email message to Praecomm's Dom Di Luigi indicating that efforts "continue to finalize last, definitive list of FRN cities. Currently back up to (15) cities, including both definite and tentative choices. Unfortunately, cities lost to AFRN in no way can be recouped." A 230, 233. The referenced "cities lost to AFRN" in Lt. Radano's email were Samarra; Kirkuk; Al Kut; Tikrit; Ramadi; Baqubah; An Nasariyah; As Samawah; Ad Diwaniyah; An Najaf; Al Hillah; Karbala. All of these cities were either listed in Contracts 9001 and 9027 or in a contract modification. A formal modification to Contracts 9001 and 9027 was never agreed to or executed by the parties.

On July 17, 2005, Mr. DiLugi's sent and email message to Administrative Contracting Officer Karen Parris providing an overview of the contracts and the decision by the government to take away 12 of Praecomm's contracted cities. A 239-41. Mr. Di Luigi also gave a detailed account of Praecomm's pricing of contracts 9001 and 9027. Mr. Di Luigi indicated that "pricing was given to the PCO based on our company providing the communication solution to those cities," because there was "one solution type per city" and because "[Praecomm's] technology will not work with our competition's." A 240. The cities which Mr. Di Luigi was referencing were the cities of (1) Samarra; (2) Kirkuk; (3) Al Kut; (4) Tikrit; (5) Ramadi; (6) Baqubah; (7) An Nasariyah; (8) As Samawah; (9) Ad Diwaniyah; (10) An Najaf; (11) Al Hillah; (12) Karbala.

Later in the same email, Mr. Di Luigi indicated:

> The pricing was designed to get us into the larger cities in the market, the cities as they were presented to us…we gave a 25% discount on equipment and we gave systems away literally…an example would be, we gave two systems for 'free,' on contract 9027, in order to gain market share in the larger cities those systems were to be used in…now, those cities are no longer going to be installed by us, they will be reassigned to Lucent [for installation of Lucent's AFRN] . . . .

A 240.

**Praecomm's Requests for Equitable Adjustment**

On August 14, 2005, Praecomm sent Contracting Officer Thomas Zubel, a letter regarding Contracts 9001 and 9027. A 252-54. Among other things, this letter indicated that it was Praecomm's understanding that the PCO intended to further modify Praecomm's contracts to again change the cities in which the equipment supplied by Praecomm would be installed. More specifically, the letter indicated that a "change to the contractually specified major cities would be a cardinal change and a breach of [Praecomm]'s contracts. Such actions by the PCO will have a significant adverse impact on [Praecomm] for which American Radio would be entitled to an equitable adjustment." A 252. The cities that Praecomm was referencing were being removed by the Government from Contracts 9001 and 9027 were Diwaniyah, Al Hillah, An Najaf, Karbala, Samarra, Kirkuk, Al Kut, Tikrit, Ramadi, Baqubah, An Nasariyah and As Samawah. The letter also indicated that "[b]ased on the PCO's representation that [Praecomm's] would be the supplier in the contractually specified cities, [Praecomm] reduced its price in the contracts by 30 percent and agreed to supply two 6 channel 100 watt MPT3200 network capable trunked radio systems for Tikrit and Ramadi at no[] charge." A 253. More specifically, Praecomm was referencing the Government's representation that Praecomm would be the supplier in the contractually specified cities of Diwaniyah, Al Hillah, An Najaf, Karbala, Samarra, Kirkuk, Al Huwayjah, Altun Kupri, Daquq, Dibbs, Laylan, Ryad, As Sulaymaniyah, Abassiya, Al Kut, Al Fallujah, Tikrit, and Ramadi[12]. The letter noted that Defendant's decision not to place Praecomm's equipment in the promised cities was "in the very least, a constructive cardinal change" to Contracts 9001 and 9027. Id. More specifically, Praecomm was referencing the Government's decision not to place Praecomm's equipment in the promised cities of

---

[12] Ramadi was removed from the list of cities by the government in June 2005 due to security concerns. A 92.

