# In the United States Court of Federal Claims

No. 06-54C

(Filed: August 9, 2007)

* * * * * * * * * * * * * * * * * * * * * * * * *

**PRAECOMM, INC.,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * *

Contract dispute; termination for convenience; contract interpretation; covenant of good faith and fair dealing; summary judgment

L. James D'Agostino of Greenberg Traurig, LLP, McLean, VA, for plaintiff. On the briefs were Joseph J. Summerill, IV, and Debra McGuire Mercer of Greenberg Traurig, LLP, Washington, D.C.

Gregg M. Schwind, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him was Major Lanny Acosta, Jr., United States Army. On the briefs were Peter Keisler, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Acting Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Patrick Butler and Kevin Robitaille, Litigation Attorneys, United States Army.

## OPINION AND ORDER

LETTOW, Judge.

Praecomm, Inc. ("Praecomm") alleges that its contracts with the United States Army ("the government") were breached when the government decided not to install and use radio equipment delivered by Praecomm in accord with the contracts. Praecomm contends that it was misled as to the basis for the contracts and that the decision not to install the radios barred future opportunities that were part and parcel of the existing contracts. In particular, Praecomm avers

that its prices for the radio equipment were aggressively low because it understood that the characteristics of its equipment would lead to awards of "follow on" contracts related to that equipment.

The government seeks summary judgment in its favor, claiming that no breach occurred and noting that Praecomm was paid in full for the amounts due under both contracts. Upon completion of briefing, a hearing was held on July 13, 2007. The disputed matter is ready for disposition.

## BACKGROUND[1]

After the United States and coalition forces entered Baghdad, Iraq in March 2003, one of the main goals of the resulting Coalition Provisional Authority was the creation, training, and equipping of local police forces in cities and towns across Iraq. *See* Defendant's Motion for Summary Judgment ("Def.'s Mot.") at 2-3; Appendix to Def.'s Mot. ("Def.'s App."), 20-21 (United States Office of Management and Budget, *Report to Congress Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003* (June 2, 2003)). On December 17, 2003, the United States government awarded contract No. DABV01-03-C-0032 ("Contract 0032") to Praecomm (also known as American Radio, Inc.). Plaintiff's Brief Opposing Summary Judgment ("Pl.'s Br.") at 4-5. Contract 0032 was for the provision and installation of analog, single-channel, handheld radios in Iraqi cities outside Baghdad, to constitute a First Responders Network ("FRN"). Def.'s Mot. at 3; Def.'s App., Decl. of Col. John L. Graham ("Graham Decl.") ¶ 4 (Feb. 22, 2007).[2] Thereafter, in April 2004, the CPA initiated the design of a more complex digital communications system known as the "Advanced First Responders Network" ("Advanced Network" or "AFRN") as a more advanced solution for Iraqi first responders. Def.'s Mot. at 3-4; Def.'s App. 81 (Office of the Special Inspector General for Iraq Reconstruction, *Review of the Advanced First Responder Network* (July 28, 2006)). Because of delays in the implementation of Advanced Network, the United States Army contacted Praecomm and discussed the possibility of upgrading the existing single-channel radios delivered under Contract 0032 to a trunked system, which would offer enhanced security. Def.'s Mot. at 4; Graham Decl. ¶¶ 4-6. The single-channel system required reprogramming each of the remaining radios by hand if one radio was lost, stolen, or captured, while a trunked system would allow a missing radio to be individually disconnected from the network without affecting the others. Graham Decl. ¶¶ 6-7. In addition, a trunked system, unlike a single-channel system, would increase the available bandwidth and allow the addition of new users. *Id.* at ¶ 7.

---

[1]The recited factual elements have been taken from the parties' documentary submissions and are undisputed, except where a factual controversy is explicitly noted.

[2]Attached to defendant's motion was a lengthy series of numbered exhibits, plus unnumbered Declarations by Colonel Graham, Lieutenant Colonel Erik Fretheim, Major Robert Sile, and Lieutenant Commander Idella Folgate.