Diwaniyah, Al Hillah, An Najaf, Karbala, Samarra, Kirkuk, Al Kut, Tikrit, Ramadi, Baqubah, An Nasariyah and As Samawah. Praecomm's August 14, 2004 letter requested an equitable adjustment from the Government.

As a follow up to his August 14 letter, Mr. Di Luigi sent an email[13] to Mr. Zubel on August 15, 2005, stating, in part:

> Background: Our Company has been involved with wireless communications in Iraq since early 2003. Through three contracts, 0032, 9001 and 9027 we have to date provided roughly 16k portable handsets and 18 systems that applies solely to the program known as FRN.
>
> The course and direction of wireless communications for First Responders in Iraq has taken a few different directions over the years and thus our role in the matter has been up and down along with it.
>
> Recently, our company has been made aware of the scaling back of the FRN program in lieu of a digitalized version known as AFRN. Our company currently holds contract [sic] to provide FRN or at least our communication solution, slotted for the FRN program application, to 17 out of the roughly 20 or 21 major cities in Iraq. This recent change about will cost our company 12 of the 17 major cities we currently hold contract for, and substitute our product with that of our competitor.

A 243.

By email dated September 23, Thomas Zubel told Praecomm by email:

> It is my understanding the equipment provided by [Praecomm], which is currently stored in a warehouse, will be used in the future. It would be wrong not to use equipment which has been bought and paid for. At this time nobody can tell exactly which cities the equipment will be used in nor do [SIC] can they tell what

[13] On or about August 15, 2005, the new CPATT C6 responded to Mr. Di Luigi's email stating: "I am the new CPATT C6 and am new to this situation, but it seems evident that we should get together to talk about this situation, along with the 1LT Radano, the action officer, and perhaps MAJ Sile, the outgoing CPATT C6. I understand the contract was closed out and according to Mr. Di Luigi they have completed the last of their contract obligations; however I understood that the contract also covered installation of the equipment, which has not happened yet." A 243.

specific technical requirements will be changed.[14]

A 250.

By letter dated October 14, 2005, Anita Jackson, MSgt, USAF, formally responded to Praecomm's August 14, 2005 letter. More specifically, on October 14, 2005, MGgt. Jackson informed Praecomm that she was unable to consider Praecomm's August 14, 2005 request for equitable adjustment because the modifications were made pursuant to the Changes Clause, FAR 52.243-1(c). She informed Praecomm that the Contracting Officer may receive and act upon a request for equitable adjustment before final payment of the contract, but she was unable to consider the request because final payments were made and the contracts closed pursuant to Praecomm invoices for payment of total quantities delivered following receipt, inspection and acceptance. A 255.

Praecomm sent a certified claim for $17,974,218.29 to the contracting officer dated November 8, 2005. A 256-264. The claim argued that the (1) PCO changed the contractually specified cities in Praecomm's contracts 9001 and 9027, that (2) Praecomm relied on the PCO's representations as well as the terms of Contract 9001 and Contract 9027; and (3) the Government breached its duty of good faith and fair dealing. Id. Praecomm requested a written final decision of the contracting officer pursuant to 41 U.S.C. § 605. A 256. The contracting officer did not respond to Praecomm's claim and pursuant to 41 U.S.C. § 605(c)(5), Praecomm filed suit in the Court of Federal Claims on January 23, 2006.

[14] Plaintiff shipped the radio equipment ordered under Contracts 9001 and 9027 in several shipments between February and August 2005. A 176-190. The radios were delivered to Iraq and stored in a warehouse in Baghdad where they remain today. Sile Decl at 5; Folgate Decl. at 3. Defendant never allowed Praecomm to install its FRN equipment or train Iraqi police forces on its use.