The Project and Contracting Office ("Project Office") in Iraq awarded contract No. W914NS-05-F-9001 ("Contract 9001") to Praecomm on October 14, 2004, for upgrading and converting the radios delivered under Contract 0032 from a single-channel system to a trunked system in four cities. Pl.'s Br. at 6; Def.'s App. 140 (Contract 9001).[3] The contract was executed on the standard commercial items contract form (SF 1449) and incorporated a statement of work ("SOW"). Def.'s App. 140 (Contract 9001). The SOW states that Praecomm was required to "provide distribution and installation of the radios at designated sites," "ensure the devices are properly fielded," and "provide training on the systems." *Id.* at 144. The government's responsibilities were to "provide a distribution plan and coordinate a distribution schedule" and "provide frequency plans." *Id.* The government did not provide a distribution or frequency plan, nor did it coordinate a distribution schedule, and it did not order the installation of the radio networks. Pl.'s Br. at 8. Contract 9001's total contract price of $363,878 included 1,502 radios ($283,878), labor to install the radios ($50,000), and a fee for miscellaneous expenses ($30,000). Def.'s App. 140 (Contract 9001).

Shortly after the award of Contract 9001, the Project Office planned to upgrade existing radio systems in several additional Iraqi cities by acquiring trunked radios similar to those provided under Contract 9001. Graham Decl. ¶ 9. The SOW for this requirement, which eventually led to Contract No. W914NS-05-F-9027 ("Contract 9027"), specified that the vendor would provide 8-channel trunked radio systems in five cities and 6-channel trunked radio systems in nine other cities. Def.'s Mot. at 7; Def.'s App. 148, 154 (Contract 9027).[4] Contract 9027 was awarded to Praecomm on December 6, 2004. Def.'s Mot. at 9; Def.'s App. 148 (Contract 9027). In the "Background" section of Contract 9027, the SOW states that the trunked radios "will need to become a long term solution given that the [Advanced Network] will not be put into many cities. The solution is to upgrade the existing analog system to a trunked radio network." Def.'s App. 154 (Contract 9027). Under Contract 9027, the vendor was required to supply the specified radio equipment, install the equipment, and provide engineering and project management as needed. *Id.*

Due to increased violence in several cities in which the Advanced Network was to be implemented, Graham Decl. ¶ 10, Contract 9027 was formally modified on January 28, 2005, to change the cities initially listed on the contract. Def.'s App. 158 (Mod. P00001). The modification changed the list of cities for the 6-channel trunked radio systems and stated that one

---

[3]The four cities were Ad Diwaniyah, An Najaf, Al Hillah, and Karbala. Def.'s App. 146 (Contract 9001).

[4]The cities identified for delivery of the 8-channel systems were Samarra, Kirkuk, As Sulaymaniyah, Al Kut, and Al Fallujah. The 6-channel system cities were Al Huwayjah, Altun Kupri, Daquq, Dibs, Layan, Ryad, Abbasiyah, Tikrit, and Ramadi. Def.'s App. 154 (Contract 9027).

additional system would be held as operational reserve. *Id.*; Pl.'s Br. at 12.[5] Except for the list of cities, all of the other terms and conditions of Contract 9027 remained the same. *Compare* Def.'s App. 154, *with id.* at 158 (Mod. P00001).