## ARGUMENT

### I. INTRODUCTION

The Government's Motion for Summary Judgment misses the fundamental basis of Praecomm's contract claims. Praecomm's breach of contract action stems from the Government's failure to fulfill its contractual obligation to allow Praecomm to supply and install FRN systems in the major Iraqi cities identified in Contract 9001 and Contract 9027 (the "Contracts"). By altering the contract terms and eliminating those cities in which Praecomm reasonably believed it had bargained for, the Government materially breached that bargain and the basis upon which Praecomm initially agreed to enter into Contracts 9001 and 9027.

The Government's misunderstanding of this essential matter is evident from the Statement of Issues in the Defendant's Motion for Summary Judgment ("Gov't Mot.") casting the issues in a narrow factual focus on placement of the equipment in storage and then asking "whether the Government breached its covenant of good faith and fair dealing" and "whether there is any legal theory under which Praecomm can recover damages." Gov't Mot., at 2. The answer to whether any legal theory exists under which Praecomm can recover damages is clearly yes. See First Fed. S&L Ass'n of Rochester v. United States, No. 95-517 C, 2007 WL 1160294 (Fed.Cl. April 13, 2007); Swanson Group, Inc. v. United States, Nos. 05-170C & 05-171C, 2007 WL 1031715 (Fed. Cl. Mar. 26, 2007); North Star Alaska Hous. Corp. v. United States, Nos. 98-168C, 02-1632C, 03-2699C, 2007 WL 1041442 (Fed. Cl. April 2, 2007) (plaintiff was entitled to the damages under the covenant of good faith and fair dealing, with respect to the enumerated actions that increased appellant's costs.).

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 255 (1986); Defenders of

Wildlife v. Hogarth, 330 F.3d 1358, 1364 (Fed. Cir. 2003). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (emphasis added). All presumptions and inferences must run to the nonmoving party, H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985), as must the resolution of all doubt. Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 163 (Fed. Cir. 1985); see Standard Federal Bank v. United States, 62 Fed.Cl. 265, 271 (2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) ("Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs.")

Summary judgment is appropriate only where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (summary judgment proper only if no reasonable trier of fact could rule in favor of nonmoving party). The moving party has the burden of demonstrating that there are no genuine issues and that it is entitled to judgment as a matter of law. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Meyers v. Asics Corp., 974 F.2d 1304, 1306 (Fed. Cir. 1992). As demonstrated by Praecomm's Response to Defendant's Proposed Findings of Uncontroverted Fact[15] and in this Brief, there are several genuine issues of material fact that preclude resolution of Praecomm's claims by summary judgment. For example, the Praecomm and the Government dispute the meaning of terms in Contracts 9001 and 9027 that list the cities in which Praecomm's equipment will be installed and dispute the truth of the Government's representations about the AFRN system when the

[15] Praecomm's specific responses to Defendant's Proposed Findings of Uncontroverted Fact are referenced as "Praecomm Response No. __".

Government was negotiating Contracts 9001 and 9027 with Praecomm. Moreover, The Government has not demonstrated that it is entitled to summary judgment as a matter of law.

## III. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE BREACH ON CONTRACTS CLAIMS.

### A. The Government Misrepresents Plaintiff's Breach of Contract Claims.

In support of its breach of contract claims, Praecomm alleges that the PCO expressed "an absolute, definite, unconditional and unequivocal manifestation to refuse to perform" Contract 9001 and Contract 9027 by "not installing Praecomm's FRN equipment in specified major Iraq cities." Compl. ¶¶ 63, 70 The Government misinterprets Praecomm's breach of contract claim as an assertion that there are terms in Contract 9001 and 9027 that require the Government to physically install Praecomm's radio equipment. Furthermore, the Government erroneously concludes that because the Government was not responsible for actually installing the equipment, it did not breach the contracts. Gov't Mot., at 15-17.