In late January 2005, Major Robert Sile, lead communications officer for the Civilian Police Assistance and Training Team, discovered that the digital Advanced Network system was now expected to cover some of the cities where the Praecomm FRN system had been scheduled for deployment. Def.'s App., Decl. of Major Robert Sile ("Sile Decl.") ¶¶ 3-4 (Feb. 28, 2007). Major Sile decided to redirect Praecomm's radio systems to other cities that would not come under the digital Advanced Network umbrella later because it would be "wasteful and redundant" to have both systems in the same city. *Id.* at ¶ 4; Def.'s App. 193 (E-mail from Sile to Dominic Di Luigi, Praecomm (Mar. 5, 2005)). In response to this change, Mr. Dominic Di Luigi, Praecomm's principal, informed Major Sile that Praecomm had "provided extremely aggressive pricing to the [Project Office] to be able to enter this market in the cities and manner we have been contracted to." *Id.* at 197 (E-mail from Di Luigi to Sile (Mar. 5, 2005)). Thereafter, efforts were made to plan to field and install Praecomm's radios in five of the 17 cities contemplated in Contracts 9001 and 9027, and to provide follow-on fielding in a number of other Iraqi cities. *Id.* at 216 (E-mail from Sile to Di Luigi (Mar. 26, 2005)), 218 (E-mail from Sile to Di Luigi (Apr. 1, 2005)), 223 (E-mail from Sile to Di Luigi (Apr. 8, 2005)). Praecomm made several counter-proposals to get its equipment into certain Iraqi cities, but none of these plans was accepted by the Army. *Id.* at 201-04 (Series of e-mails between Sile and Di Luigi (Mar. 5, 2005 to Mar. 13, 2005)), 210-20 (Praecomm Iraqi Administrative Network (IAN) Proposal (Mar. 2005)). Although the proposed list of cities continued to change, *id.* at 216-230 (Series of e-mails between Sile and Di Luigi (Mar. 26, 2005 to July 24, 2005)), a formal modification to Contracts 9001 and 9027 was never agreed and executed by the parties. Pl.'s Br. at 15; Def.'s Mot. at 11.

Praecomm shipped the radio equipment ordered under Contracts 9001 and 9027 in several installments between February and August 2005. Def.'s App. 176-190 (Series of e-mails and invoices sent by Praecomm to Project Office) (Feb. 3, 2005 to Aug. 3, 2005)). The radios were delivered to Iraq and stored in a warehouse in Baghdad where they remain to this day. Def.'s App., Decl. of Lt. Cdr. Idella Folgate ("Folgate Decl.") ¶ 5 (Feb. 21, 2007). On July 17, 2005, Praecomm's Mr. Di Luigi sent an e-mail to the Army, stating that he had provided pricing for Contracts 9001 and 9027 "based on quantity of order and likelihood of future sales/business," and that Praecomm had given the Army a 25 percent discount "designed to get us into the larger cities." Def.'s App. 239-241 (E-mail from Di Luigi to Karen Parris (July 17, 2005)). The Army paid Praecomm $363,878, the full contract price for Contract 9001, and $7,295,880, the full price for Contract 9027. *Id.* at 192 (Mem. by Thomas F. Zubel (Oct. 12, 2005)). Both of these contract prices included the charges for labor to install the radios, and the contracts were never

[5]The new list of cities identified for the 6-channel system was reduced to eight: Tikrit, Ramadi, Dahuk, Irbil, Baqubah, Al Amarah, An Nasariyah, and As Samawah. Def.'s App. 158 (Mod. P00001).

modified to delete the requirements of installing the radio equipment and training local personnel on its use. Def.'s Mot. at 11.

On August 14, 2005, Praecomm sent the Contracting Officer, Thomas Zubel, a letter demanding an equitable adjustment of $13,657,500 and asserting that a change of the contractually specified cities would be a cardinal change and a breach of Praecomm's contracts. Def.'s App. 252-54 (Letter from Di Luigi to Zubel (Aug. 14, 2005)). Mr. Zubel responded that it was his understanding at the time that the equipment provided by Praecomm would be used in the future, but he was unsure of the cities in which the equipment would be used. *Id*. at 250 (E-mail from Zubel to Di Luigi (Sept. 23, 2005)). Another contracting officer formally responded to Praecomm's letter and informed Praecomm that she was unable to consider the request for equitable adjustment because the government had made the final payments due under Contracts 9001 and 9027, and the contracts had been closed. *Id*. at 255 (Letter from Anita Jackson to Di Luigi (Oct. 14, 2005)).

On November 8, 2005, Praecomm sent a certified claim for $17,974,218.29 to the contracting officer. Def.'s App. 256-64 (Letter from Di Luigi to Zubel (Nov. 8, 2005)). In that claim, Praecomm argued that (1) the Project Office had changed the contractually specified cities in Praecomm's Contracts 9001 and 9027, (2) Praecomm had relied on the Project Office's representations, as well as the terms of Contract 9001 and Contract 9027, and (3) the government had breached its duty of good faith and fair dealing. *Id*. The contracting officer did not respond to Praecomm's claim and, pursuant to Section 605(c)(5) of the Contract Disputes Act, 41 U.S.C. § 605(c)(5), Praecomm filed suit in this court on January 23, 2006. After an answer and discovery, the government's motion for summary judgment was filed on March 1, 2007, and briefing and argument ensued in due course.