Praecomm does not contend that the Government was responsible for the installation process. Rather, Praecomm's breach of contract claims are based on the Government's failure to allow Praecomm to install the equipment that had been delivered. See, e.g., Compl. ¶ 1. The Government's obligations under the contracts included fulfilling all terms of the contract, not only the terms related to payment for the FRN equipment. Praecomm reasonably assumed that the Government would comply with all terms in the contracts and made decisions about whether to enter the contracts and the associated pricing based on those terms. See Praecomm Response No. 5.

The Government asserts that Contracts 9001 and 9027 unambiguously state that it is Praecomm's responsibility to install its radio equipment, and that therefore, the Government could not be in breach of a requirement to install the equipment. Praecomm agrees that once the

Government advised Praecomm that it was ready to have the radio equipment installed, that it was Praecomm's responsibility to perform the installation. However, absent any indication by the Government that it wanted the radios installed at a particular location, Praecomm could not unilaterally decide to install the radios. Indeed, Praecomm asserts that the Government breached Contracts 9001 and 9027 by refusing to allow Praecomm to perform installations in the cities included in the Contracts. The Government attempts to narrowly limit the scope of Praecomm's breach of contract claims by only focusing on who had the duty to physically install the radio equipment.

### B. Contracts 9001 and 9027 Required Installation of Praecomm's Equipment in Certain Specified Cities.

Contracts 9001 and 9027 required Praecomm's equipment to be installed in certain cities. The Statement of Requirements in Contract 9001 includes Specification 3.2.1: "Install and configure upgrades to convert the 4 cities to trunked system." A 146 (emphasis added). The Statement of Requirements specifically identified "4 cities" for this installation. Those four cities are Ad Diwaniyah, An Najaf, Al Hillah and Karbala. Id. Contract 9027 also specifically identified fourteen cities for which Praecomm was to provide radio equipment. A 152. Those fourteen cities were: Samarra, Kirkuk, As Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadi. By failing to allow installation of Praecomm's radio equipment in the four specified cities in Contract 9001 and the fourteen specified cities in Contract 9027, the Government breached both Contact 9001 and Contract 9027.[16] See AMP Inc. v. United States, 182 Ct.Cl. 86, 389 F.2d 448, 454 (1968) (a party to a contract must "perform[] … all of the terms of a contract, and not just some of the

[16] In addition, with respect to Contract 9001, the Defendant did not provide frequency plans or a distribution plan and did not coordinate a distribution schedule in violation of Sections 6.1 and 6.2 of the SOW. See Praecomm Response No. 29.

terms.”).

“Government contracts disputes are adjudicated under normal principles of contract interpretation.” Travelers Casualty and Surety of America v. United States, 74 Fed.Cl. 75, 87 (2006) (citation omitted).

> The Court will interpret a contract in such a way as to give meaning to all the provisions of the contract in light of the parties’ intent at the time they entered the agreement. A contract must be “interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.”

Id. (quoting Arizona v. United States, 575 F.2d 855, 863, 216 Ct.Cl. 221, 235-36 (1978)); see Martin Lane Company, Inc. v. United States, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970) (all contractual provisions must be given effect with no portion thereof rendered useless or meaningless).

Under these principles of contract interpretation, Praecomm properly accorded significance to the provisions of Contract 9001 and 9027 referencing specific cities in which Praecomm’s radio equipment was to be installed. Moreover, Praecomm relied on the fact that its equipment would be installed in the named cities when it developed pricing for the equipment. See Praecomm’s Response No. 5. In contrast, the Government did not confer any meaning to the terms of Contracts 9001 and 9027 identifying the cities in which Praecomm’s equipment was to be installed. The Government states that “the only benefits negotiated in Praecomm’s contracts were that the United States would accept delivery of the radio equipment and pay the full price.” Gov’t Mot., at 31. Furthermore, the Government asserts: “Army personnel believed that the contract could be changed at no cost to substitute the new cities for installation of the equipment; the overall number of cities and quantity of radio equipment would not change.” Id. at 11. The