## Jurisdiction

The jurisdiction of a federal court must be established as a threshold matter before the court may proceed with the merits of any action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998); *see* Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The Tucker Act provides jurisdiction for this court to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Praecomm's suit for money damages caused by breach of contract falls squarely within this statutory grant of jurisdiction.

## Standards For Decision

Courts grant summary judgment only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party moving for summary judgment

bears the initial burden of showing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the non-moving party, to prevail, "must submit conflicting evidence in the form of an affidavit or other admissible evidence." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) (citing *Anderson*, 477 U.S. at 248-49; *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001)). "Mere denials or conclusory statements are insufficient." *Ferring*, 437 F.3d at 1193 (quoting *Biotech Biologische*, 249 F.3d at 1353). The court considers all factual questions in the light most favorable to the non-moving party, but if no rational trier of fact could find for the non-moving party, the motion for summary judgment may be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 169 (2005).

"Contract interpretation is a matter of law, and thus issues of contract interpretation can be readily susceptible of resolution via summary judgment." *Record Steel & Constr., Inc. v. United States*, 62 Fed. Cl. 508, 518 (2004) (internal quotation marks and citations omitted); *see also Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil Exploration & Prod. Se., Inc. v. United States*, 530 U.S. 604, 607 (2000)). Accordingly, to resolve the current dispute, the court must identify and apply "principles of general contract law." *Franconia Assocs.*, 536 U.S. at 141 (quoting *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411 (1947)).

## ANALYSIS

### A. Termination for Convenience

#### 1. Right to terminate.

Contracts 9001 and 9027 incorporate by reference portions of the Federal Acquisition Regulations ("FAR"), particularly 48 C.F.R. § 52.212-4, which includes a clause providing for termination for the government's convenience. *See* Def.'s App. 141 (Contract 9001); 148 (Contract 9027); FAR § 52.212-4(*l*). This clause provides the United States the right to terminate the contract work, or any part of that work, "for its sole convenience" without causing a breach. FAR § 52.212-4(*l*); *see also Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988).[6] Effectively, this right allows the government to delete major portions of the

---

[6]The pertinent text of the clause provides:

> (*l*) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work

contracted work. *See Universal Fiberglass Corp. v. United States*, 537 F.2d 400, 403 (Ct. Cl. 1976) (citing *J.W. Bateson Co. v. United States*, 308 F.2d 510 (5th Cir. 1962)).[7] Ideally, a contracting officer terminating a contract for the convenience of the government would specify the circumstance that gave rise to the termination in the notification sent to the contractor. *See* FAR § 49.102(a)(1). However, where a contracting officer has not explicitly invoked the termination for convenience clause, the court has held that

> if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach, and limit liability.

*Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 638 (1997) (citing *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963); *G.C. Casebolt Co. v. United States*, 421 F.2d 710, 712 (Ct. Cl. 1970)). Thus, the contracting officer's action purporting to delete the work pursuant to the changes clause of FAR § 52.243-1, *see* Def.'s App. 255 (Letter

---

> hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

FAR § 52.212-4(*l*).

[7]"The 'termination for convenience' concept . . . arose from the unpredictable nature of governmental wartime procurement." *Maxima Corp.*, 847 F.2d at 1552.

from Jackson to Di Luigi (Oct. 14, 2005)),[8] does not render the termination for convenience clause inapplicable.