Government's position appears to be that listing the cities in the contracts was superfluous. However, such an interpretation is inconsistent with the principle that all contract provisions be given effect. See Arizona v. United States, 575 F.2d 855, 863, 216 Ct.Cl. 221, 235-36 (1978). The Government's unilateral determination that it could change the cities or simply not install Praecomm's equipment in cities listed in Contracts 9001 and 9027 is a clear violation of the terms of the contract which unambiguously state that Praecomm's equipment would be installed in the listed cities. Moreover, the Government's conduct is inconsistent with its position that the listing of the citied in the contracts was superfluous. If the listing of the cities in the contract truly had no meaning there would have been no need to formally modify Contract 9027.

### C. Questions of Fact Concerning the Parties' Intent Preclude Summary Judgment.

Praecomm contends that the Government clearly breached Contracts 9001 and 9027 by refusing to allow Praecomm to install it radio equipment in the contractually identified cities,[17] and therefore, that this Court should deny summary judgment in favor of the Government on the breach of contract claims. For the reasons stated in *supra* Section II.B and *infra* Section IV, the Government has breached its contracts with Praecomm and is not entitled to summary judgment as a matter of law. In the alternative, Praecomm submits that genuine issues of material fact concerning the purpose and meaning of terms in Contracts 9001 and 9027 preclude summary judgment.

"Summary judgment [cannot] be granted if issues are presented involving any inquiry into the state of mind of any of the contracting parties." Webster University v. United States, 20

[17] The following are the contractually identified cities: Diwaniyah, Al Hillah, An Najaf, Karbala, Samarra, Kirkuk, Al Huwayjah, Altun Kupri, Daquq, Dibbs, Laylan, Ryad, As Sulaymaniyah, Abassiya, Al Kut, Al Fallujah, Tikrit, and Ramadi. Ramadi was removed from the list of cities by the government in June 2005 due to security concerns. A 92.

Cl.Ct. 429, 434 (1990) (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2730.1 (2d ed. 1983); see FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1416 (Fed.Cir.1987) ("intent is a question of fact"). "The question of interpretation of language and conduct [in contract interpretation] ... is a question of fact, not a question of law." Beta Systems, Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir.1988) (quotation omitted). In this case, the parties dispute whether the identification of certain cities created an obligation on the part of the Government to ensure that Praecomm's radios were in fact installed in those cities. As such, the intent of the parties in entering contracts that identify specific cities must be examined to determine how the naming of those cities impacts the parties' responsibilities under the contracts. See Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551 (Ct.Cl. 1971) ("it has been a fundamental precept of common law that the intention of the parties control its interpretation."). Finally, after determining the meaning of the contract terms regarding installation of the radio equipment in specified cites, the Court must determine whether the Government breached the contract. "The issue of whether the [defendant] breached the contracts is clearly a question of fact, and one that cannot be resolved by summary judgment…" Erwin v. United States, 19 Cl. Ct. 47, 52 (1989). Based on the foregoing, resolution of the breach of contract claims by summary judgment is not appropriate.

**D. The Government Is Not Entitled to Summary Judgment on Lost Profits.**

In this Circuit, a plaintiff is entitled to damages for a breach of contract including lost profits upon its demonstration of the following:

> (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstance at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002). Although the

Government does not disagree, it nevertheless argues that, as a matter of law, Praecomm cannot recover its lost profits. Gov't Mot., at 14-27. However, it is black-letter law in this Circuit that "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." California Federal Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001), reh'g denied, reh'g en banc denied. In California Federal, the Federal Circuit reversed the granting of the government's motion for summary judgment on issue of lost profits because:

> Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits. The Court of Federal Claims erred by not permitting Cal Fed to present its evidence at a trial based on its legal conclusion that the proof would be too speculative. We therefore vacate the summary judgment on lost profits and remand for trial on the issue.