Before this court, the government resists the characterization of its actions as a termination for convenience but nonetheless invokes the clause to maintain that "the Army's decision not to require Praecomm to install the radios amounted, at most, to a constructive termination for convenience, and not a 'constructive change.'" Def.'s Mot. at 27. Praecomm does not address the government's termination-for-convenience argument directly. Instead, Praecomm contends that its contract suffered a "cardinal change" and a "constructive change." *See* Pl.'s Br. at 29, 30. These arguments are not persuasive, however. "A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *International Data Prods. Corp. v. United States*, ___ F.3d ___, 2007 WL 1827842, at *6 (Fed. Cir. June 27, 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)). "A cardinal change is a breach that occurs when the Government effects a change in the work so drastic that it effectively requires the contractor to perform duties materially different from those in the original bargain." *International Data*, ___ F.3d at ___, 2007 WL 1827842, at *6 (citing *Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir. 1996)). "Generally . . . a [cardinal] change represents a large increase in the contract burdens" either through more work or increased costs. *General Dynamics Corp. v. United States*, 585 F.2d 457, 462 (Ct. Cl. 1978)). Praecomm's contentions of "cardinal change" and "constructive change" fail because no additional work was performed, its costs were not increased, and its contractual burdens were not enlarged.

"While the [g]overnment's right to terminate a contract for convenience is not unlimited, . . . the [g]overnment is entitled to considerable latitude in making such a decision to terminate." *Custom Printing Co. v. United States*, 51 Fed. Cl. 729, 733-34 (2002) (citing *T & M Distrib., Inc. v. United States*, 185 F.3d 1279 (Fed. Cir. 1999); *Krygoski*, 94 F.3d 1537). The government may be barred from invoking a termination for convenience clause where the government "envince[s] [*sic*] bad faith or a[n] . . . abuse of discretion in its actions," *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976), or "where the [g]overnment enters a contract with no intention of fulfilling its promises," *Krygoski*, 94 F.3d at 1545 (explaining *Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982)). *See generally* John Cibinic, Jr., *et al.*, *Administration of Gov't Contracts* 1057-68 (4th ed. 2006). Accordingly, absent a finding that the Army acted in bad faith or abused its contracting discretion, the deletion of work from Contracts 9001 and 9027 resulted

---

[8]The contracting officer indicated that the modifications to the contracts were made pursuant to FAR § 52.243-1(c), but that provision addresses a contractor's obligation to assert its right to an equitable adjustment for any modification made pursuant to FAR § 52.243-1 within 30 days of the government's written order making the modification. The modifications themselves, however, might have been premised upon FAR § 52.243-1(a)(3), which permits the contracting officer to change the "place of delivery."

in a termination for convenience, not a contract breach. *See Krygoski*, 94 F.3d at 1541 (citing *Allied Materials & Equip. Co. v. United States*, 215 Ct. Cl. 902, 905-06 (1977)).

**2. Remedy for termination for convenience.**

In contrast with damages stemming from a breach of contract, the sum due a contractor after a termination for convenience is significantly circumscribed. FAR § 52.212-4 provides, in relevant part:

> [T]he Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government.

FAR § 52.212-4(*l*); *see also International Data*, ___ F.3d at ___, 2007 WL 1827842, at *4-6 (discussing costs recoverable after a termination for convenience). Under the termination-for-convenience clause, anticipatory profits and consequential damages are not recoverable. *See International Data*, __ F.3d at __, 2007 WL 1827842, at *4; *Best Foam Fabricators*, 38 Fed. Cl. at 638.

When a fixed-price contract, such as Contract 9001 or 9027, is terminated for convenience, it essentially is converted into a cost reimbursement contract. *See White Buffalo Constr., Inc. v. United States*, 52 Fed. Cl. 1, 4 (2002); *Best Foam Fabricators*, 38 Fed. Cl. at 638. Praecomm does not dispute that the government has paid Praecomm the full contract price for both Contracts 9001 and 9027. Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to Def.'s Proposed Findings") No. 37. Moreover, termination of the contracts did not require Praecomm to do additional work but rather compensated it for work that it never had to perform. *See* Def.'s Mot. at 17-18.[9] Because Praecomm has been fully compensated, *see id.* at