Id. at 1350. Indeed, the government's burden to prevail on the issue of lost profits at summary judgment is exceedingly high. As the Court of Federal Claims noted in the context of the Winstar-litigation:

> In short, there is no *Winstar*-related case law supporting the Government's contention that this court should rule for defendant as a matter of law on the Franklin Plaintiffs' lost profits claim. The crux of the Federal Circuit's rulings in *Cal Fed* and *Glendale*, and this court's rulings in *Glendale*, *Bank United*, *Suess*, *Citizens*, and *Columbia*, is that the plaintiffs were entitled to their day in court, regardless of their prospects for success and the difficult standard of proof, as long as they offered enough evidence to raise a genuine issue of material fact.

Franklin Federal Savings Bank v. United States, 55 Fed. Cl. 108, 134 (2003).

There is ample evidence to establish the existence of genuine issues of material fact for trial on each of the three elements that need to be demonstrated for lost profits. First, to prove causation, Praecomm must show that the Government's actions were a "substantial factor" in causing Praecomm's damages. See Blubonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1356 (Fed. Cir. 2001). The Government's breach of Contracts 9001 and 9027 by not installing

Praecomm's equipment in any of the promised cities, while entering sole source contracts with Lucent in the same cities, caused Praecomm to lose profits. Indeed, the Government's failure to allow Praecomm's equipment to be installed in those cities was a substantial factor that caused Praecomm to lose the benefits it expected from entering the contracts. In addition, "[c]ausation is a question of fact that ordinarily should be determined at trial." Long Island Savings Bank, FSB v. United States, 60 Fed.Cl. 80, 91 (2007).

Second, lost profits are legally foreseeable if "at the time the contract was entered into: (1) the loss was natural from all the circumstances to have and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances . . . known to the defaulting party at the time of contract." Precision Pine & Timber, Inc. v. United States, 63 Fed.Cl. 122, 129-30 (2004) (citation omitted). In this case, at the time Praecomm entered its contracts with the Government, the Government was misrepresenting the status of the AFRN system. In particular, at the same time Defendant was building up the AFRN program, Defendant told Praecomm that the AFRN system was being delayed and descaled. See Praecomm's Response to No. 8. Praecomm reasonably understood that its FRN equipment was needed and would be installed in the major cities identified in the Contracts. The Government knew that if the cities listed in Praecomm's contracts were served by another vendor, Praecomm's radios could not be installed in those cities due to compatibility issues (see Praecomm's Response No. 29), and thus, that any additional equipment in the cities could not be supplied by Praecomm. Therefore, the Government was aware of special circumstances, i.e., the fact that it was moving forward with the AFRN system in cities that were included in Praecomm's contracts, at the time of contract that resulted in lost profits. Furthermore, foreseeability is a question of fact. See Landmark

Land Co. v. FDIC, 256 F.3d 1365, 1379 (Fed. Cir. 2001).

Third, "the certainty of damages is sufficient 'if the evidence adduced enables the court to make a fair and reasonable approximation of the damages.'" Precision Pine & Timber, Inc., 63 Fed.Cl. at 131 (quoting Energy Capital Corp., 302 F.3d at 1329). Praecomm has calculated its lost profits based on a conservative estimate of the number of radios that would be required by the Government to serve the Iraqi police force in the cities identified in Contracts 9001 and 9027. See Compl., Tab A, Attach. 7. Praecomm has set forth a detailed description of the basis for its lost profits calculation in its Response to Interrogatory No. 19. Pl. App. 30-33. As stated in Praecomm's Response to Interrogatory No. 19, it has not completed discovery, not has it obtained an expert report concerning damages. While Praecomm may further refine its damages calculation, it has provided sufficient evidence to raise a genuine issue of material fact concerning the certainty of its damages calculation.

Accordingly, Praecomm has demonstrated that there are genuine issues of material fact that preclude summary judgment on the issue of lost profits.

## IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSTRUCTIVE CHANGE CLAIMS

The Federal Acquisition Regulations clearly authorize Government Contracting Officers to make changes within the general scope of a contract. 48 C.F.R. § 43.201. The problem here, and the fundamental basis of Praecomm's claim, is that the modifications to Contracts 9001 and 9027 were not within the general scope of the contract and were so substantial that they materially impacted the performance obligations of Praecomm and the Government. In short, the Government's changes were so material that they constituted a breach of contract. Where a modification to a contract is so substantial as to amount to a breach of the contract depends in the first instance on an interpretation of the scope of the contract. If the change calls for the

contractor to perform work that is not essentially the same as the parties bargained for, a cardinal change exists and action for breach arises. See In Re Boston Shipyard Corp., 886 F.2d 451, 456 (1st Cir. 1989).

In this case, the Government breached material terms of Contracts 9001 and 9027 by not installing Praecomm's FRN equipment in the specified Iraqi cities of Ad Diwaniyah, An Najaf, Al Hillah, Karbala, Samarrra, Kirkuk, Al Sulaymaniyah, Al Kut, Al Fallujah, Al Huwayiah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit and Ramadias as represented by the Government during negotiation and identified in the Contracts. To prove breach of contract the breach must be considered material or go to a matter of vital importance or to the essence of the contract. See First Annapolis Bancorp, Inc. v. United States , 75 Fed.Cl. 586, 589 (2007). "In determining the materiality of a breach, the Court must review the totality of events and circumstances. This flexible approach examines 'the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.'" Id. (citing Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 & 1557 (Fed. Cir. 1992)). Given that the parties dispute the nature of the events and circumstances regarding the Government's breach of the contracts, the Court should not resolve this case by summary judgment.

Elimination of the major Iraq cities cited above materially impacted the matter of vital importance to Praecomm for which it entered into the contracts in the first instance. Based on the totality of the circumstances, particularly the language of the Contracts and the representations of Government officials, Praecomm reasonably understood that it would fill the Government's requirements in the identified cities and thereby receive all work in those cities because of the sole source, proprietary nature of the FRN equipment that it was supplying. The

FRN trunked radio system used to upgrade and enhance Iraqi Police forces was not an item that could simply be supplied by other competitors in Iraq if Praecomm was underbid on future contracts. In reliance upon these representations, the nature of the equipment it was supplying, the language in the Contracts listing the cities in which Praecomm's equipment would be installed, and the intent of the Government when executing the Contracts to award follow on contracts to Praecomm to fulfill all necessary radio communication requirements, Praecomm discounted the unit prices of all their equipment. See Praecomm's Response No. 5. Therefore, reducing the number of major Iraq cities in which Praecomm anticipated it would supply FRN systems materially breached the Contracts as evidenced from the significant amount of damages incurred by Praecomm.

Instead of installing Praecomm's FRN systems in the listed cities, the Government contracted with Lucent for the installation of its AFRN. This was an unequivocal manifestation of the Government's intent to breach the contracts which specifically listed the cities where FRN systems were to be supplied and installed. A 144 (Contract No. 9001, Statement of Requirements, par. 5.0, 7.0; A 154-55 (Contract No. 9027, Statement of Work, par. 11-15). Furthermore, of the cities that were supplied with Praecomm FRN systems, none of the systems have been installed and have been stored in various warehouses for which Praecomm has continued to incur storage and maintenance costs. See Response No. 43.

The Government's actions and inactions clearly constituted a constructive change to the Contracts, and breach of obligations to Praecomm. A constructive change occurs where a contractor proves by a preponderance of the evidence that he performed work beyond the contract requirements, without a formal order under the Changes Clause, either due to an informal order from, or through the fault of, the Government. See M.A. DeAtley Constr., Inc. v.