---

[9]At one point, Praecomm averred that the equipment not installed "ha[s] been stored in various warehouses for which Praecomm has continued to incur storage and maintenance costs." Pl.'s Br. at 30 (citing Pl.'s Resp. to Def.'s Proposed Findings No. 43). This averment lacked any evidentiary support. The cited response merely stated that "[t]he Praecomm radios that Praecomm shipped to Baghdad in 2005, including the MPT3200 and ACU-1000 equipment, are being stored at a warehouse in Baghdad. The equipment is currently being held by the United States in a warehouse in Baghdad." Pl.'s Resp. to Def.'s Proposed Findings No. 43 (citing Folgate Decl. ¶ 5). Neither the response nor Lt. Cdr. Folgate's declaration stated or even hinted that Praecomm had borne any additional storage or maintenance costs for equipment stored by the government. *See* Folgate Decl. ¶ 5 ("The PraeComm radios that were shipped to Baghdad in 2005 are part of an inventory of equipment that is under my control."). At the hearing, Praecomm conceded that the continued storage of the equipment is not being done at Praecomm's expense. Hr'g Tr. 9:12-16 (Jul. 13, 2007).

17-18, there are no additional amounts owed Praecomm as a result of the termination for convenience of Contracts 9001 and 9027.

**B. The Covenant of Good Faith and Fair Dealing**

There is "an implied provision of every contract, whether it be one between individuals or between an individual and the [g]overnment, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *George A. Fuller Co. v. United States*, 69 F. Supp. 409, 411 (Ct. Cl. 1947); *see also Restatement (Second) of Contracts* § 205, at 99 (1981). In Praecomm's complaint, Praecomm alleges that the government "breached its duty of good faith and fair dealing . . . by deciding not to install PraeComm's . . . equipment." Compl. ¶¶ 99, 108. Had the government's failure to install Praecomm-supplied radio equipment in the contractually designated cities caused Praecomm to incur additional costs and if Praecomm's claim were limited to the recovery of those costs, this would be a different case. *Cf. George A. Fuller Co.*, 69 F.Supp. at 415 ("Plaintiff is entitled to recover the cost of temporary heat and its overhead expenses during the six months' delay."). However, Praecomm's grievance only nominally concerns the government's decision not to install the equipment. Rather, the actual premise of Praecomm's suit involves an implied prospect of so-called "follow-on" contracts. Pl.'s Br. at 29 ("Praecomm reasonably understood that it would fill the [g]overnment's requirements in the identified cities and thereby receive all work in those cities because of the sole source, proprietary nature of the FRN equipment that it was supplying."). Because "[t]he implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties," *Alaska v. United States*, 35 Fed. Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997) (Table), the pertinent question is whether the contracts contained any obligations as to future contracts.

The starting point for interpreting a contract invariably is the "plain language" of the agreement. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The court will "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Department of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The task of interpreting a contract must be performed "in a manner that gives meaning to all of its provisions and makes sense." *McAbee*, 97 F.3d at 1435. Only if the terms are "susceptible to more than one reasonable interpretation" are they ambiguous. *Id*. at 1434-35; *see also Massie v. United States*, 166 F.3d 1184, 1189 (Fed. Cir. 1999). Not unless ambiguity in the written contract terms exists, "may [a court] then resort to extrinsic evidence to resolve the ambiguity." *Teg-Paradigm*, 465 F.3d at 1338. Where appropriate, extrinsic evidence is used "to derive a construction that effectuates the parties' intent at the time they executed the contract." *Id.* (citing *Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed. Cir. 2000)). Ultimately, a court may not "rewrite a contract or insert words to which a party has never agreed." *American Capital Corp. v. Federal Deposit Ins. Corp.*, 472 F.3d 859, 865 (Fed. Cir. 2006).

Notably, Contract 9027 states in the background section of its Statement of Work that "the system will need to become a long term solution given that AFRN will not be put into many cities." Def.'s App. 154 (Contract 9027). Although Contracts 9001 and 9027 list the supplies and services Praecomm was obliged to deliver, specifying the price for each, Def.'s App. 146 (Conract 9001), 150 (Contract 9027), Praecomm contends that the use of the term "long term solution" in the background section of Contract 9027 renders the arrangement "[u]nlike a standard equipment order, in which specific terms are ordered in specified quantities at specific prices." Pl.'s Resp. to Def.'s Proposed Findings No. 5. In contrast, the government emphasizes the specific listings, maintaining that "[w]hile PraeComm may have wished for lucrative sole source future arrangements with the Iraqi authorities in major cities, these terms were not in the contracts." Def.'s Mot. at 19.