United States, 75 Fed.Cl. 575, *15-16 (Fed.Cl. 2007). Here, Colonel John Graham, and LTC Eric Fretheim verbally told Praecomm that the Government wished to install FRN trunked radio systems in major Iraq cities because: (1) Praecomm had already supplied equipment in these cities as part of Contract 0032; and (2) AFRN provided by Lucent Technologies would not be able to be installed quickly enough to meet the PCO's need in these cities. See Praecomm Response No. 7. The Government unilaterally and informally eliminated the major Iraqi cities that were to receive Praecomm's FRN systems, thus undermining the basis of the bargain to which Praecomm agreed. In short, constructive changes issued under Contracts 9001 and 9027 were breaches of contract and caused Praecomm undue economic hardship. Clearwater Constructors, Inc. v. U.S, 71 Fed.Cl. 25, 28 (2006) (citing Conner Bros. Const. Co., Inc. v. United States , 65 Fed. Cl. 657, 679 (2005)).

Praecomm is therefore entitled to additional compensation in the form of an equitable adjustment. In M.A. DeAtley, *supra*, appellant was forced to remove waste materials from a designated drop-off point as specified by the contract terms. The appellant had priced part of its bid based on how far the waste materials had to be transferred from site, and thus incurred substantial additional costs from first placing the material at the drop-off point and then hauling it to another waste site. The Court found that appellant's constructive change was based on an informal order to appellant and its compliance with that order exceeded the bounds of the contract. Id. Similar to M.A. DeAtley, where an informal change order issued by the Government altered Praecomm's scope of work under the contract and economically impacted Praecomm, Praecomm should thus be entitled to an equitable adjustment to make it whole.

## V. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

"[I]n every contract there is an implied covenant of good faith and fair dealing."

Southern California Edison v. United States, 58 Fed.Cl. 313, 325 (2003) (quoting 13 Willston on Contracts § 38:15 at 437). Allegations that the government "intentionally misrepresented facts to [the contractor], intentionally withheld material information, and took affirmative actions to protect its own interests at the expense of [the contractor] …. suffice to state a claim for breach of the implied covenant of good faith and fair dealing." Southern California Edison, 58 Fed.Cl. at 325.

The Government breached its duty of good faith and fair dealing with Praecomm when it decided to install AFRN equipment in the major Iraqi cities listed in Contracts 9001 and 9027, rather than Praecomm's FRN equipment, while representing to Praecomm that it would install Praecomm's equipment in accordance with the contracts. The PCO, Col. Graham, and LTC Fretheim represented to Praecomm that it would be the long term supplier of FRN systems to a certain number of major Iraq cities. See Praecomm Response No. 5. The Government further misrepresented the status of the AFRN system. See Praecomm Response No. 8. The Government knew that that Praecomm provided discounted pricing based on the Government's representations and promises, as well as the terms of the Contracts. See Praecomm's Response No. 5. The Government acted in bad faith by accepting Praecomm's deeply discounted prices, free equipment, and upgrades knowing that the price was offered because it was told that it would be the long term provider for of the FRN system in the contractually identified cities. See Praecomm Response No. 5.

The Government's misrepresentation and withholding of facts about the status of the AFRN system, as well as its misrepresentations that Praecomm would be the long term provider in the contractually identified cities, demonstrate the Government's breach of the implied covenant of good faith and fair dealing. Alternatively, Praecomm has raised genuine issues of

fact that preclude summary judgment in favor of the Government.

## CONCLUSION

For the foregoing reasons, Praecomm respectfully requests the Court to deny the Government's Motion for Summary Judgment.

Respectfully submitted,

/s/_______________________
Joseph J. Summerill IV
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, D.C. 20006
(202) 331-3100 (telephone)
(202) 331-3101 (facsimile)

*Counsel for Plaintiff, Praecomm., Inc.*

OF COUNSEL:

Debra McGuire Mercer
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, D.C. 20006
(202) 331-3100 (telephone)
(202) 331-3101 (facsimile)

Dated: May 2, 2007