"To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999)). An aspiration that the contract would yield a "long term solution" cannot reasonably be construed as a guarantee to Praecomm that it would be retained subsequently to provide related services and equipment on a sole-source basis. Praecomm urges the court to "read [this term] in a light most favorable to [it]," Hr'g Tr. 36:21-23 (July 13, 2007), but, in so doing, it ignores that only *factual* disputes should be viewed in the light most favorable to a party resisting summary judgment, *see Matsushita Elec.*, 475 U.S. at 586-88, and interpretation of unambiguous contractual terms is a question of law. *See Teg-Paradigm*, 465 F.3d at 1336.

Nowhere does Praecomm point to any other provision of either Contract 9001 or 9027 entitling Praecomm to perform additional work for additional compensation. Praecomm's averments that the government made representations to Praecomm "that it would be the long term supplier of FRN systems to a certain number of major Iraq[i] cities" rests on expectations that never were realized in contractual language. *See* Pl.'s Br. at 32 (citing Pl.'s Resp. to Def.'s Proposed Findings No. 5 (citing, in turn, Appendix to Pl.'s Br. (Declaration of Dominic Di Luigi (May 2, 2007); Graham Decl.); *see also* Pl.'s Resp. at 27 ("the [g]overnment was misrepresenting the status of the [rival] AFRN system. In particular, at the same time [d]efendant was building up the AFRN program, [d]efendant told Praecomm that the AFRN system was being delayed and descaled."); *id.* at 32 ("The [g]overnment acted in bad faith by accepting Praecomm's deeply discounted prices, free equipment, and upgrades knowing that the price was offered because it was told that it would be the long term provider for . . . the FRN system in the contractually identified cities."); Hr'g Tr. 32:1 to 34:8 (July 13, 2007) (asserting that the "government was on notice" of Praecomm's "deeply discounted prices"). Notably, Praecomm's contractually agreed prices were not made contingent upon receipt of further orders. Absent ambiguity in the contract terms, Praecomm's proffered evidence does not bear on the proper interpretation of the contracts. *Teg-Paradigm*, 465 F.3d at 1338-39 ("Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used 'to add to or otherwise modify the terms of a written agreement in instances where the written agreement has

been adopted by the parties as an expression of their final understanding.'") (quoting *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004)).

In the same vein, each of Praecomm's references to factual questions are not material to a genuine dispute arising under these contracts. *See* Pl.'s Br. at 25 ("[T]he intent of the parties in entering contracts that identify specific cities must be examined to determine how the naming of those cities impacts the parties' responsibilities under the contracts."); Hr'g Tr. 35:15-21 (July 13, 2007) ("[W]hether . . . handsets [from rival suppliers] were used" in particular cities is "a critical fact" that is "genuine" and "extremely material to the case as to what the government knew."). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248. Praecomm's arguments contravene the fundamental tenet that a determination of a party's contractual obligations under an "unambiguous contract provision is a question of law." *American Med. Sys., Inc. v. Medical Eng'g Corp.,* 6 F.3d 1523, 1533 (Fed. Cir. 1993) (citing *Lakeshore Commercial Fin. Corp. v. Drobac*, 107 Wis. 2d 445, 457 (1982)).

In sum, there were no contractual promises of follow-on orders or contracts for first-responder communications devices in specified Iraqi cities. The government has not breached the implied covenant of good faith and fair dealing.[10]

## CONCLUSION

For the reasons stated, the government's motion for summary judgment is granted. The Clerk shall enter judgment accordingly. No costs.[11]

s/ Charles F. Lettow
Judge

---

[10]Given this disposition, the parties' arguments regarding remedial issues need not be addressed.

[11]On July 13, 2007, Praecomm filed an unopposed motion to supplement its appendix with excerpts from a deposition of Colonel Graham, who, as previously noted, was directly involved with the planning for the first-responders network. *See supra*, at 2-3. That motion is GRANTED.